**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF  DIVISION**

**KENNETH ROSHELL ISOM**                                    **PETITIONER**

**v.**                                  **No. 5:11-cv-47-JM**

**DEXTER PAYNE, Director,
Arkansas Division of Correction[1]**                        **RESPONDENT**

**ORDER**

    **1.**   Kenneth Roshell Isom seeks *habeas* relief from his capital murder conviction and death

sentence.[2]   In December 2001, a Drew County jury found Isom guilty of felony capital murder for

killing William Burton and of attempted capital murder and rape (two counts) of Dorothy Lawson.

The jury also found Isom guilty of residential burglary and aggravated robbery.

        In weighing the death penalty for the capital murder conviction, the jury unanimously

agreed on the existence of five aggravating circumstances:  (1) Isom previously committed another

felony, an element of which was the use or threat of violence to another person or creating a

substantial risk of death or serious physical injury to another person; (2) in the commission of

committing the capital murder, Isom knowingly created a great risk of death to a person other than

the victim; (3) the capital murder was committed for the purpose of avoiding or preventing an

arrest; (4) the capital murder was committed for pecuniary gain; and (5) the capital murder was

committed in an especially cruel or depraved manner.  Jurors unanimously found one mitigator

probably existed:  Isom, while confined in the Drew County Detention Facility and awaiting trial,

alerted and notified proper jail officials on at least one occasion of suicide attempts by other

---

[1] Dexter Payne is the current Director of the Arkansas Division of Correction.  The Court directs the Clerk to update the docket to state "Division" instead of "Department."  Fed. R. Civ. P. 25(d).

[2] To the extent Isom seeks relief from his other convictions and sentences, his arguments fail for the same reasons that he is not entitled to relief from his capital murder conviction and death sentence.

detainees.  One or more members of the jury found three mitigators probably existed:  (1) Isom can be a productive member of society; (2) he has a "borderline intelligence" mental level of functioning; and (3) he participated in school activities and sports while attending school in Monticello, Arkansas.  Trial Record, Vol. 2, 193.  The jury unanimously rejected two mitigating circumstances:  Isom had a history of a good work ethic, and he had a "good family relationship." *Id.* at 194.  Deciding the aggravators outweighed the mitigating circumstances, the jury imposed the death penalty.  Isom also was consecutively sentenced to life imprisonment for aggravated robbery and the two rape counts, sixty years for attempted capital murder, and forty years for residential burglary.

The Arkansas Supreme Court affirmed the convictions and sentences.  *Isom v. State* (*Isom I*), 356 Ark. 156, 148 S.W.3d 257 (2004), *cert. denied, Isom v. Arkansas,* 543 U.S. 865 (2004) (Mem).  The Supreme Court also affirmed the denial of post-conviction relief under Rule 37.5 of the Arkansas Rules of Criminal Procedure, *Isom v. State* (*Isom II),* 2010 Ark. 495, 370 S.W.3d 491, and the denial of Isom's motion for additional DNA testing of rape kit evidence, *Isom v. State* (*Isom III*), 2010 Ark. 496, 372 S.W.3d 809, *cert. denied, Isom v. Arkansas,* 564 U.S. 1023 (2011) (Mem).

On March 1, 2011, Isom timely filed his federal *habeas* petition.[3]  *Doc. 1.*  After Isom suffered a stroke, the Court temporarily stayed the case in April 2012.  *Doc. 33.*  On Isom's motion reporting his competence to assist *habeas* counsel, *Doc. 45,* the stay was lifted in December 2012, *Doc. 48.*  Isom thereafter filed a supplemental *habeas* petition, arguing his execution would be unconstitutional due to his diminished intellectual capacity following the stroke. *Doc. 49.*  In April 2013, the Court ordered the case stayed and held in abeyance for Isom to pursue unexhausted

---

[3] The case was assigned to the Honorable J. Leon Holmes of the Eastern District of Arkansas.  Following Judge Holmes's retirement, the case was reassigned to the undersigned on January 8, 2019.  *Doc. 132.*

claims, including the competency-to-be-executed claim raised in the supplemental petition. *Doc. 60.*

In May 2015, the Arkansas Supreme Court denied Isom's motion to recall the post-conviction mandate. *Isom v. State* (*Isom IV*), 2015 Ark. 219, 462 S.W.3d 638. On the same date, the Supreme Court granted Isom's petition to reinvest jurisdiction in the circuit court to consider a petition for writ of error *coram nobis*. *Isom v. State* (*Isom V*), 2015 Ark. 225, 462 S.W.3d 662. After an evidentiary hearing, the circuit court dismissed Isom's *coram-nobis* petition; and the Supreme Court affirmed, *Isom v. State* (*Isom VI*), 2018 Ark. 368, 563 S.W.3d 533, *cert. denied, Isom v. Arkansas,* 140 S. Ct. 342 (2019) (Mem). Having exhausted his state court remedies, Isom filed an amended *habeas* petition, and the Court lifted the stay. *Docs. 154 & 155.* The Court is proceeding on Isom's amended petition, *Doc. 154,* and amended reply, *Doc. 183.*

**2. Background.** On April 2, 2001, Lawson, age seventy-two, was watching television with Burton, age seventy-nine, at his trailer home in Monticello. (Burton was Lawson's brother-in-law; she had been assisting him during his hip-replacement recovery and rehabilitation.) When Lawson answered Isom's knock at the door at 7:45 p.m., Isom forced his way into the trailer and approached the seated Burton in the living room. He demanded money from Burton and threatened him with a pair of broken scissors. After Burton handed over his wallet with $240, Isom became angry and demanded more money. He forced Burton to get out of his chair and lay down in the hallway near the bedroom. Isom repeatedly raped Lawson and then forced her half-naked into the bedroom closet.

When Lawson heard Burton cry out, she ran out of the closet and saw Isom standing on Burton's face and "twisting his spine around . . . his waist." Trial Record, Vol. 14, 1395. After Isom forced Lawson back into the closet, he returned to Burton. Lawson again ran out of the closet

when she heard Burton cry out. She saw Isom laying on top of Burton and unsuccessfully tried to take Isom's scissors. Isom then demanded Burton's diamond wedding rings. When Burton said that he did not know if he could get them off his finger, Lawson handed over her ring instead.

Isom then took Lawson into the bedroom and knocked her unconscious. When she awoke, Isom was choking her, and she passed out again. The next morning, a neighbor found Lawson laying injured on the bedroom floor. Burton's body was in the hallway. Responding officers found Burton's wallet—without any cash—next to him. The drawers of a jewelry box were open and appeared to have been rummaged through. A disfigured lamp with blood stains was found near Lawson. Her injuries included "fairly massive trauma to the face from possibly both blunt and sharp, some form of weapon" with "massive swelling around both sides of her face" and "fractures in [her] facial bones." Trial Record, Vol. 12, 1213. Her right hand and leg were partially paralyzed due to a laceration that severed half of her cervical spine. Burton's cause of death was multiple sharp and blunt force injuries.

At trial, Lawson identified Isom as the person who committed the crimes. DNA testing on rape kit evidence connected Isom to the rape and placed him at the scene. Jurors learned that Isom's DNA profile was consistent with the rape kit evidence. They heard expert testimony that the likelihood of a person in the Black population having a DNA profile consistent with the hair from Lawson's rape kit was one in fifty-seven million. Trial Record, Vol. 13, 1273. The defense theory was that Isom was not the assailant. He did not testify at trial.

The Arkansas Supreme Court determined "there was more than sufficient evidence, direct and circumstantial, that Mr. Isom caused the death of Mr. Burton in the course of committing several felonies under circumstances manifesting extreme indifference to the value of human life."

*Isom I,* 356 Ark. at 170–71, 148 S.W.3d at 267.   The Supreme Court described the evidence supporting the convictions:

> Mrs. Lawson identified [Isom] as her attacker in the attempted murder and rapes and as the person who was physically abusing Mr. Burton.  She further testified that Mr. Isom demanded and received money and her ring, using the threat of the broken scissors.  Her testimony also is sufficient to support a burglary conviction in that she stated that he pushed his way into Mr. Burton's trailer home and proceeded to commit rape and aggravated robbery.  And, finally, her in-court identification of Mr. Isom, as well as the body hair found in her vagina connecting him to the rape, placed him at the scene where Mr. Burton was murdered.  While Mrs. Lawson did not specifically see Mr. Isom stab Mr. Burton with scissors or beat Mr. Burton with a lamp, she saw Mr. Isom with the scissors standing on Mr. Burton's head and then physically laying on top of him.  She also heard his threats.  She was then beaten, knocked unconscious, and choked by Mr. Isom.  Mr. Burton's body was discovered the next morning, and his death was caused by multiple sharp and blunt force injuries.

*Id.*

**3.  Standard Of Review.**  Isom, a state prisoner, may seek a writ of *habeas corpus* in federal court, if he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Before seeking *habeas* review, Isom must have exhausted available state remedies by fairly presenting each of his claims in state court.  *Coleman v. Thompson*, 501 U.S. 722, 731 (1991);  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

On claims adjudicated on the merits, this Court may grant *habeas* relief only if Isom satisfies statutory requirements and United States Supreme Court "precedents governing the appropriate exercise of equitable discretion—including *Brecht* [v. *Abrahamson*]."   *Brown v. Davenport*, 596 U.S. 118, 134 (2022).  Isom must demonstrate that the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Under *Brecht,* Isom must show

that any trial error "had substantial and injurious effect or influence" on the verdict or sentence. 507 U.S. 619, 637–38 (1993) (quotations omitted).

*Habeas* review is not available for questions of federal law if the state court decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman,* 501 U.S. at 729. A claim is technically exhausted and procedurally defaulted when the state court declined to review it because the petitioner failed to comply with a state procedural rule. *Id.* at 729–31. Procedural default also occurs when a petitioner did not present a claim in state court and a remedy there is no longer available. *O'Sullivan*, 526 U.S. at 848. If a claim is procedurally defaulted, this Court can consider it only if Isom establishes either cause for the default and actual prejudice, or that the default will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

**4. *Loper Bright*.** After *habeas* briefing was completed, Isom sought and received permission to raise a new issue: In light of *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024), does 28 U.S.C. § 2254(d)—requiring federal *habeas* courts to defer to state court decisions on exhausted claims—offend Article III's Vesting Clause? *Docs. 198 & 205.* The Honorable D.P. Marshall, Jr., recently rejected this argument in *Johnson v. Payne,* 4:21-cv-22, *Doc. 70* (E.D. Ark. March 24, 2025). For the reasons offered by Judge Marshall, this Court also is not convinced that the United States Supreme Court, in *Loper Bright,* intended to hold § 2254(d) deference is unconstitutional.

In any event, the *Loper Bright* decision makes no difference in Isom's case. Even if this Court is mistaken about *Loper Bright*'s application, Isom is not entitled to *habeas* relief. He raises eight claims exhausted in state court and therefore subject to deference review under § 2254(d).

This Court has, in the alternative, considered the eight claims *de novo*. For the reasons explained later in the Order, none has merit.

Isom's trial lawyer was not constitutionally ineffective for not presenting an alibi defense (Claim 5.1). 466 U.S. 668 (1984). The prosecution did not suppress material evidence or fail to correct false testimony (Claim 6.1, in part). The prosecutor's closing penalty-phase remarks about an unrelated murder were not so inflammatory as to violate due process (Claim 6.2, in part). Other remarks did not impermissibly shift the jury's sense of responsibility for imposing the death penalty (Claim 6.2, in part); the trial lawyer's decision not to object was professionally reasonable (Claim 9.5, in part). Isom was not unconstitutionally denied an opportunity to rehabilitate prospective jurors; the trial court's dismissal of the prospective jurors based on their death penalty views did not deprive Isom of a fair trial (Claim 8.7). The prosecution's use of peremptory strikes on two black prospective jurors was not racially motivated (Claim 8.8.3). The trial court's submission of the avoid-arrest aggravator did not violate due process requirements (Claim 10.6, in part).

**5. Excuses For Procedural Default.** The Appendix lists Isom's fourteen claims, which include thirty-eight sub-claims, two of which have a combined thirteen sub-parts. The claims, sub-claims, and sub-parts present a web of connected and overlapping points. In this section, the Court considers the procedural posture of the claims and Isom's procedural defenses.

For the reasons explained in connection with review of Claim 2 (death-penalty challenge based on intellectual disability), Isom has not raised a previously unavailable federal claim not subject to procedural default, and the exhaustion requirement is not excused under 28 U.S.C. § 2254(b)(1)(B). The Court agrees with the parties that Claim 3 (competency to be executed based on post-trial disability) is not ripe for *habeas* review; the claim therefore is dismissed without

prejudice as premature. *Panetti v. Quarterman,* 551 U.S. 930, 947 (2007); *Stewart v. Martinez-Villareal,* 523 U.S. 637, 644–45 (1998). Claim 4 (judicial bias at trial) is procedurally defaulted because Isom did not fairly present the claim at trial and remedies there are no longer available. *O'Sullivan,* 526 U.S. at 848. The claim was not exhausted when Isom sought the trial judge's recusal for the first time in the *coram nobis* proceeding. For the reasons stated in connection with claim review, Claim 9.1 (ineffectiveness for failing to investigate and present mitigating evidence) also is procedurally defaulted.

For the reasons explained in connection with review of Claim 5.2 (ineffectiveness for failure to challenge witness testimony), the claim is raised for the first time on *habeas* review and is procedurally defaulted. *O'Sullivan,* 526 U.S. at 848. Part of Claim 6.1 (prosecution's interference with a witness) was procedurally defaulted when Isom failed to raise the claim at trial. *Id.* Claim 11 (impermissible race considerations) also is raised for the first time on *habeas* review. Isom says the exhaustion requirement is excused under 28 U.S.C. § 2254(b)(1)(B) because a fair hearing was not available in state court due to the trial court's perpetuation of racial discrimination. But this is not a case like *Rose v. Mitchell,* relied on by Isom, which addressed the availability of federal *habeas* review for constitutional defects in the state judiciary's grand jury system. 443 U.S. 545, 561 (1979). Because Isom has failed to develop any convincing argument that state processes were inadequate, the exhaustion requirement is not excused and Claim 11 is procedurally defaulted. *O'Sullivan,* 526 U.S. at 848.

Though Isom raised Claim 10.4 (erroneous first-degree murder instruction) on direct appeal, the Arkansas Supreme Court declined to reach the claim based on a state procedural rule—the absence of a contemporaneous objection. *Isom I,* 356 Ark. at 183–84, 148 S.W.3d at 275–76. Isom says the claim is not procedurally defaulted because the contemporaneous objection rule is

not an independent and adequate basis for dismissing the claim. He argues the Arkansas Supreme Court decides points absent a contemporaneous objection when the issue, like this one, is subject to mandatory review as a *Wicks* exception. *See Wicks v. State,* 270 Ark. 781, 785–87, 606 S.W.2d 366, 369–70 (1980). A state's contemporaneous objection rule is adequate to bar federal review. *Wainwright v. Sykes,* 433 U.S. 72, 86, 90 (1977). The state rule must be "firmly established and regularly followed," though a rule may qualify "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler,* 558 U.S. 53, 60–61 (2009). Under Arkansas law, the contemporaneous objection rule applies to jury instruction challenges. *Robinson v. State,* 348 Ark. 280, 294–95, 72 S.W.3d 827, 836 (2002). The Arkansas Supreme Court, moreover, has recognized that "*Wicks* presents only narrow exceptions that are to be rarely applied." *White v. State,* 2012 Ark. 221, *8, 408 S.W.3d 720, 725. Claim 10.4 therefore is procedurally defaulted. *O'Sullivan,* 526 U.S. at 848.

Payne similarly contends at least part of Claim 10.5 (impermissible victim-impact testimony) is exhausted. Though Isom objected to victim-impact testimony about Burton's generosity and the trial court overruled the objection, he did not challenge the trial court's decision on direct appeal. Payne says the claim is exhausted because the Arkansas Supreme Court reviewed the trial court's overruling of the objection under mandatory review required by Rule 4-3(h)[4] of the Arkansas Supreme Court Rules. It is true that, at the conclusion of *Isom I,* the Supreme Court conducted mandatory review and found no reversible errors under Rule 4-3(h), Arkansas Code Annotated § 16-91-113(a), and Rule 10 of the Arkansas Rules of Appellate Procedure—Criminal. *Isom I,* 356 Ark. at 186, 148 S.W.3d at 277–78. But the claim was procedurally defaulted when

---

[4] Since the Arkansas Supreme Court decided Isom's direct appeal, Rule 4-3(h) of the Arkansas Supreme Court Rules has been recodified, currently as Rule 4-3(a), without substantive changes.

Isom did not fairly present the issue to the Arkansas Supreme Court. *Williams v. Norris,* 576 F.3d 850, 865 (8th Cir. 2009).

Isom says cause to excuse procedural default exists based on his trial lawyers' ineffectiveness. He was represented by lead lawyer G.B. "Bing" Colvin, III, at trial. Gary Potts assisted with pretrial preparations and was present during *voir dire.* Timothy Bunch appeared at trial; he participated in *voir dire* and conducted cross-examination of several guilt-phase witnesses. Don Williams was the investigator. For several weeks during the pretrial stage, Robert Morehead stepped in as retained counsel with Colvin continuing to assist.

To establish cause, Isom must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective assistance of counsel is an example of cause. *Id*. Isom's exhausted ineffectiveness claims, however, do not rise to the level of constitutional violations. *Coleman,* 501 U.S. at 753–54. Because procedural default of the remaining ineffectiveness claims is not excused, Isom cannot rely on them to demonstrate cause either. *Edwards v. Carpenter,* 529 U.S. 446, 451–53 (2000).

Isom was initially represented by Craig Lambert in the Rule 37 proceeding. Lambert was replaced by Jeff Rosenzweig. With many claims, Isom says procedural default is excused because his post-conviction lawyers performed ineffectively. The United States Supreme Court has not recognized a constitutional right to counsel in state collateral proceedings; any ineffectiveness of post-conviction counsel therefore cannot excuse a procedural default. *Coleman,* 501 U.S. at 755– 57. The Supreme Court, however, has recognized an equitable exception: When state procedures require petitioners to raise ineffectiveness-of-trial-counsel claims in collateral proceedings, attorney error in the initial collateral-review case is cause to excuse procedural default of

substantial ineffectiveness claims. *Martinez v. Ryan,* 566 U.S. 1, 14 (2012). The Supreme Court expanded the equitable exception to apply when state procedural rules do not provide a "meaningful opportunity" to raise ineffectiveness-of-trial-counsel claims on direct appeal. *Trevino v. Thaler*, 569 U.S. 413, 428–29 (2013). The *Martinez-Trevino* equitable exception applies in *habeas* review of Arkansas state court decisions. *Sasser v. Hobbs,* 735 F.3d 833, 851–53 (8th Cir. 2013). Isom's procedural defaults, though, are not excused under a *Martinez-Trevino* analysis. As explained herein, his procedurally defaulted ineffectiveness-of-trial-counsel claims are not substantial. *Martinez,* 566 U.S. at 14. Isom says cause exists to excuse his judicial bias claim (Claim 4) based on a *Martinez-Trevino* analysis. But the equitable exception does not extend beyond claims of ineffective assistance of trial counsel. *Davila v. Davis,* 582 U.S. 521, 529–38 (2017).

With procedurally defaulted ineffectiveness-of-trial-counsel claims, Isom argues cause also exists to excuse procedural default based on attorney abandonment. He says the failure to develop post-conviction claims cannot be imputed to him because, before Lambert was replaced by Rosenzweig, Lambert was in a "state of distress" due to substance abuse and failed "to do much of anything in way of investigation or communication." *Doc. 183 at 17.* As further explained in connection with review of Isom's request for record expansion in the next section, Rosenzweig replaced Lambert more than two years before the Rule 37 hearing and was responsible for investigating the Rule 37 claims and preparing for the evidentiary hearing. Isom, moreover, does not point to any specific allegations of abandonment. He fails to demonstrate that, before being replaced by Rosenzweig, Lambert stopped acting as his representative. *Maple v. Thomas,* 565 U.S. 266, 281–82 (2012).

Isom says cause exists because the trial judge's bias was an impediment to his pursuit of *coram nobis* remedies. He says his efforts to obtain *coram nobis* relief were frustrated when the trial court limited discovery and threatened his lawyer with sanctions. Isom, however, has failed to demonstrate cause. For the reasons outlined in connection with review of Claim 4 (judicial bias at trial), Isom has not shown that his pursuit of *coram nobis* remedies was impeded by judicial bias.

Isom next says a conflict of interest is cause to excuse procedural fault of several claims. But he has not demonstrated that "an actual conflict of interest adversely affected his lawyer's performance." *Nave v. Delo,* 62 F.3d 1024, 1034 (8th Cir. 1995) (quotations omitted). For the reasons explained in connection with review of the related claim alleging his trial lawyers' conflict of interest (Claim 7), Isom has not demonstrated a conflict existed at trial. Colvin continued to represent Isom on direct appeal. Isom says that his interests and Colvin's interests—"preserving his reputation, his privacy, and his client roster"—were no longer aligned during the direct appeal. *Doc. 183 at 20–21.* But he has not connected Colvin's purportedly diverging self-interests to any particular claim. Isom also says a conflict of interest existed during the Rule 37 proceeding because the post-conviction mitigation investigator, Tyler Green, worked in the same office as Bunch and had the same employer—the Arkansas Public Defender Commission—as Colvin and Potts. To the extent an investigator's conflicted interests can support a finding of cause, Isom has not developed any argument that claim development was impeded by Green's connections.

For the same reasons that exhaustion is not excused, Isom has not demonstrated cause to excuse procedural default of Claim 2 (death-penalty challenge based on intellectual disability) based on the lack of an available state process. Nor has Isom demonstrated a constitutional intellectual-disability argument was so novel that the "tools . . . to construct" it were not available

when he was in state court. *Frizzell v. Hopkins*, 87 F.3d 1019, 1021 (8th Cir. 1996). Isom argues cause exists to excuse procedural default of part of Claim 6.1 (prosecution's interference with a witness) because the claim is not cognizable on *coram nobis* review. But he gives no reason for his failure to raise the claim at trial or in his post-conviction proceeding. For the reasons explained in connection with the claim, another part of Claim 6.1 (suppression of murder-weapon search) is procedurally defaulted, and Isom has not shown cause based on state interference to excuse the default. His related record-expansion argument fails for the same reason. Isom also says there is cause to excuse procedural default of Claim 13 (ineffective assistance on collateral review) based on the unavailability of a state court remedy. But as explained in connection with claim review, the claim does not state a constitutional violation.

To demonstrate prejudice to lift the procedural bar, Isom points to the prejudice requirements for ineffectiveness of counsel, evidence suppression, and structural error claims. This Court's review, however, has not uncovered any errors that "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray,* 477 U.S. at 494 (quotations omitted and emphasis original). To the extent Isom alleges prejudice as an element of the underlying claim, the Court will address the specific argument under the appropriate legal standard when reviewing each claim.

Claims 5.1, 6.1 (in part), 6.2 (in part), 8.7, 8.8.3, 9.5 (in part), and 10.6 (in part) are exhausted; the claims are considered under deference review. 28 U.S.C. § 2254(d). The remaining claims are procedurally defaulted. Because Isom has not demonstrated any excuse for procedural default, his procedurally defaulted claims are denied. Because Isom has been sentenced to death, "it would not be inappropriate to discuss the merits of [his]claim[s]." *Rankin v. Payne,* ___ 4th ___,

2025 WL 1718224 (8th Cir. June 20, 2025). *See also* 28 U.S.C. § 2254(b)(2). This Court therefore will provide alternative merits analysis where appropriate.

**6. Record Expansion.** After *habeas* briefing was completed, Isom moved for record expansion and an evidentiary hearing. *Doc. 189.* He offers eighteen exhibits. *Docs. 189-1 through 189-18.* He seeks to expand the record with declarations from teachers and family members about Isom's purported adaptive deficits to support Claim 2 (death-penalty challenge based on intellectual disability claim). *Docs. 189-1 through 189-11.* He says record expansion with a medical report is warranted for Claim 3 (competency to be executed based on post-trial disability). *Doc. 189-12.* He offers juror declarations to support part of Claim 8 (denial of a fair and representative jury). *Docs. 189-13 through 189-18.* Isom requests an evidentiary hearing on intellectual disability and procedural defenses.

Isom argues for the first time in the record-expansion motion that the exhaustion requirement is excused under 28 U.S.C. § 2254(b)(1)(B) because the state process is inadequate due to limited and confusing remedies and the appointment of unqualified post-conviction counsel. His unexhausted claims, he continues, are not procedurally defaulted. He concludes that the *habeas* evidentiary restriction, 28 U.S.C. § 2254(e)(2), does not bar record expansion on these undeveloped claims. Even if Isom had properly raised his 28 U.S.C. § 2254(b)(1)(B) argument in *habeas* briefing, the point would fail.

The exhaustion requirement is excused when "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B). The exhaustion exception applies "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano,* 454 U.S. 1, 3 (1981) (*per*

*curiam*).  The Eighth Circuit Court of Appeals has recognized that "an inordinate and unjustifiable delay renders the state's process ineffective to protect the petitioner's rights."[5]  *Welch v. Lund,* 616 F.3d 756, 760 (8th Cir. 2010) (citation omitted).

Isom first argues the exhaustion requirement is excused because Arkansas's post-conviction remedies—Rule 37, *coram nobis,* and *habeas corpus*—are confusing and limiting.  He contends the remedies should be expanded but does not explain how any limitations affected his ability to raise his constitutional claims in state court.  He has not shown the remedies were unavailable or ineffective for his claims.  28 U.S.C. § 2254(b)(1)(B).

Isom also contends exhaustion is excused because recalling the mandate is a "narrow and unpredictable" state court remedy.  *Doc. 190 at 21.*  In *Isom IV*, the Arkansas Supreme Court denied Isom's motion to recall the post-conviction mandate, which was based, in pertinent part, on the argument that Lambert was impaired by substance abuse.  2015 Ark. 219, *7–9, 462 S.W.3d at 643–45.  Isom says *Isom IV* is inconsistent with *Lee v. State,* 367 Ark. 84, 238 S.W.3d 52 (2006).  Lambert represented Ledell Lee throughout his Rule 37 proceeding.  The Supreme Court granted Lee's motion to recall the post-conviction mandate based on Lambert's admitted intoxication and impairment that was also apparent in the Rule 37 record.  The Court held that, in light of the criminal procedural requirements for appointment of post-conviction counsel, Lambert's intoxication and impairment constituted a breakdown in the appellate process.  *Lee,* 367 Ark. at 89, 91, 238 S.W.3d at 55, 56.

Isom's inconsistency argument is foreclosed by *Wooten v. Norris,* 578 F.3d 767, 783–86 (8th Cir. 2009).  *See also Dansby v. Hobbs,* 766 F.3d 809, 829 (8th Cir. 2014).  Because a motion

---

[5] For the exhaustion exception to apply, the petitioner must show "some additional factor (for example, that state delay is a result of discrimination against the petitioner, or that the State has been unnecessarily and intentionally dilatory)."  *Jones v. Solem,* 739 F.2d 329, 331 (8th Cir. 1994) (quotations omitted).

to recall the mandate is an "extraordinary remedy" and "an act of grace by the state that is not constitutionally mandated," federal courts may not "oversee the Arkansas court's application of its state-created, additional means for review." *Wooten,* 578 F.3d at 784–85. Whether a petitioner satisfies the criteria for recalling the mandate is "an issue for the Arkansas Supreme Court to decide." *Id.* at 785. For the same reason, a motion to recall the mandate is "not a proper vehicle for exhausting state remedies in Arkansas or creating a state record that might support federal habeas claims." *Id.* at 786. Because a motion to recall the mandate is not an avenue for exhaustion, any inadequacy in the remedy cannot provide a basis for excusing the exhaustion requirement.

In any event, the Arkansas Supreme Court distinguished *Isom IV* from *Lee.* Quoting *Lee,* the *Isom* Court listed examples of Lambert's "troubling behavior" during his representation of Lee and referred to his erratic behavior at Lee's Rule 37 hearing. *Isom IV,* 2015 Ark. 219, *7–8, 462 S.W.3d at 644. The Court then noted Lambert's more limited representation of Isom and the absence of Lambert's erratic or incompetent behavior in Isom's post-conviction record. *Id.* at *8–9, 462 S.W.3d at 644–45.

To the extent Isom contends recalling the mandate is no longer an extraordinary remedy and therefore an avenue for exhaustion subject to adequacy review, his argument fails. An extraordinary remedy may become ordinary "through frequency of use or application." *Wooten,* 578 F.3d at 786. Isom seems to argue that recalling the mandate is no longer extraordinary because the Arkansas Supreme Court has expanded the availability of relief. When the Eighth Circuit decided *Wooten*, the Arkansas Supreme Court recalled a mandate only in "'extraordinary circumstances,'" with relief being "exceedingly rare." *Wooten,* 578 F.3d at 783 (quoting and citing *Robbins v. State,* 353 Ark. 556, 564, 114 S.W.3d 217, 222–23 (2003)). The Supreme Court recognized that recalling a mandate required establishment of three criteria: "(1) the presence of

16

a defect in the appellate process; (2) a dismissal of proceedings in federal court because of unexhausted state court claims; and (3) the appeal was a death case that required heightened scrutiny."[6] *Lee,* 367 Ark. at 88, 238 S.W.3d at 54–55.

Since *Wooten* and *Dansby,* the Arkansas Supreme Court has offered a clarification:  While consideration of the three factors is "an appropriate means of determining whether extraordinary circumstances exist to warrant recall of our mandate," the Court's "inherent power" to recall a mandate "is not limited by strict satisfaction of all three factors in all cases." *Nooner v. State,* 2014 Ark. 296, *9–10, 438 S.W.3d 233, 240.  The Supreme Court, however, has continued to recognize that recalling a mandate should be ordered "sparingly as a last resort" and "held in reserve against grave, unforeseen contingencies." *Id.* at *9, 438 S.W.3d at 240 (quotations omitted).  The Supreme Court's "overarching concern" has been that a case should be reopened only "to address an 'error in the appellate process,' meaning an error that *this court* [Arkansas Supreme Court] made or overlooked while reviewing a case in which the death sentence was imposed.'" *Id.* at *8, 438 S.W.3d at 239 (emphasis original) (quoting *Engram v. State,* 360 Ark. 140, 147, 148, 200 S.W.3d 367, 369, 370 (2004)).  *See, e.g., Wertz v. State,* 2016 Ark. 249, *7–9, 493 S.W.3d at 776–77 (holding a breakdown in the appellate process occurred when the Arkansas Supreme Court failed to consider the erroneous penalty-phase verdict forms in its review of matters essential to the determination of the death penalty).

Recalling the mandate absent satisfaction of the second factor—prior dismissal of federal *habeas* proceedings—does not transform the remedy into an ordinary form of relief.  *See Wertz,*

---

[6] As noted in *Wooten,* the Arkansas Supreme Court first set out the criteria for recalling a mandate in *Robbins v. State.* 578 F.3d at 783 (citing *Robbins,* 353 Ark. at 564, 114 S.W.3d at 222–23).  The first *Robbins* criteria—a  state court decision "on all fours legally" with the presented issue–was rephrased in *Lee* as "the presence of a defect in the appellate process."  *Compare Robbins,* 353 Ark. at 564, 114 S.W.3d at 222–23 *with Lee,* 367 Ark. at 88, 238 S.W.3d at 54–55.

2016 Ark. 249, *5 n.5, 493 S.W.3d at 775 n.5.  Taking a motion to recall the mandate as a case—to consider whether a pending United States Supreme Court decision would affect the opinion underlying the mandate—does not make the remedy routine either.  *See Davis v. State,* 2018 Ark. 69, 539 S.W.3d 565; *Ward v. State,* 2018 Ark. 59, 539 S.W.3d 546.

Isom has not demonstrated that recalling a mandate has "become[] ordinary through frequency of use or application."  *Wooten,* 578 F.3d at 786.  Because recalling a mandate continues to exist as extraordinary relief, the remedy is outside this Court's review and not an avenue for exhaustion.  Isom argues recalling the mandate was the only state corrective process available for his ineffectiveness claims, but the claims were procedurally defaulted when Isom failed to raise them in the Rule 37 proceeding.  As explained herein, Isom has not demonstrated any excuse for procedural default of these claims.

Isom also says Arkansas trial courts have "routinely" failed to appoint qualified Rule 37 counsel.  *Doc. 190 at 26.*  But he has not shown that his post-conviction lawyers were unqualified or that their appointments rendered the Rule 37 proceeding ineffective to protect his rights. Lambert filed the Rule 37 petition on January 31, 2005, and he was replaced by Rosenzweig on October 6, 2005.  Following up on Lambert's pending motion for funding, Rosenzweig sought authorization for funds to retain an investigator, mitigation specialist, and psychologist and to conduct DNA testing.  The circuit court initially authorized $7500 and, at Rosenzweig's request, allowed an additional $16,000.  Over two years after Rosenzweig's appointment, an evidentiary hearing began in November 2007.  Isom has failed to develop any convincing argument that, during Rosenzweig's investigation and hearing preparation, he could not "undo the damage caused by Lambert's representation."  *Doc. 190 at 26.*

This Court rejects Isom's argument that the exhaustion requirement is excused for Claims 2 (death-penalty challenge based on intellectual disability) and part of Claim 8 (denial of a fair and representative jury). With Claim 2, Isom repeats his argument that there was no state court remedy for his *Atkins* claim. As explained in connection with review of the claim, Isom has not raised a previously unavailable federal claim and the exhaustion requirement is not excused under 28 U.S.C. § 2254(b)(1)(B). State court remedies were also available for Isom's jury claims. The remedy for jurors' exposure to prejudicial extraneous material is a new trial. *Sunrise Enterprises, Inc. v. Mid-South Road Builders, Inc.,* 337 Ark. 6, 987 S.W.2d 674 (1999); Ark. Code Ann. § 16-89-130(c)(7). New trial motions must be filed within thirty days after entry of the judgment. Ark. R. Crim. P. 33.3(b). Both these claims are procedurally defaulted because Isom did not fairly present them in state court and the remedies there are no longer available. *O'Sullivan,* 526 U.S. at 848.

Isom contends the exhaustion requirement for many claims is excused because a biased judge denied him a fair trial and rendered his Rule 37 and *coram nobis* proceeding inadequate. He says exhaustion is excused for Claim 4 (judicial bias at trial) because there was no available state corrective process. The related arguments fail. Isom has not shown the state court procedures were inadequate. He offers no explanation for why he did not seek the trial judge's recusal at trial. *See, e.g., Irvin v. State,* 345 Ark. 541, 549–55, 49 S.W.3d 635, 640–44 (2001) (reviewing trial record for prejudice or bias and affirming denial of recusal motion). For the reasons explained in connection with review of Claim 4 (judicial bias at trial), Isom has not demonstrated that the trial judge, who also presided over the Rule 37 and *coram nobis* proceedings, was biased.

Because Isom's undeveloped claims are procedurally defaulted, record expansion is available only if he satisfies the *habeas* evidentiary restriction. When a petitioner "has failed to

develop the factual basis of a claim" in state court, a federal court may not hold an evidentiary hearing on that claim absent satisfaction of one of two narrow exceptions. 28 U.S.C. § 2254(e)(2). The evidentiary restriction applies to procedurally defaulted ineffectiveness-of-trial-counsel claims. *Shinn v. Ramirez,* 596 U.S. 366, 371 (2022). Because there is no constitutional right to post-conviction counsel, and attorney errors during post-conviction proceedings are therefore attributable to the petitioner, Isom is responsible for post-conviction counsel's failure to develop the state court record. *Id.* at 382–84. A petitioner "fails" to develop a claim under § 2254(e)(2) when "there is a lack of diligence, or some greater fault, attributable" to the petitioner or his lawyer. *Williams v. Taylor,* 529 U.S. 420, 432 (2000). This diligence standard required Isom to make a "reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . . ." *Id.* at 435. The petitioner, however, "is not at fault when his diligent efforts to perform an act are thwarted . . . by the conduct of another or happenstance." *Id.* at 432.

Isom argues that, if his unexhausted claims are procedurally defaulted, he is not at fault for the undeveloped record. He repeats his argument that the state process was inadequate, but his inadequate state-process argument fails to overcome 28 U.S.C. § 2254(e)(2) for the same reasons that exhaustion is not excused. Isom also contends that he acted diligently to develop the record when he returned to state court and filed his motion to recall the Rule 37 mandate and proposed Rule 37 petition raising mostly ineffectiveness-of-trial-counsel claims. His arguments, *Doc. 190 at 24 n.4; Doc. 197 at 6–7,* are meritless. As recognized herein, recalling the mandate is extraordinary relief and therefore "not a proper vehicle for exhausting state remedies in Arkansas or creating a state record that might support federal habeas claims." *Wooten,* 578 F.3d at 784, 786. Isom's motion to recall the post-conviction mandate fails to demonstrate that he acted diligently in developing the state court record.

For all these reasons, Isom's request for record expansion with proffered papers to support Claims 2 and 8 (in part) is denied. His request to expand the record related to Claim 3 (competency to be executed based on post-trial disability) with a medical report is also denied. As explained herein, the claim is not ripe for review. Isom's request for an evidentiary hearing on Claim 2 and on procedural defenses—the inadequacy of state court remedies, cause and prejudice, and actual innocence—is denied. An evidentiary hearing is either barred by 28 U.S.C. § 2254(e)(2), or the Court can evaluate these issues without a hearing. The motion for record expansion and an evidentiary hearing is denied. *Doc. 189.* To the extent Isom argues in *habeas* briefing that record expansion related to procedurally defaulted claims is warranted, these requests are also denied for the same reasons.

**7. Claims For Relief.** Isom argues his trial lawyers should have done more investigation, presented an alibi defense, retained a better expert, and made different decisions during *voir dire* and at trial. He also says his lawyers had a conflict of interest. He says that the trial court committed constitutional errors and that there was an impermissible consideration of race throughout the proceedings. Isom also contends that he did not receive a fair trial due to a biased judge and jury and the prosecution's misconduct. He says the death penalty was not an available punishment because he is intellectually disabled. Isom also challenges his lawyers' work on direct appeal and in the Rule 37 proceeding. He says review of cumulative error is required. The record, however, contains overwhelming evidence that Isom committed capital murder and of the aggravators supporting the death sentence.

- **Exhausted Claims.** The exhausted claims—Claims 5.1, 6.1 (in part), 6.2 (in part), 8.7, 8.8.3, 9.5 (in part), and 10.6—are considered under 28 U.S.C. § 2254(d). Review is limited to the state court record. *Cullen v. Pinholster,* 563 U.S. 170, 181–82 (2011). The remainder of these

claims is procedurally defaulted and considered under alternative merits review or, where appropriate, *Martinez-Trevino*.   The related ineffectiveness claims—Claims 5.2, 5.4, 5.6, 5.14, 8.10.8, and 8.10.10—are procedurally defaulted and considered in this section under *Martinez-Trevino*.   Other related claims—Claims 8..8.1, 8.8.2, 10.3, and 11—are procedurally defaulted and also considered here on the merits.

o   **Ineffectiveness Related To Alibi Defense.**   Isom argues his lead trial lawyer's work was constitutionally deficient because he did not investigate an alibi defense or present related witnesses at trial.   He says that, if his lawyer had introduced evidence about his whereabouts during the crimes, there is a reasonable probability that the jury would have found him not guilty.   This is Claim 5.1.

To demonstrate constitutional ineffectiveness under the familiar *Strickland v. Washington* standard, Isom must show his trial lawyer's deficient performance and the resulting prejudice.   466 U.S. 668 (1984).   Review of the trial lawyers' work is "highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight."   *Id.* at 689.   Isom must overcome the "strong presumption" that his lawyer acted "within the wide range of reasonable professional assistance."   *Id.*   "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."   *Id.* at 690–91.   To satisfy the prejudice element, Isom must demonstrate a reasonable probability that, absent attorney error, the outcome of the proceeding would have been different.   *Id.* at 694.

Lawson testified at trial that Isom knocked on Burton's door at 7:45 p.m.   Lead lawyer Colvin did not call any alibi witnesses.   At the Rule 37 hearing, Isom's siblings— Ricky Isom,

Angela Yvonne Lambert, and Tiffany Nolen—testified that they were at their mother's house with Isom on the night of the crimes. Isom's siblings said that Isom was talking on the phone with Treva Lamb, the mother of Isom's son, between 7 p.m. and 9 p.m. Two siblings testified that, after seeing police activity at a social club near their mother's home, Isom left the house between 9:00 and 10:00 p.m. to see what had happened. Lamb testified that she called Isom on the landline at his mother's house and talked to him from 7 p.m. to 9 p.m. She said that, during the two-hour phone call, she briefly passed the phone to a friend, Yvonne Bealer.

Lamb testified that she did not tell the trial lawyer or the police that she was on the phone with Isom during the two-hour period when Burton was killed and Lawson was raped. She said that she told Isom's siblings—Ricky and Lambert—that she and Isom were talking on the telephone when the crimes were committed but did not think the timing of the phone call was "significant enough" to tell the police. Rule 37 Record, Vol. 4, 768.

Isom's mother, Linda Isom, testified that she was not home that evening but twice talked to Isom on the house cell phone between 8 p.m. and 9 p.m. Ms. Isom testified that she told Colvin and the defense team investigator that three of her children were at her house with Isom on the night of the crimes. She said that she also told the trial lawyer that Isom was on the telephone with Lamb and Bealer. Bealer did not testify at the Rule 37 hearing.

Much of the related witness testimony at the Rule 37 hearing centered around the murder of Pam Knight at the social club near the Isom home on the same night that Burton was killed. Lamb testified that she had learned of the Knight murder earlier that day and that she and Isom talked about the incident during their two-house phone conversation. The Knight murder, however, was not reported until the end of Lamb's purported phone call with Isom. The Monticello

Police Department did not receive a call about the incident—reported as a "fight"—until 8:49 p.m. Rule 37 Record, Vol. 6, 875.

Two of Isom's siblings, Ricky and Lambert, testified that they answered the phone when Lamb called the Isom house. Ricky testified that he told Colvin and a police investigator that he was with Isom at their mother's house when the crimes were committed. He said that his two sisters also reported Isom's whereabouts to Colvin. Lambert, however, testified that she did not tell the trial lawyer that she was with Isom when the crimes were committed because the lawyer did not ask her any questions after her mother provided her name. Nolen said that, because Colvin did not ask any follow-up question, she told him only that she saw Isom when she got off work that day. None of the witnesses could explain why they had not done more to alert the defense team to Isom's whereabouts on the night of the crimes.

Colvin remembered interviewing Ricky but did not recall what ground was covered. He was "sure" that he or the trial investigator would have looked into whether anyone saw Isom "out and about" at the time of the murder but could not remember the specific steps that he took. Rule 37 Record, Vol. 4, 632. Colvin did not recall being told by Isom that he was on the telephone with Lamb or that family members were reportedly with Isom when the crimes were committed. He said that his age and two strokes suffered since Isom's trial had affected his memory. Colvin testified at the Rule 37 hearing seven years after Isom's trial; he was sixty-seven years old and planned to retire in two months.

The Arkansas Supreme Court determined "[t]he decision not to present [Ricky Isom, Lamb, and Lambert[7]] may have been based on their lack of credibility and the effect that would

---

[7] The Arkansas Supreme Court incorrectly refers to Isom's sister as "Yvonne Bealer (Lambert)." *Isom II,* 2010 Ark. 495, *4, 370 S.W.3d at 494. The Supreme Court appears to have confused Yvonne Bealer, who purportedly spoke to Isom on the telephone on the night of the crimes, with Isom's sister, Angela Yvonne Lambert, who testified at the Rule 37 hearing that she and Isom were at their mother's house when the crimes were committed.

have had on the jury." *Isom II,* 2010 Ark. 495, *4–5, 370 S.W.3d at 494.  The Court held Isom "fail[ed] to bear his burden of rebutting the strong presumption that trial counsel's representation fell within the wide range of reasonable professional assistance" and "fail[ed] to show that the decision not to present these witnesses could not have been the result of reasonable professional judgment." *Id.* at *5; 370 S.W.3d at 494–95.  The Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

Isom argues the Arkansas Supreme Court did not consider whether Colvin's decision not to interview or call alibi witnesses was based on a sufficient investigation.  Colvin testified that he did not remember whether he had investigated the possibility of an alibi defense.  Using the trial lawyer's inability to remember his alibi investigation as a basis for finding constitutionally deficient performance would violate the presumption of reasonable performance and ignore the distorting effects of hindsight.  *Fretwell v. Norris,* 133 F.3d 621, 623–24 (8th Cir. 1998).  The Arkansas Supreme Court did not unreasonably determine that witness credibility is appropriately considered by a trial lawyer when evaluating potential trial witnesses.  Isom's siblings gave conflicting testimony; Lamb testified that she talked to Isom about an incident that had not been reported to police.  Isom's family members, moreover, were not disinterested witnesses.  The Supreme Court did not unreasonably apply the *Strickland* standard or make an unreasonable determination that the trial lawyer's decision not to call the witnesses was professionally reasonable.

Because the Arkansas Supreme Court did not review *Strickland* prejudice, this Court considers the element *de novo.  Rompilla v. Beard,* 545 U.S. 374, 390 (2005).  Isom has not shown a reasonable probability that, if the jury had heard these alibi witnesses, the outcome of the

proceeding would have been different. *Strickland,* 466 U.S. at 694. The credibility of the alibi testimony was weakened by the witnesses' conflicting testimony and their familial relationship with Isom. Lawson's identification of Isom and the DNA evidence connecting him to the crimes, moreover, is too much for the alibi testimony to overcome. To the extent Isom refers to other alibi testimony not raised in the Rule 37 appeal, this part of the claim is procedurally defaulted. But even if this testimony is considered, the outcome is the same. Claim 5.1 is denied.

o **Evidence Suppression and Witness Interference.** Isom argues the prosecution suppressed material evidence and failed to correct false testimony in violation of his due process right under *Brady v. Maryland,* 373 U.S. 83 (1963).[8] He says police investigators failed to disclose that Lawson did not identify him as the assailant in an April 4 photo lineup or that she wavered between identifying him and another individual in the April 5 photo lineup. He says they did not disclose the report of the April 5 identification. Isom also contends a police investigator omitted material evidence from his handwritten notes of his two interviews of witness Linda Kay Johnson. He argues the prosecution suppressed information related to a search for scissors possibly used as the murder weapon. He contends the prosecution interfered with a potential mitigation witness. This is Claim 6.1. The claim is partly exhausted; the sub-claims alleging suppression related to the scissors and interference with a witness are procedurally defaulted. In related Claim 10.3, Isom argues the trial court deprived him of a fair trial by quashing the subpoena of a prosecutor, who was present during the scissors search. The fair-trial claim is procedurally defaulted. Isom makes related procedurally defaulted ineffectiveness claims in Claims 5.2, 5.4, and 5.6.

On April 5—three days after the attack, Lawson identified Isom as the assailant in a six-

---

[8] To the extent Isom raises a violation of due process under *Napue v. Illinois,* 360 U.S. 264 (1959) based on the prosecution's failure to correct false testimony, the claim fails. Isom has not shown the prosecution knowingly solicited false testimony or failed to correct it. *Id.* at 269. He has not demonstrated that any false testimony "may have had an effect on the outcome of the trial." *Id.* at 272.

person photo lineup.  Isom sought to suppress Lawson's identification, arguing that the lineup was unduly suggestive and that Lawson had been sedated earlier in the day.

Special Agent Scott Woodward with the Arkansas State Police testified at the suppression hearing.  He said that, on April 5, he took the six photographs for the lineup, including the photograph of Isom in the number three position, with a digital camera and had the six-by-six or six-by-five inch photographs attached to a poster board.  He said that he took the photographs at the jail but that not all the photographed individuals were detained.  When Colvin asked Agent Woodward whether he considered using "stock photographs," or "mug shots," from the Monticello Police Department, Woodward responded, "I believe there was a lineup of that put together at one point.  I can't recall.  I think there was." Trial Record, Vol. 3, 310–11.

Agent Woodward described the appearance of the five individuals, other than Isom, in the photo lineup.  He denied that only two individuals "could be remotely mistaken for Ken Isom." Trial Record, Vol. 3, 315.  On cross-examination by the prosecution, Agent Woodward testified that his selection criteria for choosing individuals for photo lineups, including this one, was to "try to get them as similar in nature [to the defendant] as we can." Trial Record, Vol. 3, 322.  He said that investigators tried "to base it as close as we could" to Lawson's description of the assailant. Trial Record, Vol. 3, 323.  He said that he did not try to "highlight" Isom with his selection of photographed individuals or the positioning of Isom's photograph.  *Id.*

Agent Woodward testified that he and Lieutenant John Dement with the Monticello Police Department first took the poster photo lineup to Lawson in the intensive care unit at Drew Memorial Hospital on April 5 between 8:30 and 9:00 a.m.  He said that nurses reported giving Lawson medication to "help calm her down," and that her eyes were swollen shut. Trial Record, Vol. 3, 317.  He said that, when he and Lieutenant Dement asked Lawson if she would be able to

see the photographs, she stated that she needed her eyeglasses, which had been broken in the attack. He said they decided not to show the lineup to Lawson because "it was obvious that she probably could not see it," *id.*, and they did not want to "prejudice the viewing," Trial Record, Vol. 3, 325. He said Lieutenant Dement asked Lawson's daughter about getting new eyeglasses for her.

Agent Woodward testified that, when he and Lieutenant Dement, along with Agent Rick McKelvey, returned to the hospital at 12:54 p.m. on the same day, Lawson was wearing the new glasses and seemed alert. He said the nurses told them that she had not been given any more medication. Agent Woodward testified that Lawson studied the photo lineup for "close to six minutes" and identified Isom as the assailant. Trial Record, Vol. 3, 320. He said Lawson did not identify anyone in the lineup other than Isom and did not show any hesitation in identifying him as the assailant. He said that, after Lawson identified Isom, she asked to look at the photographs again. Agent Woodward stated that Agent McKelvey recorded the witness identification in his notes but that there was not an audio or video recording.

Reading from unidentified papers, Agent Woodward quoted Lawson's identification statement: "I seen that person next door. He is the person I talked to before it happened. I think he is the one that came in the house. It looks like him. He is the one that did that, that did that to us." Trial Record, Vol. 3, 320. The prosecution also quoted Lawson's statement—"That's the one I saw outside that day. That's the one that did this to us." Trial Record, Vol. 3, 323. Both quotes are from Agent McKelvey's notes referenced by Agent Woodward at the suppression hearing and introduced at trial. Trial Record, Vol. 19, 1752 (Defendant's Exhibit One).

Colvin asked Agent Woodward about a "rumor" that Lawson had been shown a photo lineup "earlier in the day or sometime earlier" and was unable to identify the assailant. Trial Record, Vol. 3, 321. Agent Woodward said that he "was not involved in that" and that "[t]he only

28

time I was involved was with this photograph lineup that we have." *Id*. On cross-examination, Agent Woodward repeated his testimony that he and Lieutenant Dement decided not to show Lawson the photo lineup on the morning of April 5 because she had taken medication and stated that she needed her eyeglasses to view the photographs.

Lawson's optometrist, Dr. Ricky Ferguson, also testified at the suppression hearing. He said that, while Lawson was in the hospital, her daughter asked him to make her another set of eyeglasses and that the order was entered on April 5. He said that he fitted Lawson for the glasses in the hospital and had to adjust them due to her facial swelling. He said that, after the new glasses were fitted, Lawson opened her eyes, looked toward the end of the room at the wall clock, and read off the time. He said that she "started looking around the room at different things to see what she could see." Trial Record, Vol, 4, 336.

Colvin argued in closing that the photo lineup was impermissibly suggestive and that Lawson's identification of Isom as the assailant was unreliable. Rejecting the defense arguments, the trial court denied Isom's suppression motion.

Lawson also identified Isom at trial, testifying that she would "never forget his face as long as I'm living." Trial Record, Vol. 14, 1405. She testified that she first saw Isom a few days before the April 2 attack. She said that she was walking to Burton's mailbox and saw Isom talking to Burton's next-door neighbor, Alfred Collins, in Collins's front yard. Lawson noticed Isom as a "new face" in the neighborhood. Trial Record, Vol. 14, 1378–79. She said the second time that she saw Isom was on April 2 about 6:30 or 6:45 p.m. She had been walking around the neighborhood to look for Burton's escaped pet cockatiel and was on her way back into Burton's trailer. Isom was sitting on Collins's front porch and called out to her. He asked if Burton had found his bird. He said that he lived by Savings Gas, and that, if the bird flew near his home, he

would try to catch it.   Lawson testified that she did not know Isom, but that she recognized him from seeing him in Collins's front yard a few days earlier.  Lawson testified that, at about 7:45 p.m., Isom knocked on Burton's door and forced his way into the home.  She recognized him as the man, who had asked her about the bird earlier that evening.

Agent Woodward testified at trial about crime scene evidence.  He was not asked about Lawson's identification of Isom in the photo lineup.  He testified that he arrived at the crime scene before Lawson was transported to the hospital.  He asked Lawson about the identity of the assailant and recorded her response in his notes:  "I don't know his name, but he's a black man.  The man next door knows him because I've seen him over there several times."  Trial Record, Vol. 11, 1060.  Agent Woodward also noted Lawson's response to his follow-up question about whether she knew the man's name:  "No, but the neighbor next door does.  I was talking to the man that did this outside the neighbor's yard before he came in our house.  The man that did this to us was talking to me in the yard about my bird.  He said that he lived by the Savings Station and he would bring me my bird if he saw it over there.  That is the same man that came in and did this to us."  Trial Record, Vol. 11, 1061.  Lieutenant Dement told the jury that Isom's mother lived two doors down from the Savings Station in Monticello.

Lieutenant Dement testified that he interviewed Lawson after she was transported to the hospital.  He said that Lawson reported knowing the assailant.  She told Lieutenant Dement that she did not know the assailant's name but had seen him at the neighbor's house several times and talked to him in the yard before he forced his way into Burton's trailer.

Lieutenant Dement also said that he, along with Agents Woodward and McKelvey, showed the six-person photo lineup to Lawson at the hospital.  He said that he asked Lawson to look at each picture carefully and to identify the assailant if she saw him in the lineup.  He said that they

told Lawson that "[i]f you don't see him in here, you don't see him in here." Trial Record, Vol. 12, 1153. Lieutenant Dement stated that he wanted to show the photo lineup to Lawson only one time because "I don't want it to appear that we're going to keep coming back with more pictures until we get it right. We want to get it right the first time." *Id.* He testified that Lawson looked at each photograph carefully and methodically and that she identified the number three position photograph—Isom—as the assailant. According to Lieutenant Dement, Lawson "expressed no uncertainty" and "was very adamant about her identification." Trial Record, Vol. 12, 1138.

On cross-examination, Lieutenant Dement told the jury that, during the photo identification, Lawson stated, "That's the man that did that to us. That's the man that was next door." Trial Record, Vol. 12, 1153–54. When Colvin challenged Lieutenant Dement's memory about Lawson's statement, Lieutenant Dement stated that Agent McKelvey had recorded Lawson's statements in his notes. On redirect, the prosecution asked Lieutenant Dement to retrieve the notes from Agent McKelvey to refresh his memory. After Lieutenant Dement collected the notes and resumed his testimony, the trial court granted Colvin's request to "approach the witness to see where he is and what he's reading." Trial Record, Vol. 12, 1158.

Lieutenant Dement read Agent McKelvey's notes of Lawson's statement: "I seen that person next door. He is the person that I talked to before it happened. I think he is the one that came in the house. It looks like him. He's the one that did that to us." Trial Record, Vol. 12, 1158. On recross, Lieutenant Dement, at Colvin's request, continued reading the notes: "She studied each of the photos and at 1:02 p.m. she makes the statement, 'It's one or three.' She states that 'Number One's face is a little round-shaped like that. He was wearing a white shirt with something that looked like a lightning bolt on it.'" Trial Record, Vol. 12, 1159.

Lieutenant Dement disagreed that Lawson wavered about the identity of the attacker. He

said Lawson told investigators only that the individuals in position numbers one and three had round-shaped faces. Lieutenant Dement maintained that, based on Agent McKelvey's entire report and what he heard Lawson say, Lawson was "adamant" about her identification of Isom as the assailant. Trial Record, Vol. 12, 1159–60.

After Lieutenant Dement's examination, Colvin moved to admit Agent McKelvey's report:

DEFENSE COUNSEL: I'd like to introduce that statement as a Defense Exhibit Number One?

THE COURT: Okay. Do we have a copy of it?

DEFENSE COUNSEL: No, sir. I'm—

THE COURT: Okay.

DEFENSE COUNSEL: —sure I've got one—

THE COURT: Well, just get us one. Any objections?

PROSECUTOR: No objection, Your Honor.

THE COURT: Okay. It'll be admitted as Defendant One once it's procured and properly tendered.

Trial Record, Vol. 12, 1163.

Agent McKelvey's report states as follows:

<u>INVESTIGATOR'S NOTES #4</u>

On April 05, 2001, Investigator JOHN DEMENT, Monticello Police Department, S/A SCOTT WOODWARD, ASP-CID, and I traveled to Drew Memorial Hospital to visit with Victim DOROTHY LAWSON. The purpose of the visit was to show Ms. LAWSON a photo line-up that was put together by S/A WOODWARD and the Prosecuting Attorney's Office. These photos were placed on a large poster board and presented to Ms. LAWSON at 12:54 p.m. At 1 p.m., Ms. LAWSON pointed to Photo #3. She makes the following statement: "I seen that person next door. He is the person I talked to before it happened. I think he is the one that came in the house. It looks like him. He's the one that did that to us." Ms. LAWSON requested to take a second look. She studied each of the photos and at 1:02 p.m., she makes the statement, "it's 1 or 3." She states that #1's face is a little round shaped like that. He was wearing a white shirt with something that looked

like a lightning bolt on it.  She indicated the lightning bolt would have been located
in the chest area.  ER nurses, KRISTY WAXLEY and ASHLEY MCKINSTRY,
were present.

Trial Record, Vol. 19, 1752 (Defendant's Exhibit One).

On recall, Lieutenant Dement testified that the person in the number one position was
Corey Johnson, who was detained at the Drew County jail at the time of the attack on Lawson and
Burton.  He said other investigators assembled the original smaller photo lineup that was shown
to another witness, Ken Oulette.  He told jurors that the decision was made to use larger
photographs of different individuals (other than Isom) in the lineup shown to Lawson due to "the
severity of Lawson's injuries and the small size of those pictures and knowing that we basically
would only have just one opportunity to get an identification."  Trial Record, Vol. 14, 1364.  He
said that, because Agent Woodward used a digital camera to take the photos shown to Lawson, he
was able to select the size of the photographs when he printed them.

Lawson told the jury that, while she was in the hospital, the investigators brought her a
"smaller sheet of pictures" and asked her to identify the assailant.  Trial Record, Vol. 14, 1422.
She said that she was sleeping when the officers arrived.  She said that she told them that her
eyeglasses had been broken in the attack and that she should wait until they were fixed to view the
photo lineup.  Lawson said that, after she got a new pair of glasses from the optometrist, she viewed
the photo lineup and identified Isom as the assailant.  During his testimony, Lieutenant Dement
did not refer to officers bringing a photo lineup to the hospital before Lawson received her new
glasses.  He told the jury only that he asked Lawson's daughter to get her a new pair so that she
could look at a lineup.  He said that the optometrist made the new glasses and fitted Lawson at the
hospital.

Isom argues for the first time in his *habeas* petition that the investigators failed to disclose Lawson's purported failed viewing of the photo lineup on April 4. He says that, because of the failed viewing, investigators prepared a larger and more suggestive lineup and showed the enlarged lineup to Lawson on April 5. He contends that investigators also failed to disclose Agent McKelvey's notes of the April 5 photo identification, which, according to Isom, would have revealed Lawson's equivocation in identifying him as the assailant. After this Court granted Isom's motion to stay his *habeas* petition and hold it in abeyance while he returned to state court to exhaust his state remedies, Isom raised the arguments in the *coram nobis* petition. Lieutenant Dement died prior to the *coram nobis* hearing.

Agent Woodward testified at the *coram nobis* hearing that, if he had stated at the pretrial suppression hearing that a photo lineup was brought to the hospital, though not shown to Lawson, on the morning of April 5 instead of on April 4, he was mistaken. He said that, when he and Lieutenant Dement went to the hospital on April 4, they had the photo lineup with smaller photographs but decided not to show it to Lawson because she had taken medication, her eyes were swollen shut, and she said that she would need her eyeglasses. He said that he took the digital photographs for the enlarged photo lineup on April 5; he acknowledged that the photographs had a date stamp of April 5.

Agent McKelvey testified that he, Lieutenant Dement, and Agent Woodward showed the enlarged photo lineup to Lawson on April 5 at 12:54 p.m. He said that he learned about a previous lineup from Agent Woodward in a briefing. He said that Agent Woodward reported in the briefing that the photos were enlarged for the April 5 lineup because Lawson had one eye swollen shut, she did not have her eyeglasses, and she "could not see the photographs" in the previous lineup. *Doc. 167-11 at 85–86.*

Kristy Waxley was a licensed practical nurse (LPN) at Drew Memorial Hospital in April 2001, and she cared for Lawson in the intensive care unit. In her April 4 nurse's notes, Waxley recorded—without noting the time—that Lawson was "still sleepy from Nubain/Phenergan. Arousal to verbal stimuli, but falls back to sleep almost instantly. Side rails up. . .." *Doc. 167-12 at 37*. Waxley's 3 p.m. notation referred to the photo lineup: "Police here asking for Ms. Lawson to ID suspects from photos. Attempts ID. Police officers to enlarge photos and bring them back tomorrow. Ms. Lawson agrees to view enlarged photos tomorrow. . .." *Id.* Waxley testified that, because the event was fourteen years ago, she knew what happened only to the extent the events were recorded in her notes. Reviewing the April 4 nurse's notes, Waxley stated that Lawson had facial bruising and eye swelling, and that a physician had ordered eye drops for dilation. Isom admits the prosecution provided in discovery Lawson's medical records, including Waxley's notes. *Doc. 154 at 97.*

The circuit court determined that, because Lawson was not shown a photo lineup on April 4 or 5 before she viewed the enlarged lineup, there was no suppression of favorable evidence under *Brady*. On appeal, the Arkansas Supreme Court quoted extensively from the circuit court's thorough finding of facts:

> On appeal, Isom contends that the circuit court erred in finding that there was no failed identification on April 4. To provide context for Isom's arguments and to facilitate the understanding of the issues before us, we quote extensively from the circuit court's order:
>
>> It is Petitioner's burden to convince the court that such a photo array was shown to Dorothy Lawson on April 4, 2001, by the police. The Petitioner has failed to convince the court that this in fact occurred. The court will explain why it reaches this conclusion. On this issue, the court finds the facts are these:
>>
>> A photo lineup was in fact shown to Dorothy Lawson on April 5, 2001, at about 12:54 p.m. Ms. Lawson was then a patient in the Intensive Care Unit of Drew Memorial Hospital. Scott Woodward,

a State Police Investigator working on the case, and John Dement, an investigator with the Monticello Police Department were present, as was another State Police Investigator, Rick McKelvey. The photo array for the lineup shown Ms. Lawson was prepared by Scott Woodard from photos he took that day. It was admitted at the trial of Petitioner as State's Exhibit 33 and is admitted in the record at the hearing on the Writ as Joint Exhibit 1. This is not the photo lineup complained of in this point of argument.

Defendant's argument that a photo lineup was shown by the police investigators to Dorothy Lawson on April 4, 2001, is based on a nurse's note. The note is on Petitioner's Exhibit 10, Page 125 from the Writ hearing. The time is 1500 hours or 3 p.m. It says:

Police here asking for Mrs. Lawson to ID suspect from photos. Attempts ID. Police officers to enlarge photos and bring them back tomorrow. Ms. Lawson agrees to view enlarged photos tomorrow.

The note was authored by Nurse Kristi Waxley who testified at the Writ hearing. (R. 124, et seq.) Nurse Waxley's testimony on the issue is contained on R. 136 and following. A reading of her testimony reveals that she had no independent memory of what occurred. She offered no testimony about what she meant by "attempt."

There is other evidence in the record the Court must consider on this particular issue as well. While neither party has chosen to outline the testimony of Dorothy Lawson from the trial on this issue, the Court has looked at it. It is contained in the trial transcript beginning at R. 1370. Beginning at R. 1422, Ms. Lawson was questioned on cross-examination by defense counsel about her identification and, specifically State's Exhibit 33, the photo line-up she viewed on April 5, 2001. At L 9, R. 1422, the following occurred:

> Q: And you looked at the picture?
>
> A: (Nodding affirmatively)
>
> Q: Did you have your glasses on when you looked at the pictures?
>
> A: I'm not sure about the day. They brought me some, a smaller sheet of pictures, and they told me to be sure that, to take time to look at them real good and everything. And I told them it might be better to wait till I got my, some glasses, you know, well, my

glasses were all broke up at Bill's (murder victim's) house. And so Dr. Ferguson, Ricky Ferguson he fixed a pair of glasses for me. And so that's when I looked at the pictures again and I picked out, I picked out the man.

The initial emergency room report of Dorothy Lawson's admission to Drew Memorial Hospital is located at Petitioner's Exhibit 10, Page 7. It shows she was admitted to the emergency room on 4-3-2001 at 9:36 a.m. Other evidence reflects she was transported there by ambulance. The chief complaint being "assaulted." Other portions of the exhibit show she complained of sexual assault the night before. She had numerous injuries described in the exhibit, but they included multiple bruises and lacerations in her facial area, and facial fractures. She was attended by Dr. Paul Wallick and his first history and physical dictated on 4-4-01 (Pet. Exhibit 10, p. 5-6) note "Orbits are particularly swollen and known fractures are present. Her eyes are bloodshot and hemorrhagic conjunctivitis." He further notes an ophthalmic consultation would be obtained. The records further note such a consultation took place with Dr. Claycomb on 4-4-01 at 11:45 a.m. (Pet. Exh. 10, p. 9). The Court cannot read all of the note but can read enough to find that eye injuries were confirmed by the examination.

Prior to trial a motion was filed to suppress a photo line-up that was admitted into trial evidence. (R. 129-130). A hearing was held on the motion. (R. 129-130). At that hearing, Scott Woodward testified, as did Dr. Ricky Ferguson. Mr. Woodward's testimony concerned the photographic lineup actually admitted at trial. He testified that he was unaware of any other lineup being shown Mrs. Lawson, but there was some discussion in several places of a prior photographic array. (R. 311, L. 5-12). The proof showed that Mrs. Lawson had been assaulted on the evening of April 2. On April 5, Woodward and John Dement went to Drew Memorial Hospital to see her about 8:30-9 a.m. Woodward's testimony was that Mrs. Lawson had been given some medications to "calm her." They spoke with Mrs. Lawson, who could not see then because her eyes were swollen shut and she needed her glasses, so they decided to wait to show her the photographic array they later presented her.

During the delay, the proof showed Dr. Ferguson's lab prepared another set of glasses for Mrs. Lawson, to replace the ones broken in her attack. Dr. Ferguson's testimony was that he took the new glasses to the hospital and fitted them on Mrs. Lawson because of the swelling on her facial area. He further testified that she stated after they were fitted she could see the clock on the wall across the

37

hospital room, actually telling them the time from the clock.

Later after that fitting and about 12:54 p.m. Dement and Woodward, along with Rick McKelvey, another investigator, went back to the hospital and showed Mrs. Lawson the array at issue which was admitted at trial and from which the defendant was identified. The Court found the array was not unduly suggestive. (R. 341).

From all this evidence, both direct and circumstantial, the Court is of the firm conclusion that no second array, which is the basis of this argument, was shown to Mrs. Lawson on April 4 or April 5. Since the Court finds that this prepared array was not in fact shown to Mrs. Lawson, it follows that this was not in fact evidence favorable to defendant within the meaning of *Brady*. This argument is thus rejected.

*Isom VI,* 2018 Ark. 368, *6–8, 563 S.W.3d at 539–40.  The Supreme Court found no error in the circuit court's determination that Lawson viewed only the enlarged photo lineup on April 5.  *Id.* at *8–11, 563 S.W.3d at 540–42.

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  To establish a *Brady* violation, Isom must satisfy its three parts:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  The prejudice inquiry is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles v. Whitley*, 514 U.S. 435 (1995).  Isom is not required to demonstrate that "he more likely than not would have been acquitted had the new evidence been admitted."  *Wearry v. Cain,* 577 U.S. 385, 392 (2016) (*per curiam*) (quotations omitted).  The Arkansas Supreme Court did not unreasonably apply *Brady* and its progeny in considering whether the prosecution failed to disclose evidence in

violation of Isom's right to due process. *Isom VI,* 2018 Ark. 368, *4–5, 563 S.W.3d at 538.

Isom contends the Supreme Court made an unreasonable factual determination that Lawson viewed only one photo lineup. He says that, though the prosecution disclosed Lawson's medical records, including the nurse's note of the April 4 photo lineup, the note was insufficient to put the defense on notice of Lawson's failed photo identification on April 4. He argues that, if Agent Woodward had testified accurately at the pretrial suppression hearing that he and Lieutenant Dement first went to the hospital on April 4 with the smaller photo lineup, he would have been on notice that investigators used different photographs in the two lineups. He says that he would have concluded and argued at the suppression hearing and at trial that Agent Woodward decided to take new digital photographs for the poster photo lineup on April 5 because Lawson was unable to identify him from the photographs in the smaller lineup. Isom's arguments are not convincing.

Based on careful review of the state court record, the inconsistency between Agent Woodward's pretrial hearing testimony and his *coram nobis* hearing testimony. Agent Woodward consistently testified that investigators did not show a photo lineup to Lawson on their first visit to the hospital because they believed her vision was compromised and she had taken medication. The nurse's note reports that the investigators were returning to the hospital with enlarged photographs. Isom argues there was no reason to use enlarged photographs with different individuals—except to present a more suggestive lineup after a failed identification—because Lawson had her new glasses on April 5. Lieutenant Dement, however, testified at trial that the officers used the enlarged photographs to compensate for any vision issues. Investigators repeatedly referred to Lawson's swollen eyes as a basis for their concerns. Afte taking the April 5 photographs with a digital camera, Agent Woodward was able to select the photograph size and use enlarged photos in the lineup. Isom, moreover, makes no convincing argument that the

enlarged photographs used in the poster photo lineup were more suggestive than the mug shots from the police department file.

Isom's remaining arguments also fail. He contends Lawson could see well enough to view the April 4 photo lineup. But the evidence is overwhelming that the investigators reasonably determined Lawson's vision impeded her ability to view the smaller photographs. Under these circumstances, the Supreme Court did not unreasonably hold there was no error in rejecting the nurse's note of "[a]ttempts ID" as evidence that Lawson looked at the April 4 photo lineup and was unable identify Isom as the assailant. *Isom VI,* 2018 Ark. 368, *8, 563 S.W.3d at 540–41. When reviewing the circuit court's consideration of Lawson's testimony, the Supreme Court also did not unreasonably conclude the circuit court made a "typographical error that did not otherwise affect the circuit court's reasoning or decision" and that a "fair reading" of her testimony was that she "was asked to look at photographs while in the hospital but declined to do so because she did not have her glasses."[9] *Id.* at *10, 563 S.W.3d at 541.

Based on the state court record, it was not unreasonable for the Arkansas Supreme Court to conclude that, though investigators went to the hospital on April 4 with the intention of showing the photo lineup with smaller photographs to Lawson, they decided not to show the lineup to her.

---

[9] As quoted in *Isom VI,* the transcript of Lawson's trial testimony reads:

> Q: Did you have your glasses on when you looked at the pictures?
>
> A: I'm not sure about that day. They brought me some, a smaller sheet of pictures and they told me to be sure that, to take time to look at them real good and everything. And I told them it might be better to wait till I got my, some glasses, you know. Well, my glasses was all broken up at Bill's house. And so Dr. Ferguson, Ricky Ferguson, he fixed a pair of glasses for me. And so that's when I looked at the pictures again and I picked out, I picked out the man.

*Isom VI,* 2018 Ark. 368, *9–10, 563 S.W.3d at 541. The Supreme Court noted the circuit court's order incorrectly stated Lawson's response was "I'm not sure about *the* day" instead of "*that* day." *Id.* The Court then rejected Isom's argument: Lawson was specifying one of two times that she looked at the photo lineup based on using the words "*that* day" and then saying that she "looked at the pictures again" at the end of her response. *Id.*

Because Lawson's only viewing of a photo lineup was at 12:45 p.m. on April 5, there was not a previous failed identification. The Supreme Court did not unreasonably determine there was no suppression of favorable evidence under *Brady*. Because the Supreme Court's factual determinations can "reasonably be derived from the state court evidentiary record," Isom is not entitled to *habeas* relief. *Ervin v. Bowersox,* 892 F.3d 979, 985 (8th Cir. 2018) (quotations omitted). Under deference review, this part of Claim 6.1 is denied.

Isom's argument related to Agent McKelvey's report of Lawson's photo identification fares no better. He says the report, including McKelvey's note that Lawson identified the assailant as "1 or 3," was first disclosed during trial. Trial Record, Vol. 19, 1752 (Defendant's Exhibit One). He says that, if he had known about the report, he would have introduced it at the pretrial suppression hearing and included it in his trial strategy to challenge Lawson's identification of him.

The Arkansas Supreme Court held the circuit court did not err in finding Isom failed to demonstrate Agent McKelvey's report was newly discovered *Brady* evidence. *Isom VI,* 2018 Ark. 368, *11–14, 563 S.W.3d at 542–43. The Supreme Court noted that, when introducing the report into evidence at trial, Colvin did not say that he had not previously seen the report. *Id.* at *14, 563 S.W.3d at 543. The Supreme Court also recognized that the trial lawyer testified at the *coram nobis* hearing that he could not remember whether he had the report in his file or whether he spoke to Agent McKelvey before trial. *Id.* at *14 n.2, 563 S.W.3d at 543 n.2.

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The Supreme Court did not unreasonably apply *Brady* and its progeny. Nor did the Supreme Court unreasonably determine there was no error in the circuit court's finding

that the prosecution did not suppress Agent McKelvey's report. It can "reasonably be derived from the state court evidentiary record" that the prosecution disclosed Agent McKelvey's report to the defense before trial. *Ervin*, 892 F.3d at 985.

The prosecution had an "open file policy," and Isom acknowledged in June 2001 (before the September 2001 pretrial suppression hearing) that "as far as counsel for the defense knows, he has been able to view all of the paperwork in the case currently in the prosecutor's file." Trial Record, Vol. 2, 45. Before the suppression hearing began, Isom again acknowledged the prosecution's open-file policy. Agent McKelvey testified at the *coram nobis* hearing that he used his field notes on Lawson's identification of Isom to dictate his report. He said that he put his handwritten notes and the typed report in the master file to be given to the prosecutor. He said that his typed report of Lawson's identification—which he had with him at the *coram nobis* hearing and was introduced into evidence—came from the master file.

The trial record supports Agent McKelvey's *coram nobis* testimony. His report was circulating at the time of the pretrial suppression hearing. Agent Woodward testified at the pretrial hearing that Agent McKelvey had recorded Lawson's photo identification in his notes, and both Agent Woodward and the prosecution read from the report. Colvin testified at the *coram nobis* hearing that he could not remember if the prosecution had disclosed McKelvey's report before trial. But he made no indication at trial that he was learning of its contents for the first time. When Lieutenant Dement read from the report, Colvin did not seek a new trial or ask for time to review the report. Instead, when Colvin moved to admit McKelvey's report into evidence and the trial court asked if he had a copy, Colvin responded, "sure, I've got one." Trial Record, Vol. 12, 1163.

The witness testimony relied on by Isom does not demonstrate that the prosecution suppressed the report. Lisa Freeman, the office manager for the prosecutor's office, testified that,

when she reviewed Isom's file in 2011 in preparation for the *coram nobis* hearing, she did not find Agent McKelvey's report. But she also stated that she was not employed by the prosecutor's office in 2001 and did not know what records were provided to Isom's trial lawyer. Shirley Smith, the office manager for the public defender's office in Monticello, testified that she started in her position seven months before Isom's trial. She said that her job responsibilities include filing discovery and that she is part of the trial lawyers' conversations about significant evidence. Smith did not remember seeing McKelvey's report before trial. But she stated that, though she thought she would have remembered the report, she did not "want to give you a yes or no" because the trial happened fourteen years earlier. *Doc. 167-13 at 36.* Under deference review, Isom has not demonstrated that Agent McKelvey's report was not disclosed by the prosecution. He has not shown there was suppression of evidence in violation of due process under *Brady*. Under deference review, this part of Claim 6.1 is denied.

In a related ineffectiveness claim, Isom argues that, if his trial lawyers had conducted a professionally reasonable investigation of Lawson's photo identification and presented the evidence, including the McKelvey report, at the pretrial suppression hearing, the trial court would have suppressed the identification. He says that his trial lawyers could have shown that Lawson failed to identify him in a photo lineup shown on April 4; that the lineup shown on April 5 was suggestive because only Isom appeared in the April 4 and April 5 lineups; and that Lawson's April 5 identification was unreliable because she wavered between Isom and another photographed individual. This is part of Claim 5.2.

Isom's ineffectiveness arguments related to the purported April 4 identification are procedurally defaulted. Under a *Martinez-Trevino* analysis, none are substantial for the same reasons that the *Brady* claim is denied. *Martinez,* 566 U.S. at 14. Lawson identified Isom when

she viewed a photo lineup for the first time on April 5; the trial lawyers did not fail to uncover a failed identification. Procedural default is not excused; this part of Claim 5.2 is denied.

Isom's ineffectiveness sub-claim related to the reliability of the April 5 photo identification based on Lawson's identification statements and the sub-claim's procedural posture require a closer look. At the pretrial suppression hearing, Isom argued the photo lineup was unduly suggestive and unreliable. He contended that three photographed individuals in the six-person photo lineup did not properly resemble him, and that Lawson was still under sedation when she identified him as the assailant. Denying the motion, the trial court found the lineup was not "unduly suggestive" but did not address the photographs used in the lineup. Trial Record, Vol. 4, 343. The court instead relied on the factors for considering the reliability of the identification.

On appeal, the Arkansas Supreme Court "question[ed] Mr. Isom's premise that the lineup was unduly suggestive," but dismissed the point because Isom had not preserved it for appeal by objecting to Lawson's in-court identification of him. *Isom I,* 356 Ark. at 180–81, 148 S.W. at 273–74. In the Rule 37 proceeding, Isom argued his trial lawyers' failure to object to Lawson's in-court identification deprived him of the opportunity to appeal the trial court's finding that the photo lineup was not unduly suggestive. The Arkansas Supreme Court held Isom had not demonstrated any error in the trial court's determination that the lineup was not unduly suggestive; so he had not shown *Strickland* prejudice. *Isom II,* 2010 Ark. 495, *6, 370 S.W.3d at 495–96.

Isom's *habeas* claim is that Colvin failed to argue at the suppression hearing that, based on the McKelvey report, Lawson's photo identification was unreliable because she wavered between Isom and another individual in identifying the assailant. The factual basis of Isom's *habeas* claim "fundamentally alter[s]" his state-court ineffectiveness argument, so the claim is procedurally defaulted. *Vasquez v. Hillery,* 474 U.S. 254, 260 (1986). *Martinez-Trevino* applies.

44

Isom contends his trial lawyer's work was professionally unreasonable when he did not introduce the McKelvey report at the pretrial suppression hearing. He says his lawyer should have used the report to challenge Agent Woodward's testimony that Lawson did not identify anyone in the lineup other than Isom and did not show any hesitation in identifying him as the assailant. Isom also argues his lawyer's work was constitutionally deficient when he failed to call an expert witness to testify about the unreliability of Lawson's eyewitness identification. Isom contends that, if Colvin had taken these steps, there is a reasonable probability that the trial court would have suppressed the identification. He continues that "a trial identification cannot be disentangled from a tainted pre-trial identification." *Doc. 183 at 87.*

When considering whether a pretrial photo lineup identification is tainted and therefore must be suppressed, courts must first determine whether the photo lineup is "impermissibly suggestive," meaning that "the procedure must give rise to a very substantial likelihood of irreparable misidentification." *Sexton v. Beaudreaux,* 585 U.S. 961, 965–66 (2018) (quotations omitted). "When there are no differences in appearance tending to isolate the accused's photograph, the identification procedure is not unduly suggestive." *Schawitsch v. Burt,* 491 F.3d 798, 802 (8th Cir. 2007). If this first criteria is satisfied, courts then proceed to the next step of "analyz[ing], under the totality of the circumstances, whether the impermissibly suggestive lineup created a likelihood of misidentification violating due process." *United States v. Harris,* 636 F.3d 1023, 1026 (8th Cir. 2011) (quotations omitted). If lineup is not impermissibly suggestive, the court errs in considering the reliability factors in the analysis. *Palmer v. Clarke,* 408 F.3d 423, 436 (8th Cir. 2005). *See Neil v. Biggers,* 409 U.S. 188, 200–201 (1972) (The reliability factors include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of

certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."). Before considering evidence of the *Biggers* reliability factors, including the McKelvey report, the trial court therefore was required to first find that the photo lineup was unduly suggestive.

After the attack, Lawson identified the assailant as a black male, between 5'7" and 6' tall, and with a stocky or muscular build. The six photographs used in the lineup are part of the trial record. Trial Record, Vol. 2, 134–36. Isom says the other five photographs do not resemble him or Lawson's description. He says there are differences in age, hair length, facial hair, height, build, and complexion. Based on this Court's review, the appearance of the other individuals in the lineup does not differ from Isom's appearance in any way that tends to isolate him as the assailant. "Reasonable variations in hair length and facial hair are not impermissibly suggestive, especially as they can vary on any given person at different times." *Schawitsch v. Burt,* 491 F.3d 798, 803 (8th Cir. 2007). Each photograph depicts a headshot of black male with no, or a small amount, of facial hair. Though one individual is balding and another has slightly longer hair, the variations are not impermissibly suggestive. Slight differences in build and age are not suggestive either. Isom also contends the identification procedures deviated from accepted practices: Lawson was not informed that the assailant may not be present in the photo lineup, and the investigators presenting the lineup knew who the suspect was. Neither "deviation," however, rendered the procedure unduly suggestive. Because Isom has not demonstrated that the photo lineup was impermissibly suggestive, arguments related to the reliability of Lawson's identification would have gone to the weight of the identification testimony, not its admission.

The ineffectiveness claim is not substantial because Isom has not demonstrated *Strickland* prejudice. *Martinez,* 566 U.S. at 14. Even if Isom's trial lawyers had relied on the McKelvey

report and expert testimony to argue Lawson's identification was unreliable, there is not a reasonable probability that the trial court would have suppressed the photo identification or denied a related trial objection.  Because the photo lineup was not unduly suggestive, the trial court could not have properly proceeded to the next step of analyzing the *Biggers* reliability factors in light of the McKelvey report.  It is true that, when considering Isom's suppression motion, the trial court appears to have incorrectly bypassed a suggestibility analysis and considered only whether the Lawson's identification was reliable before denying the suppression motion.  But this Court must assume in a *Strickland* analysis that the state court applies the correct legal standard to arguments raised by trial counsel.  Alternatively, if the lineup photos had been impermissibly suggestive leading to analysis of the *Biggers* reliability factors, there is not a reasonable probability that, with introduction of the McKelvey report, the trial court would have found the photo identification was unreliable.  *Strickland*, 466 U.S. at 694.  Based on the crime circumstances and Lawson's testimony, she had ample opportunity to see Isom at the time of the crime; she viewed the photo identification three days after the crime; and she consistently identified Isom as the person that talked to in the yard shortly before he forced his way into the Burton residence.  *See Biggers,* 409 U.S. at 200–201.  Under a *Martinez-Trevino* analysis, procedural default is not excused; this part of Claim 5.2 is denied.

To the extent Isom contends his trial lawyers' work was constitutionally deficient for not incorporating the McKelvey report into the defense theory, the claim is not substantial.  *Martinez,* 566 U.S. at 14.  After the report was referenced by Lieutenant Dement, Colvin introduced it into evidence.  The jury learned of McKelvey's contemporaneous note that, after Lawson identified Isom as the assailant, she stated that "it's 1 or 3 [Isom]," and "#1's face is a little round shaped like that."  Trial Record, Vol. 19, 1752 (Defendant's Exhibit One).  Jurors learned that Lawson

looked at the photographs for six minutes before identifying Isom and that she asked to take a second look. In response to Lieutenant Dement's testimony that Lawson adamantly identified Isom as the assailant, Colvin cross-examined him based on Agent McKelvey's note about whether Lawson actually wavered in her identification. In Colvin's closing argument, he questioned why Lieutenant Dement testified "with authority [Lawson] pointed [Isom] out when that's not what happened." Trial Record, Vol. 15, 1516. Under the *Strickland* standard, Isom has not demonstrated a reasonable probability that, with more emphasis on Agent McKelvey's report, the jury would have reached a different verdict. *Strickland,* 466 U.S. at 694. Based on *Martinez-Trevino*, procedural default is not excused. This part of Claim 5.2 fails.

In the remainder of Claim 5.2, Isom argues his trial lawyers' work was constitutionally ineffective for not seeking suppression of Oulette's photo identification of him on grounds that, before identifying Isom as the assailant, Oulette was aware that Isom was a suspect.

Oulette, an auxiliary officer for the Monticello Police Department, knew Lawson and Burton. He identified Isom in court. He testified that he drove by the Burton residence on April 2 shortly after 7 p.m. He said that he saw Isom sitting on the duplex steps and Lawson standing in the yard. He said that he always looked toward the duplex when he drove by because his daughter once lived there and he checked to see if there had been any changes. Oulette testified that, when he heard the call over the police radio on April 3 about the attack on Burton and Lawson, he reported seeing Lawson and Isom the previous night. He said that, on April 4, he identified Isom in a photo lineup at the police station. He said that Agent Woodward asked him to view an enlarged photo lineup a few days later, and that he again identified Isom.

Isom alleged in the *coram nobis* petition that the prosecution suppressed evidence that Oulette was aware that Isom was a suspect before identifying him. He argued the prosecution

failed to disclose that, the day before Oulette first identified Isom in a photo lineup, he was at the police station talking to Agent Roger McClemore with the Arkansas State Police and saw that McClemore had a paper with Isom's name and a photograph. In support, Isom attached three exhibits: (1) a fax cover sheet, dated April 3, 2001, and directed to the attention of "Rodger McLemore," and a paper with Isom's photograph and name; (2) the investigator's typed copy of Oulette's statement; and (3) Oulette's signed statement, dated April 4, 2001. *Doc. 167-8 at 76– 82.* In his statement, Oulette's referred to seeing McLemore's fax:

> Yesterday [April 3], I was here talking to ROGER MCCLEMORE of the Arkansas State Police about another matter. I saw the name KEN ISOM on a piece of paper that ROGER had along with a very dark picture. I told ROGER then it looked like the person that I had seen talking to DOROTHY LAWSON on Monday evening. But, I wasn't sure because the picture was so dark. It looked like it was a faxed picture. But, I am 100% sure that the person that I picked out of the line-up was the one sitting on the steps of the apartment talking to DOROTHY LAWSON.

*Doc. 167-8 at 79.* Denying *coram nobis* relief, the circuit court found Isom presented no proof to support his *Brady* argument and dismissed the claim. Isom did not appeal.

Even assuming the prosecution disclosed the *coram nobis* exhibits before trial, Isom has shown a substantial ineffectiveness claim. *Martinez,* 566 U.S. at 14. He has not demonstrated a reasonable probability that, absent Oulette's identification, the jury would not have found him guilty. *Strickland,* 566 U.S. at 694. The evidence of guilt was overwhelming; Lawson's identification of Isom and the DNA evidence connecting him to the crime scene are too much to overcome. Because the claim is not substantial, the remainder of Claim 5.2 is procedurally defaulted and therefore denied.

In related Claim 5.4, Isom argues his trial lawyers' work was constitutionally deficient because they did not investigate and impeach Oulette's testimony with evidence that his motive for identifying Isom stemmed from his (Oulette's) accidental shooting of a motorist at a traffic

stop.  A week before Oulette first identified Isom in a photo lineup, the motorists filed an action based on unlawful use of force against Oulette and Monticello state actors, including the police department and police chief.  *McCoy v. Monticello,* No. 5:01-cv-00098, Doc. 1 (E.D. Ark. March 26, 2001).  Isom has not demonstrated any connection between Oulette's identification of him and the accidental shooting or shown that Oulette's identification of him was "to curry favor with the prosecution and the police department."  *Doc. 154 at 66.*   Under the *Strickland* standard, Isom has not shown his trial lawyers' work was professionally unreasonable or demonstrated any resulting prejudice.  Because the ineffectiveness claim is not substantial, procedural default is not excused. *Martinez,* 466 U.S. at 14.  Claim 5.4 fails.

*

The Court now turns to Isom's exhausted claim (Claim 6.1, in part) that Agent McKelvey omitted material evidence from his Johnson interview notes.  There is no dispute that the prosecution provided to the defense Agent McKelvey's typed report of the interviews.  Isom contends the typed report does not include favorable evidence that appears in McKelvey's undisclosed handwritten notes from the first Johnson interview.

Johnson, who lived across the street from the Burton residence, told the jury that, before 7:00 p.m. on Monday, April 2, she saw Lawson "out in the yard" talking to Isom, who was sitting on Collins's porch.  Trial Record, Vol. 12, 1199.  She said Isom was wearing a white t-shirt and dark pants.  Johnson testified that she was twice interviewed on April 3 by a State Police criminal investigator.  She told the jury that she previously had seen Isom at Collins's duplex and that it was not unusual for him to be there.  She said that she had known Isom "a long time."  Trial Record, Vol. 12, 1200.  On cross-examination, Johnson testified that she did not report until the second interview that she saw Isom at Collins's duplex and talking with Lawson on Monday, April

2, because the investigator "did not ask" her about it during the first interview. Trial Record, Vol. 12. 1201. She said that she did not think the information was important until she "found out what happened." *Id.*

At the *coram nobis* hearing, Agent McKelvey read from his handwritten notes of his two Johnson interviews at 10:30 a.m. and 4:00 p.m. on April 3. He testified that he typed his notes into a report. The trial court admitted the handwritten notes:

> [Tuesday, April 3, 10:30 a.m. interview] didn't hear anything after 10 p.m. Alford came knocked on my door around 8 p.m. asked if I seen anybody over at his house. that was sometime after 8 p.m. *may have seen him over at Alford's Sunday.* there was a lot of them out there then. Lot of traffic all the time. Zero does hang out there. . . .

> [Tuesday, April 3, 4:00 interview] saw Dorothy and Zero talking in yard yesterday. had to be after 7 p.m. he was there when I left to go get kids at ball practice. I got back a little after 8. . . .

*Doc. 167-17 at 14* (Petitioner's Exhibit 11) (emphasis supplied).

Isom also moved to introduce Agent McKelvey's typewritten report that did not include Johnson's statement that she may have seen Isom at Collins's duplex on Sunday, April 1. He sought to amend the *coram nobis* petition, arguing Agent McKelvey's typewritten report omitted Johnson's report of perhaps seeing Isom on Sunday, which contradicted her trial testimony and second interview statement that she saw Isom on Monday, April 2, the night of the attack. Isom argued the prosecution's failure to disclose the handwritten notes and Agent McKelvey's preparation of the incomplete report violated due process under *Brady.* The trial court denied the motion to amend and to introduce the report into evidence. Isom proffered the typed report. *Doc. 167-17 at 19* (Petitioner's Proffered Exhibit 12).

After the *coram nobis* hearing, Isom moved by written motion to supplement the petition, arguing Agent McKelvey did not provide his handwritten notes until he was subpoenaed to testify

at the hearing.  The trial court granted Isom's motion but did not reopen the evidence.  The court

then denied relief, finding the handwritten notes were not impeaching and "really [don't] detract

from Johnson's testimony in any manner."  *Doc. 167-10 at 134.*

The Arkansas Supreme Court affirmed, holding the failure to disclose the handwritten

notes was not a *Brady* violation because the notes were not favorable evidence:

> The circuit court found that Johnson's undisclosed statement to McKelvey that she
> "may have seen" Isom at Collins's house on Sunday was not impeaching evidence.
> We agree.  Whether Isom was at Collins's house on Sunday was not relevant to the
> murder.  Moreover, the evidence that was impeaching was brought out at trial.  The
> jury heard Johnson's testimony that in her first interview, she did not tell McKelvey
> that she had seen Isom talking with Lawson.  We hold that the circuit court did not
> err in finding that the notes were not impeaching and thus not "favorable" evidence
> within the meaning of *Brady*.

*Isom VI,* 2018 Ark. 368, *15, 563 S.W.3d at 544.

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable

application of, clearly established federal law; nor was it an unreasonable determination of the

facts.  28 U.S.C. § 2254(d).  Isom argues Johnson's first interview statement—about seeing Isom

on Sunday—is both impeaching and exculpatory evidence.  He contends that, if jurors had been

aware of Johnson's first interview statement, they could have concluded that she saw him at

Collins's duplex on Sunday instead of on Monday.  He says Johnson's first interview statement

could have "neutralized" her trial testimony and second interview statement that she saw him on

Monday.  *Doc. 154 at 106.*  Based on review of Johnson's trial testimony, the Supreme Court did

not unreasonably determine that her first interview statement was not favorable evidence under

*Brady*.

Jurors heard Johnson's testimony that it was not unusual for her to see Isom at Collins's

duplex.  They heard that Johnson did not report until her second interview that she saw Isom at

Collins's duplex on Monday.  Johnson explained on cross-examination that she did not initially

report seeing Johnson on Monday because Agent McKelvey did not ask her and she did not think the information was important until she until she "found out what happened." Trial Record, Vol. 12, 1201. The Supreme Court did not unreasonably reject Isom's assumption that Johnson could not have seen him at Collins's duplex on Sunday and also seen him on the duplex porch talking to Lawson on Monday. To the extent the Supreme Court did not consider whether Johnson's interview statement about seeing Isom on Sunday was exculpatory evidence, the argument fails on the merits for the similar reasons that the evidence is not impeaching. Even if the handwritten notes are favorable, the evidence fails to clear the materiality hurdle. Isom has not demonstrated Johnson's first interview statement "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Under deference review, this part of Claim 6.1 is denied.

*

In the remainder of Claim 6.1, Isom argues the prosecution failed to disclose reports of the communications between Kevin Green and law enforcement about the location of a pair of scissors possibly used as the murder weapon. He says there is evidence that Green provided information leading to the discovery of the scissors.

Isom's state court argument on appeal is different than his *habeas* claim. On *coram nobis* review, the circuit court determined there was no *Brady* violation because information from Green did not result in the discovery of a pair of scissors and because Colvin was aware that Green had provided the information. Isom did not challenge the finding on appeal, arguing only that the circuit court erred in denying his related discovery motion and in partially quashing a related subpoena *duces tecum* for state Crime Lab records. Isom contends cause exists to excuse procedural default because the circuit court and state officials prevented him from developing his

claim.  He argues 28 U.S.C. § 2254(e)(2) does not bar an evidentiary hearing because he is not at fault for the lack of factual development.  Isom's procedural and evidentiary arguments require review of the state court record related to the Green search.

Before trial, Isom gave notice of the issuance of subpoenas for three prosecutors, including Frank Spain, based on their presence at the crime scene or a related search.  Because all three were participating in the Isom case, the prosecution moved to quash the subpoenas.  Spain's testimony at the pretrial hearing is relevant here.

Spain testified that, while Green was detained at the Drew County jail and represented by Potts, he (Spain) was informed by Agent Woodward and perhaps by Potts that Green claimed to have information about the location of the scissors used as the murder weapon.  In exchange for providing the information, Green wanted to be released from jail on his own recognizance pending his sentencing date or prison bed space.  Spain said that he agreed to facilitate Green's release, though he "feel[s] uncomfortable as a general rule, allowing a person who's pleading guilty to prison time to be released," Trial Record, Vol. 4, 389.  He explained that Green had already agreed to plead guilty to felony charges in exchange for a five-year sentence.  He said that Green had posted bond for his release in his felony case but was being held at the jail on a misdemeanor warrant.

Spain testified that he went with Agent Woodward, Lieutenant Dement, and Green to the location—a house—indicated by Green.  He said that he entered the house and waited while the investigators looked for the scissors.  He said that they did not find any scissors and were at the location for less than five minutes.  The trial court granted the prosecution's motion to quash Spain's subpoena, finding he did not have anything material to offer as evidence.

The Green search was also raised at the Rule 37 hearing.  Isom argued his lead trial lawyer

should have done more investigation after receiving letters from four Drew County detainees. The letters stated that Green claimed an individual named Jerry Avery had confessed to the crimes and that Green was seen leaving and then returning to the jail with Spain, Agent Woodward, and a third individual. Green testified that, while he was in the Drew County jail, he had not told another detainee that Avery committed the crimes. He said that, at some point before being sentenced and transferred to prison, he was detained in the Drew County jail and temporarily released on his own recognizance—before being taken back into custody and transferred to prison. On cross-examination, Green stated that he had not talked to police officers before Isom's trial about the case.

Spain, the prosecutor who cross-examined Green, stated on the record that he was ethically required to correct Green's testimony. He said that Green had informed either Agent Woodward or Lieutenant Dement before Isom's trial that he was willing to provide information about the case in exchange for being released from jail on his own recognizance. He said Green claimed to know the location of scissors that could have been used as the murder weapon. Spain stated that his response to Green's offer was that he would release Green only if his information "proved to be anything that could be useful." Rule 37 Record, Vol. 5, 731. He said that he went with Green, Agent Woodward, and Lieutenant Dement to the trailer where Green stated the scissors were located. He said that he "believed" the officers found a pair of scissors in the trailer and that he "believed" Green was released from jail. Rule 37 Record, Vol. 5, 731. Spain said that, based on papers in the prosecution's file, the scissors were sent to the state Crime Lab and testing showed there was no DNA evidence linking the scissors to the crimes. When examined under oath, Spain testified that his account of the circumstances surrounding the Green search was true. He said that he did not prepare a report on the search for the discovery file and could not remember if he had

discussed with Colvin that Green was being released in exchange for providing officers information about the scissors. He said that he did not remember if Agent Woodward or Lieutenant Dement prepared a report. On recall, Green testified that he did not tell law enforcement officers or prosecutors that he had information about the scissors possibly used as a murder weapon in the attack. He said that he was released on his own recognizance for a different reason.

The Arkansas Supreme Court granted Isom's petition to reinvest jurisdiction in the circuit court to consider a writ of error *coram nobis* for the circuit court to resolve the inconsistency in Spain's testimony at the pretrial hearing and at the Rule 37 hearing. *Isom V,* 2015 Ark. 225, *5–6, 462 S.W.3d at 665. The Supreme Court determined that, if Spain's account at the Rule 37 hearing that a pair of scissors was found in the trailer was accurate, there was a fundamental error of fact warranting *coram nobis* relief. *Id.*

In the *coram nobis* proceeding, Isom argued the prosecution failed to disclose reports or files related to Green's statements about the location of the scissors and did not provide the scissors that were discovered in the search of the trailer. He contended Spain's Rule 37 hearing testimony was accurate and was evidence that scissors were found at the location indicated by Green.

Isom moved for discovery to support his *coram nobis* claims. His requests were largely related to the Green search: He requested access to Crime Lab records and sought to depose Spain, Potts, Agent McKelvey, and Agent Woodward. Isom said that state actors were refusing to make voluntary disclosures and that the discovery was necessary to develop his evidence-suppression claims. After acknowledging the prosecution's argument that state court criminal procedural discovery rules did not extend to post-conviction proceedings, the trial judge denied the discovery request:

> Mr. Isom has made some serious allegations against state which if true would constitute violations of the state's obligations under Brady v. Maryland. Rule 3.1

Arkansas Rules of Professional Conduct provide that a lawyer may only bring assertions on an issue if there is a factual reason to do so. Additionally by reference only, Arkansas Rule of Civil Procedure, Rule 11(b)(3) requires a lawyer's signature on a pleading be based on a reasonable inquiry that the factual contentions in a pleading have evidentiary support. In other words it is expected that the factual allegations in a petition such as the one filed be based on evidence existing and known prior to the filing. This court is not going to require discovery in this case under these circumstances, and finds petitioner has not shown himself entitled to it. He can obtain the witnesses needed to (sic) the hearing by subpoena. He can obtain the documents needed by subpoena duces tecum. Additionally based on the allegations he already has the evidence to support his contentions.

*Doc. 167-10 at 49.*

Isom then served a subpoena *duces tecum* on the state Crime Lab record keeper, Richard Gallagher, II, to appear at the *coram nobis* hearing with documents: (1) all evidence submission forms received by the state Crime Lab from the Arkansas State Police (Drew County cases), the Monticello Police Department, and the Drew County Prosecutor's Office between the crime and the trial (April 1, 2001, and December 21, 2001); (2) all lab reports and evidence submission forms with Isom, Green, or Avery listed as the suspect; and (3) the evidence submission form, blood examination sheet, and evidence release form for the scissors submitted in Isom's case. The State moved to quash the subpoena in part, arguing Isom was not entitled to information beyond the two Crime Lab files on the crimes against Burton and Lawson. Before the hearing, Gallagher provided Isom with the two case files, along with papers related to four pairs of scissors that were submitted as evidence and tested by the Crime Lab.

The circuit court partially quashed the subpoena, requiring the Crime Lab to provide only evidence submission forms from Drew County under the names of Isom and Green during the 2001 timeframe. The court also denied Isom's renewed discovery motion. The circuit court left the record open for the Crime Lab to respond to the subpoena *duces tecum* with any additional evidence submission forms required by the order. After the hearing, counsel for the Crime Lab

informed the circuit court by letter that, based on a database search, there were no evidence submission forms from Drew County for Green (or Avery) in 2001 and that the evidence submission forms for Isom in 2001 were only in the two case files provided by the Crime Lab before the hearing.

Exhibits at the *coram nobis* hearing established that investigators discovered four pairs of scissors—three from the Isom house and one found outside a Monticello church. The four pairs of scissors were submitted with a single evidence submission form for testing at the Crime Lab, and test results did not connect any of the scissors to the crimes. After Crime Lab testing was completed, the four pairs of scissors were released to Agent Woodward and another State Police officer and then transferred to Agent McLemore.

Consistent with Crime Lab records, Agent McKelvey testified at the *coram nobis* hearing that three pairs of scissors were found in the search of Isom's mother's house and the fourth pair was found near a Monticello church. He stated that, after the Crime Lab returned the four pairs of scissors to the Arkansas State Police, they were stored in an evidence locker or building behind the highway patrol troop headquarters in Pine Bluff. He testified that he was unable to find them at the storage location during his search before the *coram nobis* hearing.

Agent McKelvey then testified that he participated in the execution of a search warrant on another house, where one or two pairs of scissors were found. He said that he submitted these scissors to the Crime Lab for testing with Isom's name listed as the suspect. Agent McKelvey, however, also stated that he recalled only four pairs of scissors being found and that he submitted those scissors to the state Crime Lab for testing. He said that all the scissors that were found were listed on the same evidence submission form. Agent McKelvey stated several times that he was having trouble hearing the questions, and the circuit court noted that McKelvey had some "hearing

problems," *Doc. 167-12 at 6.*

During the lunch break, Agent McKelvey reviewed the case file. When cross-examination resumed, McKelvey testified that he had been referring to a consent search of Collins's duplex and that no evidence was recovered during the search. The State introduced into evidence Agent McKelvey's report of his consent search of Collins's residence. McKelvey said that there was nothing in the file indicating that any scissors were found other than those from the Isom house and the church area. He said that he was mistaken when he testified earlier.

Agent Woodward testified that he met with Green at the Drew County jail before trial after learning that Green possibly had information about where a pair of scissors could be located. He said that he and Lieutenant Dement searched the location—an abandoned trailer near the crime scene—given by Green, and that Spain was also present but did not enter the trailer. He said that no scissors were found, so he did not prepare a report. Agent Woodward did not recall whether Green was asking for anything in exchange for the information.

Spain testified that, when he stated at the Rule 37 hearing that investigators searched a trailer for scissors based on information from Green, he said only that he "believed" a pair of scissors was recovered—which meant that he might be wrong. *Doc. 167-14 at 35.* He said that he could not remember whether Green was released on his own recognizance before or after the trailer was searched. He explained his pretrial hearing testimony that he feels uncomfortable agreeing to the release of a detainee, who is pleading guilty. Spain said that his experience was that released detainees will sometimes commit new criminal offenses. He said that he agreed to release Green on his own recognizance because the investigators "thought the information was worth OR'ing him to get it." *Doc. 167-14 at 22–23.* He stated that, based on possibility of finding the murder weapon, he "felt that the risks were outweighed by the possible rewards." *Doc. 167-*

*14 at 30.*  Spain testified that the Rule 37 hearing was a "long time" after the trial investigation and that he believed that his statement about recovering scissors at the trailer was incorrect.  He said that he confused two events:  the search of the trailer and the recovery of scissors at another location.  Spain testified that he was not prepared to recount the details of the Green search at the Rule 37 hearing because he had not expected Green to testify incorrectly.  Spain said that he "without a doubt" informed Colvin of the Green search because Colvin examined him (Spain) about the search at the pretrial hearing.  *Doc. 167-14 at 38–39.*

The circuit court determined that, based on hearing evidence and record review, Spain's Rule 37 hearing testimony—that a pair of scissors was found during the trailer search—was inaccurate and that scissors were not discovered at the trailer:

> This is confirmed by Scott Woodward's testimony at the Writ hearing.  It is also confirmed circumstantially with other evidence in the form of exhibits in the case.  Petitioner's Exhibit 13 is a post-trial transfer of evidence form whereby Scott Woodward transferred evidence items from himself to another State Police Officer, Roger McLemore.  On the second page thereof are listed four pairs of scissors, two gray handled, and two black handled.  Petitioner's Exhibit 5 are investigator's notes by Officer D.J. Roberts, indicating he had located a pair of scissors, silver in color, and turned them over to the case agent, Rick McKelvey.  Petitioner's Exhibit 8, is a report of a search warrant execution, reporting therein the recovery of three pairs of scissors.  The warrant was executed at the home of Leotis Isom on April 4, 2001.  Petitioner's Exhibit 7 is an Arkansas State Crime Lab Evidence Submission Form, indicating receipt at the crime lab April 17, 2001, and documenting the transfer from Rick McKelvey to the lab, four pairs of scissors, three bearing his initials and one bearing Dennis Roberts initials.  This would account for the finding of four pairs of scissors and the submission of them to the lab for analysis on April 17, 2001.  All of which supports Scott Woodward's testimony at the Writ hearing that no scissors were found at the search of the trailer.
>
> It additionally appears from the trial court record, as pointed out in Justice Danielson's dissenting opinion in <u>Isom v. State</u>, supra, that trial counsel, Mr. Colvin, was aware of Kevin Green's statements, so it is not newly discovered evidence, and does not serve as the foundation of a <u>Brady</u> claim.  Mr. Colvin's testimony at the Rule 37 hearing held in Isom's case supports this conclusion.
>
> Additionally, Mr. Spain's first testimony that no scissors were found, given about six to seven months after the attempt, is more likely to be accurate than his later

testimony in this Court's opinion.   This finding nullifies the argument of the Petitioner made on this point and it is, therefore, dismissed.

*Doc. 167-10 at 134.*

Isom argued on appeal that, because the circuit court denied discovery and partially denied his motion to quash the subpoena *duces tecum*, he was unable to develop his *Brady* claim.   He argued discovery would have provided objective evidence as to whether law enforcement discovered a fifth pair of scissors.   The Arkansas Supreme Court determined the circuit court did not abuse its discretion in limiting discovery:

> Here, the circuit court placed no limit on Isom's use of witness subpoenas for the coram nobis hearing.   The circuit court modified the document request that sought every evidence-submission form submitted by the Arkansas State Police or Monticello Police Department that emanated from Drew County over a nine-month period in 2001.   The circuit court narrowed the request to all evidence-submission forms that had some connection to either Kenneth Isom or Kevin Green.   We conclude that the circuit court did not abuse its discretion in limiting discovery.

*Isom IV,* 2018 Ark. 368, *18, 563 S.W.3d at 545.

For the same reasons that the Arkansas Supreme Court held the circuit court did not abuse its discretion in limiting discovery, this Court finds the state courts did not impede factual development of the *Brady* claim.   The circuit court's rulings did not prevent Isom from developing his claim, so there is no cause to excuse procedural default.   For similar reasons, Isom has not overcome the *habeas* evidentiary restriction.   28 U.S.C. § 2254(e)(2).   This part of Claim 6.1 is denied as procedurally defaulted.

The Court alternatively considers the *Brady* claim under merits review.   Isom concedes that he has not established that scissors were found based on Green's information.   But he argues there is evidence that the scissors were discovered and not disclosed by the prosecution.   Relying on Spain's Rule 37 testimony, Isom contends Spain would have facilitated Green's release only if investigators had found a pair of scissors in the trailer.   Isom, however, has not overcome the

presumption of correctness afforded the circuit court's crediting of Spain's pretrial and *coram nobis* hearing testimony.  28 U.S.C. § 2254(e)(1).  The outcome, moreover, would be the same under *de novo* review of the factual finding.

There is overwhelming evidence that law enforcement discovered and submitted only four pairs of scissors to the Crime Lab for testing.  Colvin and perhaps Potts, moreover, were aware of the Green search before trial.  There is no evidence that a related report or other documentation was prepared by investigators or the prosecution.  Isom mostly relies on Spain's Rule 37 hearing testimony about finding scissors at the trailer.  But this Court finds convincing Spain's *coram nobis* hearing testimony that he was mistaken at the Rule 37 proceeding.  Spain explained that, at the time of the Rule 37 hearing, years had passed since the trial investigation and that he had not expected to offer an account of the Green search at the hearing.  He said that he could not recall whether he agreed to facilitate Green's release before or after the search of the trailer.  He explained that, though he is uncomfortable agreeing to the release of detainees, he determined that the possibility of finding the murder weapon was worth the risk that Green would commit a crime while on release.  Based on this record, Isom has not demonstrated that investigators found a fifth pair of scissors during the trailer search or that the prosecution failed to disclose reports related to the search.  This part of Claim 6.1 alternatively fails on *de novo* review; Isom has not demonstrated there was suppression of favorable evidence in violation of due process under *Brady.*

For similar reasons, Isom has not demonstrated that he was denied a fair trial when the trial court quashed the Spain subpoena.  He has not shown Spain had anything material to offer as evidence.  This Court has found Claim 10.3 is procedurally defaulted and also denies the claim as meritless.

*

In the remainder of Claim 6.1, Isom argues for the first time that the prosecution interfered with his interviewing a potential mitigation witness. The claim fails as procedurally defaulted and is alternatively considered on the merits here.

Larson Tucker, a potential juror, was questioned by the trial court and excused during general *voir dire*:

THE COURT: Yes, sir., Mr. Tucker. What do you know about this?

PROSPECTIVE JUROR: Read about it in the paper and in the community and all. And I believe I taught him in school. I taught his brother. I taught his sisters. He played on my baseball team. One of his sisters was the captain of my softball team and another one played on it.

And the other day someone called and asked us, said they wanted to talk to me, and they asked my address and I gave it to them and they came out. They say they was a investigator and—But in between that time when he called to find out where I was, I called the sheriff office and asked should I talk to anybody because I knew I was on the jury duty for some months, and they didn't know. So they give me a phone number I could—

THE COURT: Le me ask Mr. Colvin. Y'all intend to call Mr. Tucker as a witness?

MR. COLVIN: We didn't know whether we could or not because he would not talk to our investigator, Your Honor.

THE COURT: Potentially?

MR. COLVIN: Yes, sir.

MR. BUNCH: I didn't know anything about it one way or the other.

MR. COLVIN: Yes, sir. He is potentially a witness.

THE COURT: You can talk to him.

I'm going to excuse you from the jury in this case.

PROSPECTIVE JUROR: Okay.

THE COURT: 'Cause they— You might have information they need.

MR. COLVIN: We'll holler at you.

PROSPECTIVE JUROR:  I'm going to leave now.

THE COURT:  Yes, sir.  We'll excuse you.

Trial Record, Vol. 5, 508.

Based on this record, Isom has not demonstrated that the prosecution prevented him from interviewing or calling Tucker as a mitigation witness.  Tucker stated only that the sheriff's office gave him a "phone number" that he could call to ask about being interviewed by the defense.  After the trial court excused Tucker as a potential juror, Colvin made no indication that he did not have sufficient time to interview Tucker about his connection to Isom.  Instead, the trial lawyer told Tucker that he would be contacting him.  This part of Claim 6.1 is alternatively denied on the merits.

In a related procedurally defaulted ineffectiveness claim (Claim 5.6), Isom argues his trial lawyers failed to investigate and discover police misconduct related to (1) Lawson's purportedly failed photo identification, (2) Johnson's interview statement that she saw Isom on Sunday, and (3) the Green trailer search.  The ineffectiveness claim is not substantial for the same reasons that the *Brady* claims fail.  *Martinez,* 566 U.S. at 14.  Procedural default is not excused; Claim 5.6 is denied.

o  **Prosecution's Remarks and Witness Examination.**  Isom contends his death sentence does not meet the standard of reliability required by the Eighth Amendment.  He says the prosecution made penalty-phase arguments impermissibly shifting the jury's sense of responsibility for assessing the death penalty.  He says the prosecution's penalty-phase reference to an unrelated murder was so inflammatory that the trial court's curative instruction was insufficient and that a mistrial or stronger admonition was warranted.  These exhausted claims are Claim 6.2 (in part).  The remainder of Claim 6.2 is procedurally defaulted; the claims are

alternatively considered here under merits review.  Isom raises related penalty-phase ineffectiveness claims in Claim 9.5.  The ineffectiveness claims are procedurally defaulted with one exception:  Whether the trial lawyer missed an objection to the prosecution's argument shifting the jury's sense of responsibility for the sentencing decision.  In Claim 5.14, Isom raises related procedurally defaulted guilt-phase ineffectiveness claims.  In Claim 8.10.10, Isom argues for the first time that his lawyer made a related *voir dire* error.  *Martinez-Trevino* applies to the procedurally defaulted ineffectiveness claims.

The penalty phase was bifurcated; the jury first considered the appropriate sentence for the capital murder conviction.  Isom argues that, in the capital murder penalty-phase rebuttal closing, the prosecution minimized the jury's sense of responsibility for the sentencing decision.  The prosecution argued:  "[Isom], by his actions, sealed his fate.  Not by what you do.  You're just determining what he did.  That's your job."  Trial Record, Vol. 17, 1648.  Later in the closing, the prosecution argued:

> Rights, talked about rights.  [Isom] gets all the rights afforded to all of us by the Constitution.  We've all been very careful to make sure that every single right that he has been given to him.
>
> Bill Burton, he had only one judge, one jury, and one executioner.  There is no appeal for Mr. Burton.

Trial Record, Vol. 17, 1650.  Isom challenged the statements for the first time on direct appeal, and the Arkansas Supreme Court considered under mandatory review whether the trial court had a duty to intervene.  *Isom I,* 356 Ark. at 274–75, 148 S.W.3d at 181–82.  Applying *Caldwell v. Mississippi,* the Arkansas Supreme Court held the prosecution's arguments were not so "flagrant" as to require the trial court to intervene *sua sponte*. *Id.* at 274–75, 148 S.W.3d at 181–82 (citing 472 U.S. 320, 341 (1985)).  The Supreme Court also held the prosecution's arguments did not "appear to this court to be an impermissible shifting of the jury's responsibility for fixing the

penalty." *Id.*

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts. 28 U.S.C. § 2254(d). In *Caldwell,* the United States Supreme Court held that, when the prosecution argued in closing that the jury's penalty decision was not the final decision but was reviewable, the imposed death penalty was not sufficiently reliable under the Eighth Amendment because the Court could not determine the effect of the prosecution's attempt to minimize the jury's sense of responsibility for imposing a death sentence. 472 U.S. at 341. Here, the prosecution's argument was not an effort to minimize to the jury "the gravity of its task" or its "sense of responsibility for determining the appropriateness of death." *Id.* Isom says the Arkansas Supreme Court did not consider jurors' pre-existing beliefs about the judicial system. But the prosecution's remarks did not "mislead the jury as to its role in the sentencing process in a way that allow[ed] the jury to feel less responsible than it should for the sentencing decision." *Romano v. Oklahoma,* 512 U.S. 1, 9 (1994) (quotations omitted). The prosecution instead was arguing that the jury's role was to decide the penalty, and that Burton did not have the same opportunity to avoid death as Isom did in the judicial system. Any alleged error, moreover, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637–38. This part of Claim 6.2 is denied.

In the related exhausted ineffectiveness claim, Isom contends his trial lawyer's work was constitutionally deficient when he did not object to the prosecution's remarks that "Bill Burton, he had only one judge, one jury, and one executioner. There is no appeal for Mr. Burton." Trial Record, Vol. 17, 1650.

Relying on the direct appeal opinion that there was no shifting of the jury's responsibility,

the Arkansas Supreme Court rejected the ineffectiveness claim.  *Isom II*, 2010 Ark. 495, *7, 370 S.W.3d at 496.  The Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  For the reasons explained in connection with the underlying prosecutorial misconduct claim, the Supreme Court did not unreasonably determine that the ineffectiveness claim failed.  Any trial objection to the prosecution's argument would have been meritless, and Isom cannot demonstrate that his lawyer's work was constitutionally deficient for failing to raise a meritless argument.  *Thai v. Mapes,* 412 F.3d 970, 978 (8th Cir. 2005).  Isom argues for the first time that his trial lawyer's work also fell below the constitutional standard because he did not object to the prosecution's closing remark:  "[Isom] by his actions, sealed his fate.  Not by what you do.  You're just determining what he did.  That's your job."  Trial Record, Vol. 17, 1648.  For same reasons that the prosecutorial misconduct claim fails, the ineffectiveness claim is not substantial.  *Martinez,* 566 U.S. at 14.  Any objection would have been meritless.  *Thai,* 412 F.3d at 978.  Procedural default therefore is not excused.  This part of Claim 9.5 is denied.

In part of Claim 6.2, Isom challenges the prosecution's rebuttal closing argument that the death penalty was necessary to prevent Isom from being a continued threat.  The prosecution referenced a murder committed by Cecil Boren, an escaped convict:  "Heard Mr. Colvin say that he'll never be a threat to you, never be a threat to Ms. Lawson.  Well, I think you remember a little over a year ago, the family of Cecil Boren wouldn't look at it that way."  Trial Record, Vol. 17, 1649.  Isom's trial lawyer objected to the Boren reference; the trial court instructed the jury:

> This is argument, ladies and gentlemen.  There's been no evidence presented about either the cases Mr. Colvin mentioned or this one that Mr. Cason [the prosecutor] mentioned.  So they really don't have anything to do with this case.  This case should be decided on its own facts.

Trial Record, Vol. 17, 1649–50.

On direct appeal, the Arkansas Supreme Court held the prosecution's comments were not a due process violation:

> The prosecutor's reference to an unrelated case where an escaped convict murdered Cecil Boren was undoubtedly improper, and we do not in any wise condone such arguments. Nevertheless, it is apparent to this court that it was defense counsel who first went outside the record and referred to unrelated cases, including the Charles Manson case, the mother who drowned her two children in a car, and finally the two women who were slain at a Pizza Hut in Arkansas. In all these cases, the killers received a sentence of life without parole. That argument by defense counsel also was improper. However, it is the circuit judge's immediate admonishment to the jury to disregard defense counsel's and the prosecutor's remarks that tempers the prosecutor's reference to the Cecil Boren murder. Moreover, defense counsel made no request for a mistrial. And, finally, the jury had earlier been instructed that arguments of counsel with no basis in the evidence should be discarded. Any taint resulting from these arguments was substantially diminished by the circuit judge's instruction and admonishment. We hold that Mr. Isom was not denied a fair trial because of the Cecil Boren comment.

*Isom I,* 356 Ark. at 183, 148 S.W.3d at 275.

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The prosecution's remarks did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quotations omitted). They were not "so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial." *Sublett v. Dormire,* 217 F.3d 598, 600 (8th Cir. 2000) (quotations omitted). The alleged error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637–38. Any prejudice was cured by the trial court's instruction and admonition. Isom argues for the first time on reply that the prosecution's statement deprived him of the individualized determination of the death penalty required by *Furman v. Georgia,* 408 U.S. 238 (1972) (*per curiam*). Because the argument was not raised in state court, it is procedurally defaulted and not considered here. This

part of Claim 6.2 fails.

In the related ineffectiveness claim, Isom contends his trial lawyer missed the objection to the prosecution's reference to the Boren murder. But his state court argument raised a different issue: Whether his trial lawyer's work fell short of the *Strickland* standard by opening the door to the prosecution's remarks with references to Charles Manson and others serving a life sentence. *Isom II,* 2010 Ark. 495, *6–7, 370 S.W.3d at 495–96. The procedurally defaulted claim is not substantial, so procedural default is not excused. *Martinez,* 566 U.S. at 14. Isom's lawyer objected to the Boren remark; the trial court instructed the jury. Trial Record, Vol. 17, 1649–50. This part of Claim 9.5 fails.

In the remaining procedurally defaulted prosecutorial misconduct claims in Claim 6.2, Isom challenges the prosecutor's examination of witnesses, his remarks during *voir dire*, and his capital murder penalty-phase closing argument.

Isom says the prosecution made *voir dire* statements that impermissibly communicated to jurors the Burton family's desire for a death sentence and the prosecution's personal opinion that a death sentence was appropriate. During *voir dire,* the prosecution stated to prospective jurors:

> Now, it's fine to talk about it in the abstract like we're doing now. But when you have to put your name to the paper and then, in addition, say that is your verdict, I need to know now if there's anybody who'd have any reservations about doing that, because I, the State and the people involved with the State's case, feel very strongly that that is the appropriate sentence in this case. And, again, that's only—

Trial Record, Vol. 7, 660. Colvin objected on the ground that "what the victim or the alleged victim wants is inadmissible, and that's telling them what they want." *Id.* He argued that the "people involved" were the victims. *Id.* The trial court sustained the objection, finding the prosecution was making an "argument and we don't need to get into that, stating a personal belief." Trial Record, Vol. 7, 661. The prosecution then told the prospective jurors that the State was

requesting the death penalty:

> And you know, when I say that the State is requesting this, I guess, you know ,you know by now that these, myself and the other attorneys represent the State of Arkansas, represent the government so to speak.  That's the, who's making this request of you.

> But, as I was about to say, regardless of what we ask you or don't ask you, or what Mr. Colvin asks you or doesn't ask you, it's your call and only your call in the end. I just want to be assured that all of you can be up to it, and I think so.

*Id.*

On direct appeal, Isom argued the prosecution impermissibly interjected the Burton family's desire for a death sentence.  The Arkansas Supreme Court declined to consider the  merits because Isom had not presented any supporting authority and concluded only that the jury was tainted.  *Isom I,* 356 Ark. at 179–80, 148 S.W.3d at 273.  The claim was procedurally defaulted when Isom did not fairly present it in state court.

The claim also fails under alternative merits analysis.  Admission of the victim's family members' opinions about the appropriate sentence remains a violation of the Eighth Amendment. *Bosse v. Oklahoma,* 580 U.S. 1, 3 (2016) (citing *Booth v. Maryland,* 482 U.S. 496 (1987)).  But Isom has not demonstrated that *habeas* relief is warranted.  The prosecution did not specifically refer to the victim's family, and the trial court instructed the prosecution not to address personal beliefs.  Isom has not shown that the prosecution's statement so infected the trial with unfairness as to result in the denial of due process.  *Darden,* 477 U.S. at 181.  Any error, moreover, did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht,* 507 U.S. at 637–38.  Isom argues for the first time on *habeas* review that, with these remarks, the prosecution also improperly inserted his personal opinion about the death penalty.  "Statements about the prosecutor's personal belief in the death penalty are inappropriate and contrary to a reasoned opinion by the jury." *Weaver v. Bowersox,* 438 F.3d 832, 840–41 (8th Cir. 2006) (citation

omitted).  But this is not a case where the prosecution made "assertions of special authority over the circumstances in which the death penalty should be applied."  *Barnett v. Roper,* 541 F.3d 804, 813 (8th Cir. 2008).  Instead of making a series of improper statements, the prosecutor clarified that he was asking for the death penalty but that the punishment was the jury's "call."  Trial Record, Vol. 7, 661.  The prosecutor's remarks were not so outrageous or prejudicial that a *sua sponte* mistrial was required; the remarks did not inject such unfairness into the proceeding that Isom was denied the due process of law.  *Barnett,* 541 F.3d at 813.  And any error cannot overcome the *Brecht* standard.  507 U.S. at 637–38.  This part of Claim 6.2 is denied.

In the related procedurally defaulted ineffectiveness claim, Isom says that, in addition to raising an objection to the prosecution's statement, his trial lawyer should have requested a curative instruction or moved to exclude prospective jurors on the panel.  The lawyer's work, however, was constitutionally reasonable.  Because the claim is not substantial, procedural default is not excused.  *Martinez,* 566 U.S. at 14.  Claim 8.10.10 is denied.

Isom also contends the prosecution examined witnesses and made guilt-phase closing remarks that violated his constitutional rights.  He says the prosecution violated his right to remain silent, impermissibly shifted the burden of proof, and interfered with his right to present a defense. He argues that the prosecution inferred that his family and supporters were present in the courtroom to intimidate the jury.  He says the prosecution infringed on his right to a trial and the presumption of innocence by arguing that Lawson was traumatized by testifying at trial.  Isom argues the prosecution raised facts that were not in evidence and appealed to jurors' passions by comparing him to the terrorists, who committed the recent September 11 attack on the World Trade Center.  All these procedurally defaulted claims are meritless.  Isom has not shown that the prosecution's examination and closing remarks so infected the trial with unfairness as to result in

the denial of due process. *Darden,* 477 U.S. at 181. Any error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637–38. The Court has determined these claims are procedurally defaulted, and they also fail on the merits. This part of Claim 6.2 is denied.

The procedurally defaulted capital murder penalty-phase claims fare no better than the guilt-phase claims. Isom says the prosecution intended to inflame the passions and racial prejudices of the jury during Lawson's victim-impact cross-examination by emphasizing the rapes inflicted by Isom. He challenges the prosecution's rebuttal closing on several fronts. Isom argues the prosecution again impermissibly compared his crimes to the September 11 terrorist attack. He says the prosecution improperly argued Lawson's rape rendered Burton's murder especially cruel. He challenges the prosecution's general deterrence argument and purported misstatement of the death penalty's weighing process. He contends the prosecution impermissibly appealed to vengeance, improperly communicated the family's wishes for the death penalty, and introduced facts not in evidence. As with Isom's guilt-phase challenges, the prosecution's cross-examination and closing remarks did not so infect the trial with unfairness as to result in the denial of due process. *Darden,* 477 U.S. at 181. And any error in the penalty phase did not result in the harm required by the *Brecht* standard. 507 U.S. at 637–38. Under alternative merits analysis, *habeas* relief on the procedurally defaulted claims is not warranted. This part of Claim 6.2 fails.

Isom's remaining related procedurally defaulted penalty-phase ineffectiveness claims (Claim 9.5, in part) and his related guilt-phase ineffectiveness claims (Claim 5.14) are reviewed under *Martinez-Trevino.* Isom has not demonstrated the trial lawyers' decision not to object during the prosecution's examination of witnesses was outside "the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. He has not shown the prosecution's closing remarks

were so improper that the trial lawyer's only choice was to object. *Bussard v. Lockhart,* 32 F.3d 322, 324 (8th Cir. 1994). Isom also has not demonstrated a reasonable probability that, if his trial lawyer had objected to witness examination or challenged closing remarks, any objection would have been successful or the jury would have chosen a different verdict. *Strickland,* 466 U.S. at 694. Because the procedurally defaulted ineffectiveness claims are not substantial, procedural default is not excused. *Martinez,* 566 U.S. at 14. Claim 5.14 and the remainder of Claim 9.5 are denied.

o **Prospective Jurors' Disqualification.** Isom contends the trial court's dismissal of twelve prospective jurors due to their death penalty views deprived him of an impartial jury in violation of the Sixth Amendment. He says the trial court determined the jurors were not death-qualified based on "superficial questioning" and without an opportunity for rehabilitation by the defense. This is Claim 8.7. The related procedurally defaulted ineffectiveness claim is Claim 8.10.8.

At a pretrial hearing, the trial court informed the prosecution and defense counsel that, during general *voir dire*, the court would identify "those jurors who would either never, under any set of facts or circumstances, consider imposing the death penalty or voting for it, or who would always do so, wouldn't consider the alternative of life without parole." Trial Record, Vol. 4, 409. The trial court continued that time would be saved by identifying and excusing both sets of disqualified jurors during general *voir dire.* On the morning of trial, Isom objected to the trial court's proposed *voir dire* question:

> MR. BUNCH: Judge, I was handed some proposed voir dire questions that the Court was going to ask.
>
> THE COURT: Yes, sir?
>
> MR. BUNCH: Question Number One: "Is there anyone who could never vote for the death penalty or who would automatically vote against the death penalty regardless of what the facts of the particular case might prove to be." And then the

Court cites Witherspoon v. Illinois.

It's our position that Witherspoon v. Illinois' standard has been supplanted or modified somewhat by a line of cases in Adams v. Texas and Wainwright v. Whit (sic), and that the standard now is not whether you would automatically vote against the death penalty, but rather if your views would substantially impair or prevent you from considering the death penalty.

We believe that's the appropriate standard and that's the question that should be asked as opposed to the question that the Court proposes.

\* \* \* \*

[THE PROSECUTION]:  The Morgan v. Illinois is the portion of the case I've been handed, and it does say that the proper standard is whether a juror's beliefs would prevent or substantially impair the performance of his duties as a juror.  And, of course, that's within automatically a vote, so I'm not sure how material that is.

THE COURT:  I agree.  It's just another way of saying the same thing.  Witherspoon has not been overruled or changed.  These same questions were used by the trial court in questionnaires submitted to jurors in the Timothy McVey case, and also in the Susan Smith case, which are two cases that got a great deal of publicity and, certainly, were prepared and researched very well.

And I think it's still the standard, the Witherspoon standard.  But what this goes on to say, it's not the only standard, the Witherspoon.  Anything that would prevent, I think, a juror from performing his duties in accordance with the instruction and the oath would be grounds or subject to challenge for cause is what this says, and I agree with that.  That is the law.  Anything that would substantially impair or prevent the performance of the juror in accordance with instruction and his oath.  But, certainly, the Witherspoon question would do that.

If you can't consider the death penalty under any set of facts or circumstances, you can't do your duty as a juror.  And so I'm not going to change the question.  If other things show up which would interfere with the jurors' ability to do their duty, then those will be considered by the Court.  I don't know what those might be, but I'm not going to change the question.

Trial Record, Vol. 4, 422–25.

After the trial court questioned the prospective jurors during general *voir dire,* six *voir dire* panels (four panels of six prospective jurors; two panels of twelve) were questioned by the prosecution and defense.  The trial court decided for-cause challenges after each panel was

questioned.  At the end of *voir dire,* the prosecution and defense exercised their peremptory strikes.

During general *voir dire,* the trial court asked prospective jurors if they were aware of any facts that would prevent them from being fair and impartial.  Prospective juror Michael Jones stated that, even though he had been Isom's spiritual counselor while Isom was in jail, he could be fair and impartial in the guilt phase.  In response to the trial court's questioning, he stated that, as a minister, he could not under any set of facts or circumstances impose the death penalty.  The trial court excused Jones.  Isom then sought a future opportunity to rehabilitate jurors:  "Your Honor, just for future reference, if someone indicates unwillingness to impose the death penalty, we would like to have an opportunity to rehabilitate that witness, or that juror—excuse me—before they're excused."  Trial Record, Vol. 5, 473.  The prosecution did not respond; the trial court did not offer a ruling.  An unrecorded bench conversation was held outside the hearing of the prospective jurors.

Later in general *voir dire,* the trial court asked prospective jurors about their willingness to impose the death penalty:

> THE COURT:  Is there anyone who could never vote for the death penalty or who would automatically vote against the death penalty regardless of what the facts of the particular case might prove to be?  If you're in that category, please raise your hand.

Trial Record, Vol. 6, 578.

Twelve prospective jurors indicated that they could not vote for the death penalty.  The trial court asked each of the twelve responding jurors individually if he or she "could never, under any set of facts or circumstances, consider imposing for the death penalty."  Trial Record, Vol, 6, 578–83.  As each prospective juror individually responded—verbally or with a head shake—that he or she could not impose a death sentence, the trial court excused the juror.  Ronnie Burton was the tenth of the twelve prospective jurors individually questioned by the trial court.  He responded that he did not "feel comfortable" imposing the death penalty.  Trial Record, Vol. 6, 583.

The trial court then asked a follow-up question: "Could you ever consider imposing it?" *Id.* After Burton responded negatively, the trial court excused him. The trial court denied Isom's request for an opportunity to rehabilitate Burton:

> THE COURT: I've never seen anybody rehabilitated in voir dire. And I'm just going—I don't think it serves any useful purpose. It'll be a waste of time. That's the reason I feel that way.

Trial Record, Vol. 6, 583. After excusing Burton, the trial court excused the remaining two prospective jurors, who indicated in response to individual questioning that they could not impose the death penalty.

After the trial court turned to other questioning, prospective juror Joe Jones stated that he had been thinking about whether he could impose the death penalty and did not believe that he could. He gave consistent responses during follow-up questioning by the trial court. Jones was excused by the trial court with no objection or request for rehabilitation by the defense. The trial court did not excuse Lee Ann Taylor, who stated that she did not know if she could impose a death sentence.

After general *voir dire,* Isom argued that he should have been allowed an opportunity to rehabilitate jurors who had expressed an opposition to the death penalty. He seemed to extend his argument beyond Burton to all twelve jurors who had responded to the trial court's death-penalty questioning that they could not consider a death sentence. He contended the trial court's denial of an opportunity for rehabilitation violated his federal constitutional rights and the state criminal rules of procedure. The trial court denied Isom's motion:

> THE COURT: The Court didn't feel any of these jurors equivocated. And I think it'd be hard for the Defense to show that they would somehow be able to convince them differently than an answer they had already given unequivocally. And I don't see where I've done anything that was outside of my discretion.

Trial Record, Vol. 7, 639.

During *voir dire* conducted by counsel, prospective juror Haley Greer was equivocal about whether she could impose the death penalty. After questioning by the prosecution and defense counsel, the trial court excused her, finding "she went from not knowing if she could to think[ing] she could not to she can't. So I'm going to grant the motion." Trial Record, Vol. 8, 775.

On direct appeal, Isom argued the trial court's denial of his rehabilitation request during general *voir dire* questioning of the twelve jurors violated his right to due process. The Arkansas Supreme Court held the trial court did not abuse its discretion in denying additional questions:

> The circuit judge had already posited the general question of whether the prospective jurors could consider the death penalty under any circumstances. A negative answer resulted in excusal for cause at times. At times, the judge clearly did not believe that additional questions would be productive or beneficial. In light of this, it was not an abuse of the circuit judge's discretion to disallow further questions by defense counsel.

*Isom I,* 356 Ark. at 174, 148 S.W.3d at 269. The Court noted that the trial court allowed Isom to ask additional questions of some prospective jurors. *Id.* at 174 n.2, 148 S.W.3d at 269 n.2.

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The Supreme Court considered federal constitutional law on the appropriate standard for determining when a prospective juror may be excluded for cause based on his or her death penalty views. *Isom I,* 356 Ark. at 173, 148 S.W.3d at 268–69 (citing *Witherspoon v. Illinois,* 391 U.S. 510 (1968) and *Wainwright v. Witt,* 469 U.S. 412 (1985)).

Isom argues the trial court erroneously determined whether the twelve jurors were death-qualified under *Witherspoon v. Illinois* instead of the standard clarified by the United States Supreme Court in *Wainwright v. Witt.* In *Witherspoon,* the United States Supreme Court held prospective jurors could not be excused for cause for "voic[ing] general objections to the death penalty or express[ing] conscientious or religious scruples against its infliction." 391 U.S. at 522.

The Court noted prospective jurors could be excluded for cause when they "made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." 391 U.S. at 522 n.21.

In *Witt,* the Supreme Court clarified the proper standard for determining when a juror should be excused for cause based on his or her death penalty views: "[W]hether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.'" 469 U.S. at 424 (quotations omitted). The Court further explained:

> We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully *infra*, this is why deference must be paid to the trial judge who sees and hears the jurors.

*Id.* at 424–46.

Isom says the trial court's limited questioning of the prospective jurors recognized only *Witherspoon* and did not permit the analysis required by *Witt.* He says the prospective jurors did not have the opportunity to answer whether they would follow the statutory scheme for determining the appropriate sentence or indicate whether they would follow the law. Isom has failed to show a constitutional violation. Each of the twelve jurors responded that he or she "could never, under any set of facts or circumstances, consider imposing for the death penalty." Trial

Record, Vol. 6, 578–83.  Isom says the problem caused by the limited questioning was compounded by the trial court's refusal to allow additional questions.  He argues that, with additional questioning, there is a reasonable probability that the prospective jurors would have provided responses allowing them to withstand a cause challenge.  The twelve jurors, however, were unequivocal that they could not impose the death penalty.  Under deference review, the trial court's denial of the opportunity for rehabilitation was not constitutional error.  Isom also summarily states that, notwithstanding the *Witherspoon* and *Witt* standards, the excusal of the prospective jurors violated his constitutional rights.  Because Isom did not raise this argument in state court and has not developed it here, this Court does not reach it.  Under deference review, Claim 8.7 is denied.

For the same reasons, the related ineffectiveness claim is not substantial.  *Martinez,* 566 U.S. at 14.  Isom has not demonstrated the trial lawyers' lack of an objection to the trial court's *voir dire* method was constitutionally deficient performance.  Any objection would have been meritless.  *Thai,* 412 F.3d at 978.  Nor has Isom shown resulting prejudice under *Strickland.* Procedural default therefore is not excused; Claim 8.10.8 is denied.

o  **Racially Motivated Strikes.**  Isom next argues his constitutional rights were violated because the prosecution's peremptory strikes on two black jurors were racially motivated.  He contends the prosecution's offered explanations for the strikes were pretextual, and the trial court improperly applied the three-step framework in *Batson v. Kentucky,* 476 U.S. 79, 96–98 (1986). As stated herein, Isom is a black male; both victims were white.  Isom reports that an all-white jury was seated.  This is Claim 8.8.3.  Isom makes related procedurally defaulted claims of racial discrimination in Claims 8.8.1 and 8.8.2.  He says for the first time in Claim 8.10.7 that his trial lawyer's work was constitutionally ineffective for not making a record of the exclusion of black

prospective jurors. The procedurally defaulted ineffectiveness claims are considered under *Martinez-Trevino*. In procedurally defaulted Claim 11, Isom contends racial discrimination affected "every aspect of the investigation, prosecution, trial and defense of Kenneth Isom." *Doc. 154 at 208.*

After the six *voir dire* panels were questioned and the trial court ruled on for-cause challenges, the prosecution and defense exercised peremptory strikes. Counsel were excused from the courtroom to mark their peremptory strikes on the list of remaining prospective jurors; the trial court then held a bench conference outside the hearing of the prospective jurors. The strike procedure is not part of the trial record. After the bench conference, the trial court stated that "peremptories have been used" and that a jury had been seated. Trial Record, Vol. 10, 944. The trial court then stated that, because peremptory strikes had been exercised against the next two prospective jurors on the panel list, the selection of alternates would begin with the third available prospective juror. The selection of alternate jurors was on the record; no additional peremptory strikes were exercised. Isom then raised a *Batson* challenge to the prosecution's peremptory strikes against two black males, Dock Nelson and Milton Jackson, stating two of the prosecution's first four strikes were against prospective black jurors.

Without conceding Isom had made a *prima facie* case of discrimination, the prosecution offered race-neutral reasons for the strikes: Jackson was sleeping during the proceedings. After the *voir dire* panels had been questioned, the trial court dismissed the prospective jurors with "clear instructions" to return to the courtroom in an hour for the exercising of peremptory strikes. Trial Record, Vol. 10, 946. Jackson went home and did not return. (The trial court interjected that Jackson was the only prospective juror who did not return to the courtroom.) There was not a misunderstanding about the trial court's directive, and Jackson "chose to do what he did and was,

no doubt, surprised that the Court went to the trouble to call him on the phone and tell him to be back here in the morning, notwithstanding the fact that he didn't return." Trial Record, Vol. 10, 946–47. Jackson's attitude, demeanor, and actions reflected that he did not want to serve as a juror. Also, based on the prosecutor's previous representation of Jackson in a real estate transaction, he believed that Jackson was "strange." Trial Record, Vol. 10, 947.

The prosecutor's offered reason for striking Nelson was that he had used a peremptory strike on all prospective jurors, including Nelson, who responded to the death penalty *voir dire* multiple-choice question by agreeing most strongly with Response B over Response A:

(A)  I believe the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case; or

(B)  Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it in the proper set of circumstances.

Trial Record, Vol. 9, 842–43; Vol. 10, 947. The prosecution also stated that Nelson expressed "some reservations about whether he could view the disturbing nature of some evidence." Trial Record, Vol. 10, 947–48. After hearing the prosecution's offered reasons for the peremptory strikes, the trial court rejected Isom's *Batson* challenge.

The Arkansas Supreme Court affirmed. *Isom I,* 356 Ark. at 177–79, 148 S.W.3d at 271–72. The Court held that, though there was "some question as to whether Isom made a *prima facie* case of racial discrimination," the prosecution offered race-neutral reasons for the two peremptory strikes and the trial court did not abuse its discretion in denying the *Batson* challenge. *Id.* at 178–79, 148 S.W.3d at 272.

To prove a *Batson* violation, the trial court must first determine if the defendant made a *prima facie* showing that the prosecution's peremptory challenge was racially motivated. 476 U.S. at 96–97. If that demonstration is made, the burden shifts to the prosecution to present a race-

neutral explanation for the strike.  *Id.* at 97–98.  The defendant ultimately bears the burden of establishing the prosecution engaged in purposeful discrimination.  *Id.* at 98.  The "best evidence of discriminatory intent" is often the demeanor of the prosecution, which is a matter "peculiarly within a trial judge's province."  *Flowers v. Mississippi,* 588 U.S. 284, 302–03 (2019) (quotations omitted).  "The trial judge must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes based on race."  *Id.* at 303.  Appellate review is "highly deferential" because the appellate court is looking at a paper record and the trial court's findings are mostly based on an evaluation of credibility.  *Id.* (quotations omitted).

The state court decisions were not contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).  Isom argues both the trial court and the Arkansas Supreme Court misapplied the *Batson* framework.  He says that, after the prosecution offered race-neutral reasons for the two peremptory strikes, the trial court failed to take the next step of considering whether the offered reasons were pretextual.  The Eighth Circuit Court of Appeals rejected this argument in *Smulls v. Roper*: "[F]ederal law has never required explicit fact-findings following a *Batson* challenge, especially where a *prima facie* case is acknowledged and the prosecution presents specific nondiscriminatory reasons on the record."  535 F.3d 853, 860 (8th Cir. 2008) (citations omitted).  The trial court's "denial of a *Batson* challenge is itself a finding at the third step that the defendant failed to carry his burden of establishing that the strike was motivated by purposeful discrimination."  *Id.* at 863 (citations omitted).  By holding the trial court did not abuse its discretion in overruling the *Batson* challenge, the Arkansas Supreme Court implicitly found that the prosecution's peremptory strikes were not motivated by purposeful discrimination.  *Stenhouse v. Hobbs,* 631 F.3d 888, 895 (8th Cir. 2011) (citation omitted).  Under

§ 2254(d)(1) deference review, neither the trial court nor the Arkansas Supreme Court unreasonably applied the *Batson* framework.

Isom next argues the state courts made an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). This Court's review presumes the state courts correctly determined the facts; Isom must rebut that presumption with clear and convincing evidence. *Weaver v. Bowersox,* 241 F.3d 1024, 1030 (8th Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)). On *habeas* review, deference to the trial court's factual determinations is "doubly great" when considering a *Batson* challenge because of the "unique awareness of the totality of the circumstances surrounding voir dire" and "the statutory restraints on the scope of federal habeas review." *Id.* (quotations omitted). The trial court "personally observed the venirepersons' demeanor during voir dire, and doubtless developed a sense for those their acumen." *Id.* at 1031. The trial court also "personally observed the prosecutor during the exercise of peremptory strikes, and later when he explained his conduct." *Id.*

Isom first argues the state courts unreasonably determined the prosecution's peremptory strike against Jackson was not racially motivated. Affirming the trial court, the Arkansas Supreme Court concluded the prosecution's race-neutral reasons—"Mr. Jackson had been sleeping during *voir dire,* had not shown up on time to the courthouse, and was known to be 'strange'"—were not pretextual. *Isom I,* 356 Ark. at 179, 148 S.W.3d at 272. Isom says that, when Jackson's *voir dire* panel was asked whether anyone would have difficulty staying awake or concentrating during trial, Jackson did not indicate that he would have a problem. He says the prosecution did not move to excuse Jackson for cause based on prior representation of Jackson or his falling asleep during *voir dire.* Isom says that, based on Jackson's employment and reputation in the community, he was unlikely to be "strange" in a way that disqualified him from jury service. He says that the

prosecutor did not use a peremptory strike on other prospective jurors that he knew or had represented. None of these arguments are convincing. The prosecution's primary offered reason for striking Jackson was that he would not be a conscientious juror. Isom has not demonstrated that the prosecution's offered reasons were not the actual reasons and that the prosecution engaged in purposeful discrimination. He has not overcome the presumption of correctness afforded the state courts' findings and therefore has not demonstrated that the courts made an unreasonable determination of the facts. *Weaver,* 241 F.3d at 1031. Under deference review, Arkansas state courts did not make an unreasonable determination that the prosecution's exercise of a peremptory strike on Jackson was not racially motivated.

Isom also contends the state courts unreasonably determined the prosecution's peremptory strike against Nelson was not racially motivated. He argues the prosecution's reason for striking Nelson were pretextual because Nelson was a "pro-punishment juror," who stated during *voir dire* that he could vote for the death penalty. *Doc. 154 at 153.* He says Nelson responded during *voir dire* that he could handle disturbing evidence. Isom also argues evidence of pretext is the prosecution's suggestion during *voir dire* that the defense challenge Nelson for cause based on his (Nelson's) statement that, if someone takes a life, that person ought to give a life. He says the Arkansas Supreme Court made an unreasonable factual determination that Nelson stated during *voir dire* that he had been taught *not* to take another life.

Based on record review, Nelson's death penalty responses were too equivocal to label him a "pro-punishment juror." When the prosecutor asked prospective jurors if they would vote for a death sentence if he proved beyond a reasonable doubt that the aggravators justified the sentence, Nelson responded affirmatively. He also stated that he could sign a death verdict. But he responded that he did not believe the death penalty should ever be imposed, though he could assess

it in the proper set of circumstances as long as the law allowed for it. And he seemed to have difficulty saying aloud that someone's life should be taken:

> MR. BUNCH:  Mr. Nelson, what are your views about the death penalty?
>
> PROSPECTIVE JUROR:  I was raised that when somebody, whenever you take anybody else's life— That's—That's hard to say.
>
> MR. BUNCH:  Do you believe that if you take a life, you ought to give a life?
>
> PROSPECTIVE JUROR:  Yes.

Trial Record, Vol. 9, 860.

Isom is correct that the prosecution asked the prospective jurors in Nelson's *voir dire* panel whether they would be able to hear and view disturbing evidence. Six of the twelve prospective jurors responded. The transcript is murky, though, because potential jurors are not identified by name. One female prospective juror—apparently Angela McDonald, who was excused for cause based on her response—said the evidence would upset her. Two prospective jurors stated that they did not know if they would find the evidence difficult to see and hear; one was a woman, and the gender of the other is not indicated in the trial record. Three prospective jurors stated that they could handle viewing the evidence.

In rejecting Isom's for-cause challenge of Nelson, the trial court believed Nelson responded that he had been taught not to take another life:

> THE COURT:  Defense?
>
> MR. COLVIN:  What about Mr. Nelson? Didn't he say if you take a life you have to give a life.
>
> [PROSECUTION]:  Dock Nelson did make that answer, but I assume they'll make that strike, that is if they want to be consistent with the other strikes that they've made, the other motions for cause they've made.
>
> MR. COLVIN:  Your Honor, I understood that the second juror, Dock Nelson, said that if you take a life, you got to give a life.

THE COURT:  Well, he said that *and then he said he'd also been taught not to take another life.*  So I think he gave two answers.  I'm not exactly sure what he meant.

MR. COLVIN:  Now, if you heard him say that, then I won't ask that he be questioned further.

THE COURT:  I'm not going to grant a cause challenge at this time—

MR. COLVIN:  Okay.

THE COURT:  —on Mr. Nelson.

Trial Record, Vol. 9, 878 (emphasis supplied).  At this point in *voir dire*, the parties did not raise and the trial court did not address Nelson's response that he did not believe in the death penalty.  Though the trial court correctly recognized Nelson's death-penalty equivocation, the court misstated his *voir dire* response.  In any event, this Court rejects Isom's argument that the prosecution's statement here negates a reasonable determination that the prosecution had actual reasons for striking Nelson.

Isom has not demonstrated that the trial court unreasonably rejected his *Batson* challenge based on the prosecution's striking Nelson.  He has not shown the prosecutor's first race-neutral reason—he had used a peremptory strike on all prospective jurors, who responded, as Nelson did, that they did not believe in the death penalty, though they could follow the law and impose the sentence—was pretextual.  Four other prospective jurors had given the same response as Nelson; at least one was excused for cause.  Because the potential jurors are not identified by name in the *voir dire* record and peremptory strikes were exercised on papers not included in the record, this Court cannot independently confirm the correctness of the prosecution's offered reason.  But Isom has never challenged the accuracy of the prosecution's statement.  He has not argued the prosecution accepted other jurors, who gave the same response as Nelson.  Isom also has not shown the prosecution's second offered reason—Nelson had reservations about whether he could view

disturbing evidence—is pretextual. The transcript again does not permit the Court to independently confirm the prosecution's offered reason. Isom, however, did not challenge the accuracy of the prosecution's statement at trial. He now says Nelson did not acknowledge any reservations about viewing the evidence, but he gives no reason to believe that the prosecution's offered reason did not accurately reflect Nelson's *voir dire* response. Based on the "doubly great" deference afforded the trial court's decision and Nelson's *voir dire* responses, the trial court did not unreasonably reject Isom's *Batson* challenge. Isom has not demonstrated that the prosecution's offered reasons for striking Nelson were not the actual reasons and that the prosecution engaged in purposeful discrimination. He has not overcome the presumption of correctness afforded the trial court's factual determination; he has not demonstrated that the court made an unreasonable determination that the prosecution's exercise of a peremptory strike on Nelson was not racially motivated. *Weaver,* 241 F.3d at 1031.

Affirming the trial court's denial of the *Batson* challenge, the Arkansas Supreme Court, apparently repeating the trial court's misstatement, determined the race-neutral reason for the peremptory strike on Nelson was his *voir dire* statement that "he had been taught 'not to take another life.'" *Isom I,* 356 Ark. at 178, 148 S.W.3d at 272. Isom is correct that the Supreme Court made an erroneous factual finding. The Supreme Court did not accurately recount Nelson's *voir dire* response about taking another life; the prosecution's offered race-neutral reason was Nelson's response that he did not believe in the death penalty but could impose it as required by law. The issue is whether, in light of the appellate court's erroneous factual finding, this Court can defer to the trial court's factual determination. The Eighth Circuit Court of Appeals "has not directly addressed whether, if the reasoning of the state appellate court cannot pass muster under AEDPA, the rationale of the state trial court also merits deference under § 2254(d)." *Stenhouse,* 631 F.3d

at 894–895.  In any event, either *habeas* relief is unavailable because the factual-determination

error is harmless, *Brecht* 507 U.S. at 637–38, or the claim fails under *de novo* review. *See Wooten*

*v. Lumpkin,* 113 F.4th 560, 567 (5th Cir. 2024) ("In a case where the state court reaches the correct

result, but provides inadequate reasons, habeas relief will be inappropriate because the error in

reasoning will be harmless under *Brecht*.").

In Claim 8.8.1, Isom says there was "mass dismissal" of black prospective jurors when

eleven of the twelve prospective jurors excused based on their death penalty views were black.

*Doc. 154 at 148.*  He reports that support for the death penalty is lower among black Americans

than white Americans, and he says the "the disproportionate effect would have been mitigated had

the court actually engaged with the venirepersons." *Doc. 154 at 149.*  As explained in connection

with Claim 8.7, these prospective jurors unequivocally responded that they could not impose the

death penalty.  In Claim 8.8.2, Isom says the trial court excused a black prospective juror (Graylin

Wilson) based on hardship but did not excuse two white prospective jurors (Glenda Clubb and

Rick Rhodes) based on similar work obligations.  This Court disagrees.  Wilson informed the trial

court that he lost his job a year earlier and was in debt.  He said that he had recently completed

barber school and had started his barber shop two or three months before appearing for jury

selection.  He said that, if he was not in his shop cutting hair, he was not making any money.

Unlike Wilson, Clubb said only that her physical therapy patients would not receive treatment if

she was not available.  She added that her absence at work was not a matter of "life or death."

Trial Record, Vol. 6, 623.  Rhodes said that he would lose several hundred dollars for missing

work during a five-day trial, but that he did not have "any particular financial hardships."  Trial

Record, Vol. 6, 609.  With Claims 8.8.1 and 8.8.2, Isom has not established a constitutional claim

of racial discrimination during jury selection. The procedurally defaulted claims also fail on the merits.

In related Claim 11, Isom says his constitutional rights were violated by racial discrimination at various trial stages. He says his race influenced the prosecution's decision to charge him with capital murder and seek the death penalty. He says that, because of intentional discrimination, an all-white jury was seated. He says racial stereotypes influenced the jury and were exploited by the prosecution. Isom says Colvin's racist perceptions of him affected his representation. These claims fail separately and fare no better when considered collectively. Because Isom has not demonstrated a constitutional violation based on racial discrimination, the procedurally defaulted claim alternatively fails on the merits.

The related procedurally defaulted ineffectiveness claim, Claim 8.10.7, is not substantial. Isom says his trial lawyers missed the objections when black prospective jurors were excused from the jury based on hardship or their death penalty views. He says his lawyers failed to make a record of the disproportionate hardship dismissals of black prospective jurors. He says they should have made better arguments to support the *Batson* challenge. *Strickland* performance analysis is unnecessary because Isom has not demonstrated actual prejudice. He has not shown a reasonable probability that, with a different jury composition, the jury would have found him not guilty or chosen life imprisonment at sentencing. *Strickland,* 466 U.S. at 694. Because the claim is not substantial, procedural default is not excused. *Martinez,* 566 U.S. at 14. Claim 8.10.7 is denied.

o **Avoid-Arrest Aggravator.** Isom argues the trial court's submission of the avoid-arrest aggravator violated due process because the aggravator is vague and overbroad. He also says there was insufficient evidence to support the aggravator. This is Claim 10.6.

Under Arkansas law, one of ten statutory aggravators is that "[t]he capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody."[10]   Ark. Code Ann. § 5-4-604(5).   Rejecting Isom's challenge on direct appeal, the Arkansas Supreme Court reaffirmed its previous holding that "this subsection is not unconstitutionally vague or overbroad and, further, that it does not fail to narrow and channel the jury's discretion in deciding the propriety of punishment." *Isom I,* 356 Ark. at 185, 148 S.W.3d at 277 (citations omitted).   The Supreme Court reasoned that avoiding arrest is not the motive for murder in every case:

> We have recognized that a consequence of every murder is the elimination of the victim as a potential witness.  However, we have added that avoiding arrest is not necessarily an invariable motive for killing.  Manifestly, there are multiple motives for murder.  The jury in the instant case could readily have found that Mr. Isom sought to kill both Mr. Burton and Mrs. Lawson to eliminate them as witnesses and, thus, to prevent his arrest.  Whether the same holds true to other murder cases is irrelevant to this appeal and beyond the scope of our review.  In addition, we disagree that this aggravator does not narrow the class of persons subject to the death penalty.  The jury concluded that the aggravator applied, and the effect of that finding is to limit the class of people for which the death penalty may be appropriate.  We affirm the circuit judge on this point.

*Id.* at 185–86, 148 S.W.3d at 277 (internal citation omitted).

The Arkansas Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable determination of the facts. 28 U.S.C. § 2254(d).  The Eighth Circuit Court of Appeals has held Arkansas's avoid-arrest aggravator satisfies constitutional requirements because it "sufficiently narrows the class of murderers eligible for the death penalty by specifying only a subgroup of murders as capital ones." *Wainwright v. Lockhart,* 80 F.3d 1226, 1231 (8th Cir. 1996) (citation omitted).  The Circuit has further determined the aggravator is not vague and overbroad because "[t]he statutory language

---

[10] Section 5-4-604(5) of the Arkansas Code Annotated was amended in 2025 to state "capital offense" instead of "capital murder."  2025 Arkansas Laws Act 662 (S.B. 375).

defining the circumstance is specific enough to guide the jury and avoid the arbitrary and capricious imposition of the death penalty." *Id.* (citation omitted).

Isom contends the Arkansas Supreme Court's decision is contrary to clearly established law that an aggravator is unconstitutional if it applies to every defendant convicted of murder. But the Supreme Court did not state that it was irrelevant whether the avoid-arrest aggravator applied in every murder case. Instead, the Court determined that avoiding arrest is not invariably the motive for murder, that Isom's motive for seeking to kill Burton and Lawson was to avoid arrest, and that whether avoiding arrest was the motive in other murder cases was irrelevant to its decision. *Isom I,* 356 Ark. at 185–86, 148 S.W.3d at 277.

Isom also argues there was insufficient evidence to submit the aggravator the jury. But the Supreme Court did not unreasonably determine that the jury "could readily have found" that Isom killed Burton and attempted to kill Lawson to eliminate them as witnesses and therefore avoid arrest. *Id.* Isom regularly visited Collins's duplex next-door to the Burton residence. Lawson identified Isom as the attacker; Isom could have reasonably believed that Burton, if he had survived, also would have been able to identify him.

Isom contends for the first time that the aggravator mental state—the murder was committed purposefully to avoid arrest—conflicts with his conviction for causing Burton's death under circumstances manifesting an extreme indifference to the value of human life. The argument is procedurally defaulted and also fails under alternative merits review. "Any higher intent requirement at the penalty phase simply supports the aggravating circumstance and further narrows the class of murderers eligible for the death penalty." *Wainwright,* 80 F.3d at 1231. Claim 10.6 is denied.

\*

The remaining claims are procedurally defaulted. As explained herein, the procedural default of ineffectiveness-of-trial-counsel claims is considered under *Martinez-Trevino*; other claims are alternatively reviewed on the merits.

- **Intellectual Disability.** Isom argues for the first time that he is ineligible for the death penalty due to an intellectual disability. Relying on Eighth Circuit precedent, he says that, though he did not raise a statutory intellectual disability defense in state court, his federal constitutional claim under *Atkins* was previously unavailable; so it cannot be procedurally defaulted and record expansion is required. He alternatively argues the exhaustion requirement is excused under 28 U.S.C. § 2254(b)(1)(B) due to an unavailable or ineffective state court remedy. This is Claim 2.

At the time of Isom's December 2001 trial, a defendant with an intellectual disability at the time of committing capital murder was ineligible for the death penalty under state law. Ark. Code Ann. § 5-4-618(b) (Repl. 1993). Under the state procedure, a capital murder defendant must raise intellectual disability by motion prior to trial. Ark. Code Ann. § 5-4-618(d). Isom did not raise the statutory defense. Six months after Isom's trial, the United States Supreme Court decided *Atkins v. Virginia* in June 2002, holding the Eighth Amendment prohibits execution of persons with an intellectual disability. 536 U.S. 304 (2002).

The Eighth Circuit Court of Appeals has considered the appropriate *habeas* review of an *Atkins* claim, when the petitioner's state court proceedings predated *Atkins* and the petitioner did not raise an available statutory intellectual disability defense under state law. *Sasser v. Norris*, 553 F.3d 1121, 1124–125 (8th Cir. 2009), *abrogated on other grounds by Wood v. Milyard,* 566 U.S. 463 (2012); *Simpson v. Norris*, 490 F.3d 1029, 1034–036 (8th Cir. 2007); *Jackson v. Norris*, 256 Fed. Appx. 12 (8th Cir. 2007) (*per curiam*). The Court of Appeals reasoned that *Atkins* "created a previously unavailable federal claim, and that claim is separate and distinct" from

the "similar claim under Arkansas law." *Simpson,* 490 F.3d at 1035. The petitioner therefore raised a "previously unavailable federal claim" that could not have been procedurally defaulted in state court.[11] *Sasser,* 553 F.3d at 1125. Under these circumstances, the *habeas* evidentiary restriction, 28 U.S.C. § 2254(e)(2), does not apply because the petitioner cannot lack diligence in developing an unavailable claim. *Simpson,* 490 F.3d at 1035.

*Atkins* was decided after the *Sasser, Simpson,* and *Jackson* petitioners' post-conviction proceedings concluded in circuit court. 536 U.S. 304. *See Jackson v. Norris,* 615 F.3d 959, 962 n.5 (8th Cir. 2010) ("*Atkins* was decided on June 20, 2002, after the Arkansas Supreme Court had affirmed Jackson's conviction and sentence and while his appeal from the trial court's denial of post-conviction relief was pending." (citations omitted)); *Sasser v. State,* 338 Ark. 375, 993 S.W.2d 901 (1999) (affirming the denial of the Rule 37 petition in July 1999); Appellee's Br. 1, *Simpson v. Norris,* No. 06-2823, 2006 WL 6266981, *1 (8th Cir.) (citing Appellant's Addendum 140) (The circuit court denied Simpson's Rule 37 petition on March 5, 2002.). Unlike these petitioners, Isom filed his Rule 37 petition—on January 31, 2005—over two years after the United States Supreme Court decided *Atkins.* Payne argues that Isom's *Atkins* claim is not "previously unavailable" because Isom, unlike the *Sasser, Simpson,* and *Jackson* petitioners, could have raised the federal constitutional claim in his Rule 37 proceeding. Isom replies that Rule 37 was not an available remedy because, he says, Arkansas state courts would not have considered an *Atkins* claim on post-conviction review. Neither position is dispositive.

---

[11] The Eighth Circuit held in *Roberts v. Payne* that the petitioner's *Atkins* claim was exhausted in state court, though *Atkins* was not decided until after the petitioner's trial. 113 F.4th 801 (8th Cir. 2024). Because the *Roberts* petitioner raised a state statutory intellectual disability defense at trial, "*Atkins* did not provide a 'previously unavailable federal claim,' as Roberts's prior hearings were substantively akin to a federal *Atkins* hearing." *Id* at 809. *See also Rankin v. Payne,* 141 F.4th 913, 925 & n.8, 2025 WL 1718224, *6 & n.8 (8th Cir. 2025).

*Atkins* is not "previously unavailable" during state court proceedings if the case was decided before Isom's conviction became final. *Gilmore v. Taylor,* 508 U.S. 333, 339–40 (1993) (retroactivity analysis). A conviction is final when the availability of a state-court direct appeal has been exhausted and either the time for filing a *certiorari* petition has elapsed or the petition has been denied. *Caspari v. Bohlen,* 510 U.S. 383, 390 (1994) (retroactivity analysis). None of the *Sasser, Simpson,* and *Jackson* petitioners filed a timely *certiorari* petition; *Atkins* was decided after their convictions became final. *Simpson v. State,* 338 Ark. 511, 999 S.W.2d 181 (1999) (no *certiorari* petition filed); *Jackson v. State,* 330 Ark. 126, 954 S.W.2d 894 (1997) (no *certiorari* petition filed); *Sasser v. State,* 321 Ark. 438, 902 S.W.2d 773 (1995) (no *certiorari* petition filed). By contrast, the United States Supreme Court denied Isom's petition for writ of *certiorari* in his direct appeal on October 4, 2004—over two years after the Court decided *Atkins*. *Isom v. Arkansas,* 543 U.S. 865 (2004) (Mem.). Because the United States Supreme Court decided *Atkins* before Isom's conviction was final, his federal constitutional claim is not previously unavailable.

Isom also argues the exhaustion requirement is excused due to an unavailable or ineffective state court remedy or an ineffective process under 28 U.S.C. § 2254(b)(1)(B). He says that he could not avail himself of *Atkins* in state court for two reasons: (1) Arkansas state courts will not hear an *Atkins* claim absent an execution warrant, and (2) *Atkins* was not available at his December 2001 trial, and his post-*Atkins* Rule 37 proceeding was not a permissible state court procedure for an *Atkins* claim.

Isom first argues an *Atkins* claim is not ripe for adjudication in Arkansas state courts until an execution date has been set. He primarily relies on *Lard v. State,* 2020 Ark. 110, 595 S.W.3d 355 (2020). In *Lard,* the Arkansas Supreme Court, citing competency-to-be-executed cases, held the Rule 37 petitioner's *Atkins* argument was not ripe for review because an execution date had

not been set. *Id.* at *3–4, 595 S.W.3d at 356–57. The Supreme Court's holding appears to be limited to Lard's argument challenging his execution. In any event, the weight of authority points to the ripening of an *Atkins* claim before an execution is scheduled. The Arkansas Supreme Court recognizes that the state intellectual disability statute—which directs defendants to raise intellectual disability arguments by motion prior to trial, Ark. Code Ann. § 5-4-618(d)—satisfies the Eighth Amendment under *Atkins*. *Engram*, 360 Ark. at 148 n.1, 200 S.W.3d at 371 n.1. The Court has determined that *Atkins* "merely reaffirmed this State's preexisting prohibition against executing the mentally retarded" under the state statute. *Anderson v. State,* 357 Ark. 180, 216, 163 S.W.3d 333, 354–55 (2004). More recently, the Eighth Circuit has held that, unlike *Ford* competency-to-be-executed claims, the *Atkins* claims raised by two Arkansas prisoners ripened before an execution date was scheduled. *Williams v. Kelly,* 858 F.3d 464, 472–73 (8th Cir. 2021); *Davis v. Kelley,* 854 F.3d 967, 971–73 (8th Cir. 2017). *See also Lard,* 2020 Ark. 110, *8–10, 595 S.W.3d at 359–60 (Wynne, J., concurring) (recognizing the distinction between intellectual disability and competency-to-be-executed claims). Based on an examination of the relevant intellectual disability law, ripeness of the *Atkins* claim in state court is not delayed until Isom's execution is scheduled.

Isom next argues a state court remedy was unavailable or ineffective for his *Atkins* claim because Arkansas state courts distinguish *Atkins* claims from statutory intellectual disability claims and review only statutory claims in Rule 37 proceedings. As explained herein, this Court rejects Isom's argument that Arkansas courts distinguish between *Atkins* and statutory intellectual disability claims. In the two Rule 37 cases relied on by Isom, the appellant argued that he was ineligible for the death penalty based on the state statute and *Atkins*. In both cases, the Arkansas Supreme Court determined intellectual disability had been raised and settled on direct appeal.

*Roberts v. State*, 2020 Ark. 45, 15, 592 S.W.3d 675, 684–85; *Anderson v. State*, 2011 Ark. 488, *4, 385 S.W.3d 783, 787.  Isom has made no convincing argument that the Arkansas Supreme Court make any distinction between statutory claims and *Atkins* claims with respect to collateral review.

In any event, the issue remains whether Isom has demonstrated the unavailability or ineffectiveness of state court remedies for his *Atkins* claim under 28 U.S.C. § 2254(b)(1)(B). Though Rule 37 does not generally provide a remedy when an issue could have been raised at trial or argued on appeal, an exception exists for "structural or fundamental errors that render the judgment of conviction void or subject to collateral attack."  *Arroyo v. State,* 2013 Ark. 244, *4 n.1, 428 S.W.3d 464, 468 n.1.  It is undisputed that Isom did not avail himself of the available state statutory intellectual disability defense at trial, Ark. Code Ann. § 5-4-618(d), but *Atkins* was decided between the trial and Rule 37 proceeding.  This Court has not uncovered any Arkansas Supreme Court collateral-review decision addressing a standalone intellectual disability claim. But whether Arkansas courts, in light of the post-trial *Atkins* decision, would have reviewed the constitutional claim in Isom's Rule 37 proceeding is an open question.  Tied to the issue is the Arkansas Supreme Court's view that *Atkins* "merely reaffirmed" the state statutory intellectual disability defense, *Anderson,* 357 Ark. at 216, 163 S.W.3d at 354–55, compared to the Eighth Circuit's position that *Atkins* created a federal constitutional right "separate and distinct from any preexisting Arkansas statutory right," *Simpson,* 490 F.3d at 1035.  Further analysis is unnecessary because, due to Isom's abandonment of the *Atkins* claim in the Rule 37 proceeding. this Court declines to find excusal of the exhaustion requirement is warranted.  To the extent Isom contends state and federal law precludes abandonment of an *Atkins* claim, his arguments are not convincing.

Citing *Atkins* and the state statutory intellectual disability defense, Isom raised in the Rule 37 proceeding an ineffectiveness-of-trial-counsel claim based on intellectual disability. In an *ex parte* motion for expert assistance, Isom reported that "a colorable claim of mental retardation exists" and requested funds to hire a "mental health expert in the area of mental retardation." Rule 37 Record, Vol. 1, 32. After Lambert was replaced by Rosenzweig, Isom sought authorization of funds to, among other things, hire a psychologist to "conduct testing for the mental retardation claim." Rule 37 Record, Vol. 2, 406.

At the hearing on Isom's motion seeking authorization of funding, Rosenzweig on behalf of Isom framed the *Atkins* claim as a standalone claim, arguing the Rule 37 petition alleged Isom may be ineligible for the death penalty due to an intellectual disability. He elicited testimony from Colvin that Isom's trial occurred before the United States Supreme Court decided in *Atkins* that a person with an intellectual disability was constitutionally ineligible for the death penalty. Rosenzweig argued testing was necessary to determine whether Isom had an intellectual disability. When the circuit court asked if there was evidence that Isom had an intellectual disability, Rosenzweig's response was based on *Atkins*:

> [Isom] was tested and the State Hospital report reflects a finding that Isom had a full scale IQ of seventy-seven. There is a built in measurement error of ten points, thus, even assuming that the Arkansas State Hospital formed its testing to perfection, full scale IQ may only be seventy-two, just two points higher than the figure discussed by the Supreme Court in Atkins.
>
> So I would submit that there is a prima facie basis for this. This is not someone who was, you know, who was employed as a physicist or, you know, anywhere or holding public office or something like that. This is a person who these tests put one on notice that this needs to be further, this needs to be examined further. And a psychologist is, testing by psychologist is necessary for that purpose.
>
> Again, Your Honor, I have no problem with a reasonable cap, and if, with provisos for application to this Court to exceed if it, if it becomes appropriate.

I anticipate that our mitigation specialist, who again, as I said, is on salary at the Public Defender Commission and this will not need, we wouldn't need a specific authorization, would be able to do a lot of the, of the investigation for the associated matters.

In other words, retardation as contemplated by Atkins v. Virginia is not, is not merely, it is not merely of, oh, he scored this on a test. You look at all sorts of history and adaptive behavior. You look at all sorts of school records and whatever, whatever other records may exist or may be available or may be accessible in order to get the best possible result and best possible analysis. And there are— Frankly, I don't know how it's going to come out. . . .

If this is not looked at appropriately by this Court, then that is, then it's going to be looked at by the federal courts, cause someone's going to end up having to look at it because of the, because of the Atkins decision. So we either do it here or it's done in Little Rock down the road. But it's going to be— It's going to end up being done because Atkins is the law. So— So we have, we have that issue. We have that issue here.

Rule 37 Record, Vol. 3, 553–55.

The circuit court authorized $7500. In a subsequent request for additional funds, Isom stated that he would likely file an amended petition. At the related hearing, Rosenzweig seemingly referred to the intellectual disability claim through the lens of attorney ineffectiveness, arguing additional funds were necessary, in part, to "determine whether . . . everything appropriate from a mental health standpoint was introduced at . . . trial" because "[i]f not, that's an aspect of ineffectiveness." Rule 37 Record, Vol. 3, 592. He said funding was necessary to retain Dr. Bob Gale, a psychiatrist.[12] The circuit court authorized an additional $16,000. Isom did not file an amended petition, and an evidentiary hearing was held in November 2007.

---

[12] In a declaration attached to the motion to recall the post-conviction mandate, Jeff Rosenzweig attested that Dr. Gale interviewed Isom at the prison, but his (Rosenzweig's) recollection was that Dr. Gale did not conduct formal testing. Appellant's Brief On Motion To Recall The Mandate (Exhibit 2) (December 2, 2013).

At the beginning of the evidentiary hearing, Isom withdrew the "mental retardation claim."[13]  Rule 37 Record, Vol. 3, 598.

> After a full investigation of it, I told Mr. Deen [the prosecuting attorney] that we would be abandoning that claim and we would formally do so on the record.  So we are not going to assert that Mr. Isom is mentally retarded within the, within the parameters set forth in *Atkins versus Virginia* and in the Arkansas state mental retardation statute.  So we would formally abandon that claim.

*Id.*  Isom then abandoned a second claim—trial counsel's ineffectiveness for not obtaining a mitochondrial DNA test on the rape kit evidence.

Based on this Court's review of the entire Rule 37 record, Isom sought and received authorization of funding to investigate a standalone *Atkins* claim; he abandoned the claim after investigation results did not support an intellectual disability.  Rosenzweig on behalf of Isom recognized that *Atkins* had not been decided at the time of Isom's trial.  He argued *Atkins* required the circuit court to consider whether Isom was constitutionally ineligible for the death penalty based on intellectual disability.  He contended that, if the state court did not consider the constitutional claim, a federal *habeas* court would review the issue.  When Rosenzweig abandoned two claims before the Rule 37 hearing, he referred to the "mental retardation claim" and an

---

[13]Isom argued in his motion to recall the post-conviction mandate that Rosenzweig was ineffective for waiving the ineffectiveness claim related to intellectual disability.  The Arkansas Supreme Court considered whether Isom had presented evidence of an intellectual disability at trial and found no error supporting recall of the mandate:

> The record reflects that a forensic psychologist interviewed Isom at Rosenzweig's request.  Prior to trial, Isom underwent a mental evaluation at the state hospital and was interviewed by a forensic psychologist.  That evaluation placed Isom's IQ at 77 and concluded that Isom was competent to stand trial.  Moreover, Isom points to nothing in the record before this court to indicate that Isom was mentally retarded at the time of trial.  In addition, there was nothing in the record that would have required the trial court, or this court, to sua sponte order additional investigation.  *See e.g., Ward* [*v. State*], 2015 Ark. 62 (refusing to recall this court's mandate when the defendant had received the constitutionally mandated evaluation at the state hospital and there was no evidence that the state-hospital evaluation was inadequate and no evidence presented that an independent evaluation would have rendered a different result).

*Isom VI,* 2015 Ark. at *15–16 , 462 S.W.3d at 648.

ineffectiveness claim related to DNA testing.  Unlike with DNA testing, Rosenzweig did not frame the abandoned intellectual disability claim in terms of attorney ineffectiveness.

Isom did not fairly present the intellectual disability in state court and remedies there are no longer available.  Because the exhaustion requirement is not excused, the claim is technically exhausted and procedurally defaulted.  *O'Sullivan,* 526 U.S. at 848.  Because Isom has not demonstrated any cause to excuse procedural default, the claim is denied.  The Court also considers the claim under alternative merits analysis.

The United States Supreme Court has described the "three core elements" of the medical community's "generally accepted, uncontroversial intellectual-disability diagnostic definition":

> (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—*i.e.*, a score of roughly 70—adjusted for the standard error of measurement); (2) adaptive deficits (the inability to learn basic skills and adjust behavior  to changing circumstances); and (3) the onset of these deficits while still a minor.

*Moore v. Texas,* 581 U.S. 1, 7 (2017) (internal quotations omitted).

Under Arkansas law, the death penalty may not be imposed when the person has been diagnosed with an intellectual disability based on the statutory definition:

> (A) Significantly below-average general intellectual functioning accompanied by a significant deficit or impairment in adaptive functioning manifest in the developmental period, but no later than age eighteen (18) years of age; and
> (B) A deficit in adaptive behavior.[14]

Ark. Code Ann. § 5-4-618(a)(1).  As explained herein, the Arkansas Supreme Court interprets the state statute as concurrent with the federal constitutional right.  *Anderson,* 357 Ark. at 216, 163 S.W.3d at 354–55.  *See Sasser v. Hobbs,* 735 F.3d at 842.

---

[14] In 2019, the Arkansas General Assembly replaced "subaverage" with "below-average" to describe intellectual functioning.  2019 Ark. Acts 1035.

"[A]n IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the [intellectual disability] definition." *Atkins,* 536 U.S. at 309 n.5. "[W]here an IQ score is close to, but above, 70, courts must account for the test's standard error of measurement [(SEM)]." *Moore,* 581 U.S. at 3 (quotations omitted).    Both the United States Supreme Court and the Eighth Circuit have endorsed a five-point SEM. *Hall v. Florida,* 572 U.S. 701, 713–14 (1986); *Jackson v. Payne,* 9 F.4th 646, 654 (8th Cir. 2021).  The Eighth Circuit directs that courts should apply the +/- 5 SEM because an intellectual disability may be diagnosed in individuals with IQs between 70 and 75 and "significant deficits in adaptive behavior." *Jackson,* 9 F.4th at 653 (quotations omitted).  So when the low end of the IQ score range "falls at or below 70," courts must "move on to consider [the petitioner's] adaptive functioning." *Moore,* 581 U.S. at 14.  For an intellectual-disability diagnosis, the petitioner must demonstrate that the adaptive functioning deficits relate to intellectual impairment. *Id.* at 656.

Dr. Michael Simon, the Arkansas State Hospital supervising forensic psychologist, evaluated Isom in June 2001, six months after the attack on Burton and Lawson.  Dr. Simon found Isom was competent to stand trial, reporting his "verbalizations were logical, coherent, and goal-directed."  Trial Record, Vol. 2, 62.  Dr. Simon determined Isom was "well oriented and in good contact with reality. *Id.* Isom reported graduating from high school.  Testing showed Isom's IQ score was 77, which placed him in the "Borderline range of intelligence." *Id.*

Colvin testified at the Rule 37 hearing that he retained Dr. Bradley Diner, a psychiatrist, before trial to evaluate Isom primarily to develop mitigating circumstances.  Colvin stated that Dr. Diner did not prepare a written report to avoid the disclosure requirement "based on what I learned from it."  Rule 37 Record, Vol. 3, 573.  He said that, at the time, he knew the specific tests used by Dr. Diner but that he did not remember them at the time of the hearing.  He remembered wanting

to know Isom's IQ, so that he could use it in mitigation.  He testified that Dr. Diner's oral report did not support an intellectual disability defense.  He said that he had known Isom for years and "didn't have any evidence at all" of intellectual disability.  Rule 37 Record, Vol. 4, 663.

Colvin's penalty-phase strategy was that Isom was a "fine, upstanding friend."  Rule 37 Record, Vol. 4, 641.  Isom's sister, Nolan, testified that Isom was ten years older than she was.  She said Isom was a parental figure for her and "trie[d] to guide her in the right direction."  Trial Record, Vol. 16, 1591.  Nolan said that she respected Isom's opinion and sought his advice.  Isom's thirteen-year-old daughter, Samantha, testified that she looked to her father for advice and assistance, and that he helped her financially.  She said that she had visited Isom during his previous incarceration.  Isom's mother testified that Isom worked regularly, that he lived with her, and that she depended on him and her other son.  She said that Isom had not always lived with her and that he began working after graduating from high school.  She said that he parented his sisters and did car repairs and maintenance for her.  She said that she regularly visited Isom during his previous incarcerations.

Colvin also introduced and read to the jury the State Hospital mental evaluation report as evidence that Isom's IQ score fell in the borderline range of intelligence.  He introduced and read to the jury a letter from Kim Daniel, a partner in the concrete construction business that had employed Isom.  Daniel wrote that Isom was a dependable employee when he was available:

> Ken Isom would work for us during each period of time that he was not incarcerated going as far back as 1994.  This employment continued off and on up until approximately May of 1999.
>
> We continued to employ Ken in spite of his differences with the law for the reason that he was a good, trustworthy help that we could trust to show up for work and depend on to do a good job.

Trial Record, Vol. 19, 1754 (Defendant's Exhibit 3).

On alternative merits review, Isom has not demonstrated an intellectual-functioning deficit manifesting by the age of eighteen, as required by the intellectual-disability definition. *Moore*, 581 U.S. at  7; Ark. Code Ann. § 5-4-618(a).  Applying a +/- 5-point SEM to Isom's 77 IQ score assessed before trial, his score range is 72 to 82.  Because the lower end of the score range does not fall at or below 70, consideration of Isom's adaptive functioning is not warranted.  Other evidence, moreover, supports the conclusion that Isom is not intellectually disabled.  Isom's trial lawyer recognized there was no evidence of an intellectual disability based on his relationship with Isom over the years.  He testified that Dr. Diner's oral report would not have supported an intellectual disability diagnosis.  In the Rule 37 proceeding, Rosenzweig argued Isom may be ineligible for the death penalty under *Atkins*.  But, after a "full investigation," including Dr. Gale's prison interview, Rosenzweig abandoned the claim.  Rule 37 Record, Vol. 3, 598.

Isom argues a merits decision is premature and an evidentiary hearing is warranted based on three things:  (1) pretrial IQ score of 77, (2) 2011 IQ score of 74, and (3) allegations in the *habeas* petition that he was in special education classes, needed help with homework, lived with his mother into his thirties, and relied on his mother to manage his finances.  By separate motion, Isom seeks to expand the record with declarations from family members and teachers. *Docs. 189-1 through 189-11*.

Record expansion, including an evidentiary hearing, is denied. *Doc. 189.*  Either 28 U.S.C. § 2254(e)(2) bars record expansion because Isom did not diligently seek to raise the *Atkins* claim in state court or additional evidence would not assist the Court in deciding the claim.  Even if the proffered declarations are considered, the outcome is the same.

Isom's reliance on *Sasser*—in which the Eighth Circuit held IQ scores of 79 and 83 did not preclude a finding of intellectual disability—is unfounded.  735 F.3d at 839, 850.  The Circuit

103

recognized the *Sasser* petitioner's 79 IQ score was based on an outdated set of scoring norms and therefore should be reduced by four points to 75 ("Flynn Effect"), which fell in the 70-75 range. *Id.* at 839.  Isom makes no argument that the Flynn Effect is applicable to his 77 IQ score.

Based on review of the online state court docket, Isom attached to his motion to recall the post-conviction mandate the forensic neuropsychological report prepared by Dr. Garrett Andrews, a neuropsychologist.  Dr. Garrett reported that Isom's pre-stroke August 2011 testing reflected a 74 IQ, and that Isom's history was "highly suggestive of Intellectual Disability."  *Isom v. State,* No. 08-1386 (Ark. Dec. 2, 2013) (Exhibit 4).  And it is true that the United States Supreme Court has recognized that "analysis of multiple IQ scores jointly is a complicated endeavor," and that "each IQ score must be assessed using the SEM." [15]  *Hall,* 572 U.S. at 714.  But the 2011 test results are not part of the state court record, *Wooten,* 578 F.3d at 784, 786; Isom has not proffered or sought to expand the record with the report.  Isom has not demonstrated the intellectual functioning deficit required for a finding of intellectual disability to support an *Atkins* claim.

Even if this Court considers adaptive deficits, Isom's proffered declarations do not demonstrate the necessary deficits.  Several teachers remember Isom's below-average reading comprehension, but their recollections are mostly vague and affected by the passage of time.  Isom's mother stated that Isom lived with her when he was not in prison or with a girlfriend, that he gave her his paychecks when he was working, and that she cooked for Isom and paid his bills.  *Doc. 189-8.*  But Isom's employment history and living arrangements appear to have been affected by his frequent incarcerations rather than below-average intellectual functioning.

---

[15] The United States Supreme Court has granted *certiorari* to consider whether and how courts may consider the cumulative effect of multiple IQ scores in assessing an *Atkins* claim.  *Hamm v. Smith,* __ S. Ct. __, 2025 WL 1603602 (Mem.).

Based on review of the trial record, Isom, at age twenty-one, was convicted of seven counts of theft of property and one count of burglary in 1989.  He was sentenced to an aggregate term of eight years' imprisonment.  While on parole in 1991, he was convicted of theft of property and sentenced to fifteen years' imprisonment.[16]  In 1997, Isom, while on parole, committed three offenses, including second-degree battery, and was sentenced to an aggregate term of twelve months' imprisonment.  Isom reported to Dr. Simon in June 2001 that he had been "in and out of prison [since 1989] until 'flattening out his time in March 2001.'"  Trial Record, Vol. 2, 61.  He told Dr. Simon that he "typically returned to prison on parole violations" but was twice convicted on new charges.  *Id.*  Isom "estimated that he had spent about two-thirds of the last 12 years in prison." *Id.*

Claim 2 is denied.  The exhaustion requirement is not excused, and the claim is denied as procedurally defaulted.  The claim is also denied on the merits; Isom has not demonstrated that he has an intellectual disability making him ineligible for the death penalty.  Record expansion, including an evidentiary hearing, is denied. *Doc. 189.*  Even if the proffered papers are considered, the outcome is the same.

- **Judicial Bias Investigation.**  Isom contends his trial lawyer's work fell short of the constitutional standard when he did not seek recusal of the trial judge, the Honorable Sam Pope of the Drew County Circuit Court.  Judge Pope presided at trial, during post-conviction proceedings, and on state *habeas* and *coram nobis* review.  Isom says that his lawyer either knew or should have known that Judge Pope "developed significant animus" toward him when he (Judge Pope) was the Drew County Prosecuting Attorney. *Doc. 154 at 28.*  In a related due process claim, Isom says

---

[16] The Arkansas Court of Appeals affirmed the conviction and sentence. *Isom v. State,* CACR 92-397, 1993 WL 53560.

that he was denied a fair trial due to a biased judge.  These are Claims 4 and 5.7.  He does not extend his claims to the *coram nobis* proceeding.

In 1991 and 1992, then-prosecutor Pope prosecuted three cases against Isom for theft of property and burglary charges.  Isom was twice acquitted.  In the third case referenced herein, a jury found Isom guilty of theft of property, and he was sentenced to fifteen years' imprisonment.  A month after Isom was released on parole in 1994, then-prosecutor Pope met with Jack Gillean, the Governor's Executive Assistant for Criminal Justice, to express his concern that he did not receive the required legal notice before Isom's parole release.  Pope questioned whether Isom was properly paroled given his lengthy sentence and expressed his hope that Isom could be returned to prison.  Responding by letter, Gillean stated that, based on Isom's prison records and state law, Isom was parole eligible and properly paroled.

Isom argues that, because of then-prosecutor Pope's prosecution of cases against him and his "extraordinary actions" to rescind his parole, *Doc. 154 at 28,* there was a risk of actual bias  He says Judge Pope demonstrated bias during trial proceedings when he quashed prosecutor Spain's subpoena, granted only a limited continuance of the trial date, and made jury-related decisions that resulted in the seating of an all-white jury.  He says Judge Pope's denial of Rule 37 relief is further evidence of bias.  He says Judge Pope's *coram nobis* rulings–denying Isom's discovery request and interjecting during witness testimony, though not a basis for the *habeas* claim, also provide evidence of bias.

On review of the circuit court's denial of *coram nobis* relief, the Arkansas Supreme Court affirmed the denial of the recusal motion, holding Isom failed to demonstrate actual bias or the appearance of bias sufficient to require recusal in that proceeding.  *Isom VI,* 2018 Ark. 368, *18– 24, 563 S.W.3d at 545–48.  Isom acknowledged that a trial judge's previous prosecution of a

defendant did not require recusal. *Id.* at *20, 563 S.W.3d at 546 (citing *Irvin v. State,* 345 Ark. 541, 552–53, 49 S.W.3d 635, 642–43 (2001)). And the Supreme Court held then-prosecutor Pope's contacting the governor's office about Isom's parole eligibility was part of his ordinary duties. *Id.* at *22, 563 S.W.3d at 547. The Court held the trial judge's reference to sanctions in the discovery order was not warranted; but the reference did not require disqualification and the trial judge acted within his discretion in denying discovery. *Id.* at *23, 563 S.W.3d at 548. The Supreme Court held the trial judge's two interjections during witness testimony, though unnecessary, did not demonstrate bias either. *Id.* at *24, 563 S.W.3d at 548. This Court applies a presumption of correctness under 28 U.S.C. § 2254(e)(1) to any relevant state court factual determination.

The United States Supreme Court has not "required recusal as a matter of course when a judge has had prior involvement with a defendant in his role as a prosecutor," though "vigilance" is necessary "when trial judges peculiarly familiar with a party sit in judgment of themselves." *Isom v. Arkansas,* 140 S. Ct. 342, 343–44 (2019) (Mem) (Statement of Sotomayor, J., respecting the denial of *certiorari* in *Isom VI*). The objective inquiry is "whether the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania,* 579 U.S. 1, 8 (2016) (quotations omitted). Then-prosecutor Pope's fulfillment of his prosecutorial role related to Isom's prosecutions and parole release—over seven years before trial—did not "create[] a constitutionally intolerable probability of actual bias." *Caperton v. A.T. Massey Coal Col, Inc.,* 556 U.S. 868, 882 (2009). This is not a case like *Williams,* in which the United States Supreme Court held a state supreme court justice's failure to recuse from post-conviction review of a death penalty case presented an unconstitutional risk of bias due to the justice's "significant, personal involvement in a critical trial decision." 579 U.S. at 11. The justice

had been the prosecutor, who authorized the decision to seek the death penalty against the petitioner. *Id.* Isom argues Judge Pope was "more familiar and adverse to Isom," *Doc. 183 at 67,* than the justice was to the *Williams* petitioner. But he has not shown—"based on objective and reasonable perceptions"—that Judge Pope's prior professional connection to him posed a serious risk of actual bias. *Caperton,* 556 U.S. at 884. The Court has already rejected Claim 4 as procedurally defaulted, and now denies the claim on the merits.

The related ineffectiveness claim is not substantial. *Martinez,* 566 U.S. at 14. Isom relies on Justice Sotomayor's statement respecting the denial of *certiorari* in the *coram nobis* case that the allegations of bias are "complicated" because Isom did not raise the issue at trial or "for nearly 15 years thereafter during his postconviction proceedings." *Isom v. Arkansas,* 140 S. Ct. at 344. Isom, however, has not demonstrated his trial lawyers' work was outside "the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. He has not pointed to any available disqualifying evidence that the trial lawyer failed to discover or act on. He has not demonstrated that, if his lawyer had sought recusal of Judge Pope, there is a reasonable probability that the trial judge would have recused or been removed from the case. *Id.* at 694. Because Isom's procedural default of Claim 5.7 is not excused, the claim is denied.

- **Guilt-Phase Ineffectiveness.** Isom challenges his trial lawyers' guilt-phase work in Claims 5.3, 5.5, 5.9, 5.12, 5.13, and 5.15. He says his lawyers missed opportunities to impeach witnesses and failed to raise meritorious objections. He contends his lawyers' work was constitutionally ineffective when they did not argue Arkansas's capital murder statute is unconstitutional.

Isom first contends Bunch's work was professionally unreasonable when he missed opportunities to impeach Lawson's testimony. He contends Colvin acted professionally

unreasonable in asking the unprepared Bunch to assist at trial.  At the Rule 37 hearing, Bunch testified that he did not foresee assisting Colvin at trial and was "caught off guard" and "absolutely unprepared" when Colvin asked him on the morning of trial to sit at counsel's table.  Trial Record, Vol. 4, 683, 684.  He said that, after the prosecution completed Lawson's direct examination, Colvin asked him (Bunch) to cross-examine her.  Bunch testified that he was not aware that Colvin had sought before trial to suppress Lawson's photo identification of Isom and did not know Colvin's trial strategy.

Isom's argument based on Bunch's failure to impeach Lawson's in-court identification of Isom with the McKelvey report requires a closer look.  But none of Bunch's purported missteps clear the *Strickland* prejudice hurdle.  Isom has not demonstrated a reasonable probability that, with a better cross-examination of Lawson, the jury would not have found him guilty of capital murder.  The jury was aware of the McKelvey report because Colvin introduced it during Lieutenant Dement's testimony before calling Lawson to testify.  Jurors learned that Lawson took six minutes before identifying photo number three (Isom) as the assailant, that, after identifying Isom, she asked to look at the photo lineup again, and that she stated that "it's 1 or 3" and "#1's face is a little round shaped like that."  Trial Record, Vol. 19, 1752 (Defendant's Exhibit One). Because the ineffectiveness claim is not substantial, procedural default is not excused.  Claim 5.3 is denied.

Isom  next argues his trial lawyers' work was constitutionally deficient when they did not challenge the admission and reliability of forensic evidence—microscopic hair comparisons, blood splatter evidence, forensic pathology, and DNA analysis.  This is Claim 5.9.

Isom contends his trial lawyers unreasonably failed to seek exclusion of the microscopic hair analysis or conduct an adequate cross-examination based on the unreliability of the analysis

for identification purposes.  Lisa Channell, the State Crime Lab chief criminalist, testified that she examined the hair collected in Lawson's rape kit and compared it to known samples from Burton, Lawson, and Isom.  She described the examination process:

> We have about twenty to twenty-five microscopic characteristics of the hair that we look at.  And as I mentioned before, we have the body area and the race of the hair which we can determine.  And then we will look at the length and width and the color and the outside of the hair, which is called the cuticle.  We will see if the scales on the hair are permanent or if they are very close to the hair, if they are large or small.
>
> Then we'll look at the cortex of the hair, which is the middle part of the hair.  We'll look at the pigment granules.  We will see if there are any structures in that cortex that the pigment granules may be evenly dispersed throughout the hair or they may be clumped together throughout the hair.
>
> And then we'll look at the known sample of the hair from an individual and we will, again, look at those characteristics and we will do a side-by-side comparison.  We have what's called a comparison microscope, which has two stages on it.  So two places to place microscope slides.  And then it comes into one eyepiece, so when I'm looking at, into the microscope, half of my field of view is a question hair, half of my field of view is a known hair.  And then we will just make the determination if the hairs are microscopically similar or dissimilar.
>
> . . .  We divide the world into three races and that's Caucasian, Negroid, and Mongoloid.  And Mongoloid are all oriental people and American Indian people.  And these three categories have very distinctive hair characteristics.
>
> If you cut the hair, the cross-section of each of these three groups of people would have very distinct hair characteristics.

 Trial Record, Vol. 13, 1249–50.  Channell testified that the hair collected in Lawson's rape kit was a Negroid pubic hair "microscopically similar" to the known pubic hair sample from Isom.  Trial Record, Vol. 13, 1251.  She said that the hair did not match samples collected from Burton or Lawson.   Channell then explained the term, "microscopically similar":

> Like I said, there are about twenty to twenty-five characteristics of a hair.  There aren't enough characteristics in a hair for us to say by looking at it under the microscope this hair came from this particular person to the exclusion of all others.  But we can say this one has similar characteristics to this one.  And so that's what we mean when we say this hair is microscopically similar.    All of the

110

characteristics, the color, the internal structure had the same characteristics as the
known sample.

Trial Record, Vol. 13, 1252.  On cross-examination, Colvin asked Channell about the limitations
on microscopic hair analysis.  She acknowledged her report statement that "microscopic hair
analysis is not a basis for personal identification."  Trial Record, Vol. 13, 11256.  She explained
again that "the limiting number of microscopic characteristics lead us to say that we cannot look
under the microscope and say this hair came from this head or this person."  *Id.*  As Colvin
continued to emphasize the analysis limitations, Channell testified that she could not conclude
based on her analysis that the hair collected in the rape kit came from Isom.

Isom argues his trial lawyers' work was professionally unreasonable when they did not
seek a hearing and argue the microscopic hair analysis should be excluded as "unreliable and
irrelevant" under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579.  *Doc. 154 at 72.*  He
alternatively contends Colvin's cross-examination of Channell was professionally unreasonable
because he failed to expose the flaws and limitations of the hair analysis.  Isom relies on
*Williamson v. Reynolds*, 904 F. Supp. 1529, 1558 (E.D. Okla. 1995), abrogated on other grounds
by *Nguyen v. Reynolds,* 131 F.3d 1340 (10th Cir. 1997), in which an Oklahoma district court
determined expert testimony on microscopic hair analysis was scientifically unreliable and
therefore inadmissible under the *Daubert* standard.  Isom also points to *Strawhacker v. State,*
2016 Ark. 348, 500 S.W.3d 716, in which the Arkansas Supreme Court granted a writ of error
*coram nobis* based on the expert testimony of Michael Malone, an FBI supervisory special agent.
Malone had testified at the petitioner's trial about his microscopic hair comparison of a pubic hair
found on the petitioner's jeans and the victim's known sample.  After the trial, the Department of
Justice wrote the petitioner that Malone's testimony overstated the evidence in three ways that
"exceeded the limits of science":

> (1) testifying that the hair could be associated with a single person to the exclusion of all others; (2) assigning a statistical weight or probability that the hair originated from a particular source; (3) citing his past experience in the laboratory making positive hair identifications.

*Strawhacker,* 2016 Ark. at *4, 500 S.W.3d at 718.  *See also Pitts v. State,* 2016 Ark. 345, 501 S.W.3d 803 (companion case).

Isom has not demonstrated the trial lawyers' work was outside "the wide range of reasonable professional assistance."  *Strickland,* 466 U.S. at 689.  Colvin's cross-examination was thorough.  He emphasized the hair-analysis limitations and elicited testimony from Channell that she could not conclude that the hair sample from the rape kit belonged to Isom.  Isom, moreover, has provided no authority requiring Arkansas courts to exclude the hair analysis at the time of Isom's trial.  Because the ineffectiveness claim is not substantial, procedural default is not excused.  *Martinez,* 566 U.S. at 14.  This part of Claim 5.9 is denied.

Isom next argues his trial lawyers' work was constitutionally deficient when they did not challenge Agent Woodward's testimony describing the blood splatters at the crime scene.  Agent Woodward told the jury that, based on its pattern, the blood stain at the base of the bedroom closet door and nearby wall was caused by aspirated blood blown out by an injured person.  He said that, based on a different pattern on the same wall, there was cast-off blood from blood slinging off the weapon as it moved through the air after the first blow.  Isom says his lawyers failed to argue the testimony was inadmissible because Agent Woodward is not an expert in blood splatter analysis.  He alternately contends they should have challenged Woodward's testimony on cross-examination or retained a defense expert on bloodstain patterns.  He says the testimony was not relevant and only served to stir the passions of the jury with graphic descriptions of the crime.  Isom has not shown that, with exclusion or challenges of the blood splatter analysis, there is a reasonable probability that the jury would have reached a different verdict. *Strickland,* 466 U.S.

at 694.  The jury heard the crime details from Lawson and were aware of the repeated blows inflicted by Isom.  The ineffectiveness claim is not substantial, so procedural default is not excused.  *Martinez,* 566 U.S. at 14.  This part of Claim 5.9 fails.

Isom also contends his trial lawyers failed to thoroughly investigate the collection and chain of custody of the rape kit and did not seek meaningful review of the DNA testing by the Crime Lab.  He says they did not sufficiently challenge the inadequacies of DNA testing and analysis and did not adequately cross-examine the State Crime Lab forensic analyst Melissa Myhand.  He says his lawyers should have made more objections and given a better closing argument.

Before trial, Myhand prepared a State Crime Lab report based on comparison of a DNA profile extracted from the pubic hair root in Lawson's rape kit with known samples.  On Colvin's motion, the trial court directed the Crime Lab to release the necessary material for review of Myhand's methodology and analysis by Genetic Technologies, Inc., an independent lab retained by the defense.  Colvin testified at the Rule 37 hearing that Genetic Technologies conducted the review and gave him an oral report.  He said that, because the independent lab concluded that the State Crime Laboratory used the proper procedures and offered nothing helpful to the defense, he did not obtain a written report subject to disclosure to the prosecution under state criminal procedural rules.

Myhand testified at trial that she compared DNA segments from the rape kit hair to known samples from Lawson, Burton, and Isom.  She said only a partial DNA profile was available from the rape kit hair.  She said that Lawson and Burton were excluded as potential contributors, but that Isom's DNA profile was consistent with the DNA bands from the rape kit hair.  Myhand testified that there was a statistical probability of one in 57 million in the black population that a

person would have the same genetic markers as the DNA profile extracted from the rape kit evidence. She said that her statistical analysis reflected that the recovered hair provided only a partial DNA profile. She said that her analysis was peer-reviewed at the Crime Lab, and that the reviewer confirmed her results.

Isom alleged in his Rule 37 petition that his trial lawyers' work was constitutionally deficient because they did not retain an independent lab to conduct mitochondrial DNA testing. He obtained the trial court's authorization for funds to conduct retesting. Before the Rule 37 hearing, Isom abandoned the ineffectiveness claim, stating that the mitochondrial DNA testing "provided better numbers" but did not exclude Isom as the contributor of the rape kit evidence. Rule 37 Record, Vol. 3, 599. He informed the trial court that he could not demonstrate the prejudice element of an ineffectiveness claim.

Isom continued to seek state court relief based on DNA testing. In a petition for a writ of *habeas corpus* based on new scientific evidence and motion for DNA testing, Isom sought authorization for testing with a new procedure—the mini-STR (short tandem repeats)—capable of providing a more complete genetic profile of a partial DNA sample. The trial court granted the motion, and an independent lab, Bode Technology, conducted the DNA testing using the new technology. The mini-STR test did not exclude Isom as the contributor of the DNA profile developed from the rape kit hair; the results showed the likelihood of a person having the same DNA bands as those found in the rape kit hair was 1 in 580,000 for a non-relative. In a supplemental *habeas* petition, Isom sought an order directing that the DNA from the rape kit hair be compared to the DNA profiles of two cousins and purported suspects, Green and Avery. The trial court denied the *habeas* petition. The Arkansas Supreme Court affirmed, holding (1) the trial court's denial of additional testing was not fundamentally unfair, and (2) the state statute did

not require additional testing because the mini-STR test results "did not exclude [Isom] as the source of the DNA evidence and further testing of third parties would not conclusively eliminate him." *Isom II,* 2010 Ark. 496, *8, 372 S.W.3d at 814. *See* Ark. Code Ann. § 16-112-208(b) ("If the deoxyribonucleic acid (DNA) test results obtained under this subchapter are inconclusive, the court may order additional testing or deny further relief to the person who requested the testing.").

Based on the state court record, Isom has not demonstrated a reasonable probability that, with more work and different decisions by his trial lawyers, the jury would have rejected the DNA evidence or found him not guilty. *Strickland,* 466 U.S. at 694. No DNA test has excluded Isom as the contributor of the rape kit hair. Witnesses explained the chain of custody of the rape kit evidence; Myhand told the jury that a complete DNA profile was not available from the recovered hair. Because the ineffectiveness claim is not substantial, procedural default is not excused. *Martinez,* 566 U.S. at 14. This part of Claim 5.9 is denied.

Isom argues his trial lawyers failed to challenge the "unscientific and prejudicial inferences" made by Dr. Charles Kokes, who conducted Burton's autopsy. *Doc. 154 at 84–85.* He points to Dr. Kokes's testimony that Burton's multiple stab wounds in the left chest area indicated that, at the time that he received the wounds, Burton was no longer able to defend himself. Dr. Kokes explained that "[w]hen one is left in the condition where one can no longer move or try to ward off blows, that leaves the assailant able to inflict multiple, repetitive injuries to the same anatomic area." Trial Record, Vol. 13, 1314. He said that "the left front of the chest [was] typical for this phenomenon" because it was over the heart and "instinctively known" to be a "vital area." Trial Record, Vol. 13, 1314–15. Isom also points to Dr. Kokes's rating Burton's health at an eight on a scale of one to ten. He says that his trial lawyers failed to ensure an in-chambers conference was on the record and missed the objection to the admission of autopsy

115

photographs.  Isom has not shown the absence of objections was professionally unreasonable under the *Strickland* standard.  He has not demonstrated a reasonable probability that, absent Dr. Kokes's challenged testimony or the autopsy photographs, the jury would have reached a different verdict or sentence.  *Strickland,* 466 U.S. at 694.  The in-chambers conference was held after the trial lawyers asked to review the autopsy photographs; there was no objection following the conference.  The ineffectiveness claim is not substantial, so procedural default is not excused. *Martinez,* 566 U.S. at 14.  This part of Claim 5.9 is denied.

Isom contends his trial lawyers' work was constitutionally ineffective because they did not challenge the capital murder statute, Ark. Code Ann. § 5-1-101, as unconstitutional based on its overlap with the first-degree murder statute, Ark. Code Ann. § 5-1-102.  He correctly states that the Arkansas Supreme Court did not consider the constitutional challenge on direct appeal because the trial lawyers did not raise the argument at trial.  *Isom I,* 356 Ark. at 186, 148 S.W.3d at 277.  The Supreme Court, however, noted that "this issue has been raised and dismissed by this court numerous times."  *Id.* (citations omitted).  *See also Cox v. Norris,* 133 F.3d 565, 570–71 (1997).  Because the law is clear that a constitutional challenge would have been unsuccessful, the lack of an objection was not constitutionally deficient performance.  *Thai,* 412 F.3d at 978. The ineffectiveness claim is not substantial; procedural default therefore is not excused. *Martinez,* 566 U.S. at 14.  Claim 5.15 is denied.

Isom also argues Colvin made statements during the guilt phase that prejudiced his defense. He says Colvin should have done a better cross-examination of Collins and made more hearsay objections. These are Claims 5.5, 5.12, and 5.13  The ineffectiveness claims are not substantial. *Martinez,* 566 U.S. at 14.  Isom has not demonstrated a reasonable probability that, absent these

purported attorney errors, the jury would have found him not guilty of capital murder. *Strickland,* 466 U.S. at 694. Procedural default is not excused; the claims are denied.

- **Conflict Of Interest.** In Claim 7, Isom says Potts and Colvin had conflicts of interest adversely affecting his representation. He says Potts's representation of Green at the time of the scissors search prevented investigation of Green's knowledge of the murder weapon and limited Isom's argument in support of Spain's related subpoena. He says an assassination threat against Colvin created a conflict between Colvin's survival and vigorous advocacy. To the extent precedent related to conflict of interest is implicated, *Martinez-Trevino* applies. *Dansby,* 766 F.3d at 836–37. The Court assumes without deciding that Potts represented Isom at least during pretrial proceedings.

Because Isom did not raise this point at trial, he must demonstrate a substantial claim that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 345 (1980). To establish an adverse effect, Isom must show "the conflict caused the attorney's choice, not that the choice was prejudicial in any other way." *Covey v. United States*, 377 F.3d 903, 908 (8th Cir. 2004) (quotations omitted). He must "identify a plausible alternative defense strategy or tactic that [his] defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Plunk v. Hobbs*, 766 F.3d 760, 764 (8th Cir. 2014) (*en banc*) (quotations omitted). If Isom establishes an actual conflict of interest, a demonstration of *Strickland* prejudice is not required. *Cuyler*, 446 U.S. at 349–50.

As explained herein, Isom has not demonstrated that investigators found a fifth pair of scissors during the trailer search based on Green's tip. He has not shown an actual conflict

adversely affecting his trial lawyers' work.  *Cuyler,* 446 U.S. at 348.  The claim fares no better under a *Strickland* analysis; Isom has not demonstrated a substantial ineffectiveness claim related to the Green search.  *Martinez,* 566 U.S. at 14.  Isom's reference to a third-party allegation about Green is not sufficiently developed for *habeas* review.  Record expansion, moreover, is barred by 28 U.S.C. § 2254(e)(2).  Procedural default is not excused; this part of Claim 7 fails.

Isom also argues the threat against Colvin caused him to agree, or not object to, security measures at trial, which created a prejudicial atmosphere and impacted the jury's assessment of his dangerousness.  When security measures were discussed a pretrial hearing, the trial court asked if there had been threats against the victim's family, Isom, or his family.  Colvin responded that, when he stopped at a convenience store one morning, he was "advised that [he] was going to be assassinated.  He said that " we kind of laughed it off because I told them you have to be somebody important to be assassinated."  Trial Record, Vol. 4, 414.

After hearing from Colvin and the prosecution, the trial court determined that a metal detector would be used during trial and that a bailiff and one State Police officer would be posted at the courtroom's two doors.  Colvin reiterated his concern that "the jury not perceive that [the State Police officer's] there to protect the Court and court officials from Mr. Isom who has never shown any inclination to harm anybody."  Trial Record, Vol. 4, 416.  Isom has not shown an actual conflict adversely affecting his trial lawyers' work.  *Cuyler,* 446 U.S. at 348.  Nor has he demonstrated a substantial ineffectiveness claim under a *Strickland* analysis.  *Martinez,* 566 U.S. at 14.  Procedural default is not excused; the remainder of Claim 7 fails.

- **Impartial Jury.**  In the remainder of Claim 8, Isom raises additional arguments that he was denied a fair and impartial jury.  All these claims are procedurally defaulted.  The Court considers them, in the alternative, on the merits.  In Claim 8.10, Isom makes related procedurally

defaulted ineffectiveness claims.  These claims are considered under *Martinez-Trevino*.  As explained herein, record expansion with juror declarations is barred by 28 U.S.C. § 2254(e)(2).

Isom contends media coverage and community sentiment biased the jury.  He argues his trial lawyers' work was constitutionally deficient for not moving to change venue.  These are Claims 8.1 and 8.10.1.  Isom says there was extensive media coverage related to the case, including details of the crime, his criminal history, and trial coverage.  He says the county had a population of 18,723 in 2000, and Lawson and Burton were well-known.  He says the jury pool had too many connections to the victims and their families; he says too many prospective jurors had heard about the case.

To demonstrate ineffectiveness, Isom must show a reasonable probability that the trial court would have granted a venue motion.  *Johnson v. Leapley,* 982 F.2d 526 (Table), 1992 WL 389238, *1 (8th Cir. 1992) (unpublished and *per curiam*).  Under Arkansas law, trial courts may move a case to another county when "the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had in the county."  Ark. Code Ann. § 16-88-201.

*Voir dire* was thorough.  During general *voir dire*, the trial court asked prospective jurors if they knew anything about the case, knew or had contact with the parties or lawyers, or had a relationship with any trial witnesses.  The trial court excused those with relationships or experiences that would interfere with their ability to be impartial.  The trial court also asked prospective jurors if they had heard anything in the media about the case.  Some indicated that they had heard about the case, though the transcript does not provide the number.  All these prospective jurors responded that they had not formed an opinion about Isom's guilt or innocence based on the media exposure.  After the jurors were sworn, the trial court stressed to jurors the

need for "fairness and the appearance of fairness." Trial Record, Vol. 10, 950. The trial court instructed jurors that the case must be decided based only on the evidence presented in court and not based on evidence acquired from any other source. Based on this record, *voir dire* did not reveal prejudice preventing a fair trial in Drew County.

Isom has not demonstrated a reasonable probability that an impartial jury could not be seated or that the trial court would have granted a change of venue motion. *Strickland,* 466 U.S. at 694. Because the ineffectiveness claim is not substantial, procedural default is not excused. *Martinez,* 566 U.S. at 14. Claim 8.10.1 is denied. For the same reasons, Isom has not demonstrated that the jury relied on information outside the record in deciding his guilt and sentence. Claim 8.1. has been denied as procedurally defaulted and also fails on the merits.

In Claim 8.2, Isom contends the use of voter registration records for selecting jury panels ensures black citizens are underrepresented on Drew County juries. But he has not shown systematic exclusion. *Berghuis v. Smith,* 559 U.S. 314, 332 (2010). Systematic exclusion is not established "merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Id.* (emphasis original). "Absent proof that certain racial or ethnic groups face obstacles in the voter registration process," the use of voter registration lists to select jury pools does not show systematic exclusion. *United States v. Sanchez*, 156 F.3d 875, 879 (8th Cir. 1998). *See also United States v. Erickson,* 999 F.3d 622, 627–28 (8th Cir. 2021). "Evidence of a discrepancy on a single venire panel cannot demonstrate systematic exclusion." *Singleton v. Lockhart*, 871 F.2d 1395, 1399 (8th Cir. 1989). Claim 8.2 also fails on the merits. For the same reasons, Isom has not demonstrated that his trial lawyer's work was constitutionally deficient for not raising a fair cross-section challenge. Claim 8.10.2 is not substantial, so procedural default is not excused. *Martinez,* 566 U.S. at 14. The ineffectiveness claim is denied.

Isom alleges the jury's exposure to heightened security presence in the courtroom and to rumors of death threats influenced the verdict and sentence and deprived him of a fair trial. This is Claim 8.3. A bailiff and state trooper were at the two courtroom entrances. Isom says that three more uniformed officers were at the trial, and that there was a "large security presence" on the last day of the trial, *Doc. 154 at 135.* He argues the security presence made believable false rumors— known to jurors—that the jurors would be killed by a gang member if Isom was found guilty or sentenced to death.

In a proffered declaration, the jury foreman attests that, after the trial started, he heard rumors about jurors being killed by gang members if there was a guilty verdict. *Doc. 189-18.* The foreman states that he was scared but "assured the jury" that gangs were "not that big of a problem" in Monticello and that "the gang problem was blown out of proportion." *Id.* The foreman attests that he was "shocked" to see thirteen to fifteen state troopers in the courtroom when the trial court announced the death sentence. *Id.* In two other proffered declarations, jurors refer to "a lot of security" at trial and an increased police presence on the last day of the trial. *Docs. 189-13 & 189-16.* None of these jurors, however, state that any juror was influenced by outside influences. Even if the proffered declarations are considered, Isom has not demonstrated that he was denied a fair trial. Claim 8.3 is also denied on the merits.

In Claim 8.5, Isom argues that he was visible to jurors when he was shackled as he walked down the sidewalk from the jail to the courthouse. But he does not claim that any jurors actually saw him. Isom has not developed any argument that jurors were influenced by exposure to shackling. Claim 8.5 is alternatively denied on the merits. The related ineffectiveness claims (Claims 5.10 and 5.11) fare no better. Isom says his trial lawyers missed objections to his transportation arrangements and the excessive security at trial. But he has not demonstrated that

jurors were influenced by the security measures. Because Isom has not shown *Strickland* prejudice, the claims are not substantial. *Maritnez,* 566 U.S. at 14. Procedural default is not excused, the claims are denied.

Isom next says four jurors did not disclose connections to the case. He says Juror Sharon Warren worked with his aunt; he says two jurors—Bobby Smith, Jr., and Jason Savage—were in the same bowling league as Burton. Isom says that, when Juror Connie Rash disclosed during *voir dire* that she had been represented by the prosecutor, she did not state the type of case. Isom proffers declarations from Savage and Smith. Juror Savage attested that he had seen Burton before but did not know him. *Doc. 189-17.* Juror Smith "knew Bill Burton vaguely" from when he and his wife had participated in a bowling league. *Doc. 189-18.* Neither Savage nor Smith stated that they were influenced by their brush with Burton. The alleged connections of Jurors Warren and Rash, without more, are not circumstances indicating bias. Even if the proffered juror declarations are considered, Isom has not demonstrated that a biased juror was seated. Claim 8.4 also fails on the merits.

Isom also contends denial of individual, sequestered *voir dire* prevented him from thoroughly questioning prospective jurors and exposed them to repeated references to the death penalty and the prejudicial sentiments of other prospective jurors. But he has not demonstrated denial of individual, sequestered *voir dire* resulted in a biased jury. He has not shown *voir dire* in mostly six-person panels was "so egregious" or "so taint[ed] the jury" that he was denied a fair trial. *Trujillo v. Sullivan,* 815 F.2d 597, 607 (10th Cir. 1987). For the same reasons, Isom has not demonstrated that his trial lawyer's argument for individual, sequestered *voir dire* fell below the constitutional standard. The ineffectiveness claim is not substantial; procedural default therefore is not excused. *Martinez,* 566 U.S. at 14. Isom also complains the trial court acted arbitrarily in

denying for-cause challenges thereby requiring peremptory strikes on unqualified jurors. But these stricken prospective jurors were "removed from the jury as effectively as if the trial court had excused [them] for cause." *Ross v. Oklahoma,* 487 U.S. 81, 85–86 (1988). The "loss of a peremptory challenge" does not violate the right to an impartial jury. *Id.* at 88. Apart from the procedural bar, Claims 8.6 and 8.9 fail on the merits. The ineffectiveness claim (Claim 8.10.3) is denied based on procedural default.

Isom also says Colvin committed constitutional error when he delegated *voir dire* responsibilities to Bunch, who was not prepared. But he has not shown that Bunch's work was inadequate. Because Isom has not demonstrated a substantial ineffectiveness claim, procedural default is not excused. *Martinez,* 566 U.S. at 14. Claim 8.10.4 is denied.

Isom says that his trial lawyers should have challenged unqualified jurors for cause or used peremptory strikes. Four of these jurors were seated. Juror Albert Melancon believed a person sentenced to life imprisonment was eligible for release. Jurors Rash and Mark Bowden thought the appeals process delays an execution. Juror Doug Grimmett was on the jury in the Knight murder case with many of the same trial participants. Isom has not demonstrated that his lawyers' decision not to seek excusal of these jurors or use a peremptory strike was professionally unreasonable under the *Strickland* standard. He has not shown any were biased against him. Claim 8.10.5 is not a substantial ineffectiveness claim, so procedural default is not excused. *Martinez,* 566 U.S. at 14. The claim fails.

Isom argues his trial lawyers should have objected to the trial court's "arbitrary" excusal of Sanders Bealer during general *voir dire. Doc. 154 at 163.* Bealer stood when the trial court asked if any prospective jurors had connections to the case. He stated that he and Isom had been "associated for years" and that Isom and his nephews were "all around" him. Trial Record, Vol.

6, 535.  When the trial court asked Bealer if he could be fair and impartial, Bealer stated that he "probably would lean [Isom's] way" because he knew him.  Trial Record, Vol. 6, 535–36.  He said that Isom was a friend and that his mind was "already set."  Trial Record, Vol. 6, 537.

Isom contends that Bealer's responses were similar to those from another prospective juror, Billie Handley, who indicated that she had a connection the case.  Handley initially stated that, based on knowing the Lawson family, she thought that she would "lean towards Ms. Lawson."  Trial Record, Vol. 5, 523.  After further questioning, Handley responded that knowing the Lawson family would not make her feel pressured to give the benefit of the doubt to the prosecution witnesses.  She said that she "would be fair" and explained that she was not "bosom buddies" with the family.  Trial Record, Vol. 5, 525.  She said that she stood up because she "just know[s] them and ha[s] read about them," but that she "wasn't sure really whether [she] was even supposed to stand up or not."  *Id*.  Though the trial court did not excuse Handley during general *voir dire,* she was not seated on the jury.  Under the *Strickland* standard, Isom has not demonstrated that his trial lawyers' work was constitutionally deficient for not objecting to Bealer's excusal.  Nor has he shown a reasonable probability that the trial lawyers' decisions resulted in the seating of a biased juror.  *Strickland,* 466 U.S. at 694.  Because the ineffectiveness claim is not substantial, procedural default is not excused.  *Martinez,* 566 U.S. at 14.  Claim 8.10.6 is denied.

Isom next argues that his trial lawyer's work was constitutionally ineffective when he did not request a curative instruction or move for exclusion of prospective jurors who were exposed to victim-impact evidence during *voir dire.*  This is Claim 8.10.9.  Responding to the trial lawyer's questioning, Juror Clubb stated that seeing disturbing photographs would not prevent her from showing mercy in the penalty phase.  She added that, while she was working at a physical therapy clinic, Lawson came in for treatment and her injuries were "horrible to see."  Trial Record, Vol. 7,

704. The trial lawyer's work was not constitutionally deficient. The lawyer was aware that jurors would be shown pictures of Lawson's injuries; his line of questioning was intended to reveal prospective jurors' concerns about viewing them. Clubb and two prospective jurors on the panel were seated on the jury, but Clubb's comments were not impermissible victim-impact evidence. The trial lawyer's related work did not result in the seating of a biased juror. His performance did not fall below the constitutional standard; Isom has not shown resulting actual prejudice under the *Strickland* standard. Claim 8.10.9 is not a substantial ineffectiveness claim, *Martinez,* 566 U.S. at 14; the claim is denied as procedurally defaulted.

- **Ineffectiveness Related To Mitigation Evidence.** Isom contends his lead trial lawyer Colvin failed to investigate and present evidence of intergenerational poverty, childhood adversity, and mental impairments. He argues that, if the jury had heard this evidence during the penalty phase, there is a reasonable probability that he would not have been sentenced to death. He says that, if he had been screened by a qualified expert and undergone a neuropsychological battery, there is a reasonable probability that the jury would have found him guilty of first-degree murder. These are Claims 5.8 and 9.1.

Isom's guilt-phase argument is not substantial. *Martinez,* 566 U.S. at 14. He has not shown deficient performance or resulting prejudice under the *Strickland* standard. Claim 5.8 is procedurally defaulted; the claim is denied. Isom's penalty-phase arguments requires a closer look.

Isom initially raised a similar penalty-phase argument in the Rule 37 proceeding. By the time of the evidentiary hearing and post-hearing briefing, Isom, with new counsel, had a different argument: His trial lawyer missed more evidence that Isom was a hard worker, did work and favors for family members, was a talented athlete, and had an absentee father. The circuit court

rejected Isom's new argument, and the Arkansas Supreme Court affirmed, *Isom II*, 2010 Ark. 495, *5, 370 S.W.3d at 495.  The Supreme Court held that trial testimony about Isom's good qualities was more detailed than the proffered Rule 37 testimony, and that the proffered testimony would have been cumulative.  *Id.*  The Court determined Isom had not rebutted the presumption that the trial lawyer's penalty-phase work "fell within the wide range of reasonable professional assistance."  *Id.*

On *habeas* review, Isom expands on his abandoned post-conviction argument based on childhood adversity and impairments.  The factual basis of his claim "fundamentally alter[s]" the argument considered by the Arkansas Supreme Court, so the claim is procedurally defaulted. *Vasquez,* 474 U.S. at 260.  *Martinez-Trevino* applies.  This Court's review is limited to the state court record.  *Shinn,* 596 U.S. 366; 28 U.S.C. § 2254(e)(2).

Colvin's penalty-phase strategy was that Isom was a good employee and loving family member.  As explained herein, three family members testified that they relied on Isom.  A jailer testified that Isom has not caused problems while he has been detained, that he directed other detainees to follow the jail rules, and that he had alerted her when two detainees cut themselves. Colvin also introduced into evidence the employer's letter and the State Hospital forensic evaluation report.

Isom contends evidence of his life circumstances and impairments would have been more compelling than the "good guy" evidence presented at trial.  He relies, in part, on his 74 IQ score from 2011 not available on *habeas* review.  He argues his lawyer should have interviewed more witnesses, collected more material, retained an appropriate neuropsychological examiner, and sought another IQ test.  He says that, with an adequate investigation, the trial lawyer would have discovered that his family was poor, that he was neglected and abused as a child, and that he

struggled with addiction after being exposed to drugs and alcohol at a young age. Isom also contends his lawyer failed to use readily available evidence of his difficulties in school, his failure to live independently, and his trouble with complex tasks. He says that, with more testing and a complete psychosocial history, he would have been diagnosed with an intellectual disability, organic brain dysfunction, and the developmental effects of childhood adversity. He says his trial lawyer should have investigated his early exposure to toxins and possible traumatic brain injuries.

Colvin had a long history with Isom. When Colvin was a prosecutor, he prosecuted Isom on forgery charges in the late 1980s and early 1990s; he had also represented Isom in criminal cases. Colvin had a good relationship with Isom and believed that he was a "really nice guy." Rule 37 Record, Vol. 4, 663. The State Hospital evaluation, finding Isom had a 77 IQ, was completed early in the case.

Colvin was assisted in the mitigation investigation by investigator Williams. He said that he and Williams "couldn't find anything, though, that would help us." Rule 37 Record, Vol. 4, 638–39. Colvin recalled talking to Isom's mother and siblings but could not remember if he talked to other family members. He said that he interviewed Isom's high school football coach but decided that he would not be a good witness. He suspected substance abuse but did not think that evidence would be helpful either. Colvin considered using evidence of an emotional disturbance to explain the crimes, and he consulted Dr. Diner. But Dr. Diner's oral report did not support an intellectual disability diagnosis and was not helpful to the mitigation case. Explaining his incomplete recollections, Colvin testified that he had "about seven of these that have gone to trial since then" and "[t]hey all kind of run together after a while." Trial Record, Vol. 4, 639.

The mitigation case presented at trial had some pull. At least one juror found four related mitigating circumstances: (1) Isom, while confined in the Drew County Detention Facility and

awaiting trial, alerted and notified proper jail officials on at least one occasion of suicide attempts by other detainees; (2) Isom can be a productive member of society; (3) he has a "borderline intelligence" mental level of functioning; and (4) he participated in school activities and sports while attending school in Monticello, Arkansas.  Trial Record, Vol. 2, 193.

Perhaps a different penalty-phase strategy would have been more compelling.  But courts must avoid "the distorting effects of hindsight" and consider the trial lawyer's work from his perspective at the time.  *Strickland,* 466 U.S. at 689.  Though this lens and under the circumstances, Isom has not overcome the presumption that the trial lawyer's work was constitutionally adequate.  His related investigation and choices fell "within the wide range of reasonable professional assistance."  *Strickland,* 466 U.S. at 689.  There is not a reasonable probability, moreover, that, with evidence of childhood adversity and greater mental impairment, the jury would have chosen a life sentence.  *Strickland,* 466 U.S. at 694.  For the reasons explained in connection with the intellectual disability claim, even if the proffered declarations are considered, the outcome is the same.  Because Isom's ineffectiveness claim is not substantial, procedural default is not excused.  *Martinez,* 566 U.S. at 14.  Claim 9.1 is denied.

- **Penalty-Phase Ineffectiveness—Remaining Claims.**  Isom argues his trial lawyer failed to challenge two victim-impact statements and missed an objection to the bifurcated sentencing procedure.  He contends Colvin made remarks in the penalty-phase capital-murder closing that fell below the constitutional performance standard.  These are Claims 9.2, 9.3, and 9.4.  In related Claim 10.5, Isom contends the trial court violated his right to due process and a fair trial by permitting introduction of the two victim-impact statements.

After jury selection, Isom invoked the witness-sequestration rule and the trial court excluded witnesses from the courtroom.  Two Burton family members withdrew as victim-impact

witnesses and were present during the trial.  Isom argues his trial lawyer's work was constitutionally deficient when they did not object to these two witnesses reading their victim-impact statements to the jury.  But he has not shown a reasonable probability that, absent the victim-impact testimony, his sentence would have been different.  *Strickland,* 466 U.S. at 694. Because Claim 9.2 is not a substantial ineffectiveness claim, procedural default is not excused, *Martinez,* 566 U.S. at 14; the claim is denied.  The related trial-error claim fares no better.  It is true that witness exclusion is mandatory when requested by either party.  *Lard v. State,* 2014 Ark. 1, 23–24, 431 S.W.3d 249, 266–67.  But Isom has not demonstrated that any error "had substantial and injurious effect or influence" on the verdict or sentence.  *Brecht,* 507 U.S. at 637–38.   Claim 10.5 is procedurally defaulted and fails here under merits analysis.

In Claim 9.3, Isom says his trial lawyer acted professionally unreasonable when he did not object to the bifurcation of the penalty phase—with the capital-murder conviction presented first. He argues that, if the jury had been aware of the sentencing ranges for his non-capital convictions when considering whether to impose the death penalty, there is a reasonable likelihood that it would have chosen a life sentence for the capital murder conviction.  He says that, after voting for the death penalty, the jury "thought nothing" of imposing the maximum sentence on the remaining convictions. *Doc. 154 at 197.*   Isom correctly notes the Arkansas statutory scheme provides only for bifurcation of the guilt and sentencing phases.  *Hill v. State,* 275 Ark. 71, 87, 628 S.W.2d 284, 292 (1982).  But he has not cleared the *Strickland* prejudice hurdle.  He has not demonstrated a reasonable probability that, absent bifurcation of the penalty phase, the trial outcome would have been different.  *Strickland,* 466 U.S. at 694.  Because Claim 9.3 is not a substantial ineffectiveness claim, it is denied based on procedural default.  *Martinez,* 566 U.S. at 14.

Isom next contends Colvin was advocating in favor of the death penalty in his penalty-phase capital-murder closing remarks:

> Things that you have a right to do in this democratic society is have a right to your own judgment. If you feel that Ken Isom should get the death penalty and no one else on this jury thinks he should, should get life without parole, you don't have to give that up just to make it a unanimous verdict. You have the right to stick to it. And in sticking to it, you have a right as a juror not to be harassed or intimidated, vilified or otherwise, to get you to join the other people who want to give him life without parole. So, please, if you have a judgment, or when you reach in your own mind judgment of punishment in this case, don't let somebody else talk you out of it simply so that you will have a unanimous verdict. You got that right.

Trial Record, Vol. 17, 1637. Isom also says his lawyer minimized his crimes and therefore alienated the jury by arguing that his case was not comparable to notorious crimes:

> . . . [I]s this case horrible enough to where it justifies us killing out citizens? Is it a Charles Manson case? Did we eat Mr. Burton? Did we push our car down the ramp with our little children in it to drown?

Trial Record, Vol 17, 1640. This is Claim 9.4.

The trial lawyer's argument urging jurors to "stick" to their penalty decision gives some pause. But, in light of his entire closing argument, the lawyer was not advocating for a death sentence. Under Arkansas law, a jury's decision to impose the death penalty must be unanimous. Ark. Code Ann. § 5-4-603(c). Colvin's point was that jurors should not yield to pressure from other jurors in reaching a sentencing decision. In any event, the trial lawyer's remarks did not make a difference in the sentence under the *Strickland* standard. To the extent Isom raises other remarks for the first time on reply, these arguments are not considered. Because Claim 9.4 is not substantial, procedural default is not excused. *Martinez,* 566 U.S. at 14. The claim is denied.

- **Trial Error.** Isom says the trial court's evidentiary decisions and first-degree murder instruction violated his constitutional rights. These are Claims 10.1, 10.2, and 10.4.

Trooper Dennis Roberts's testimony—he interviewed Burton's next-door neighbor Collins because "a name of a suspect had been developed prior to my arrival and I was told that the man who lived—in this house"—did not violate the Confrontation Clause.  Trial Record, Vol. 12, 1165–66.  The testimony was offered only to explain why Trooper Roberts interviewed Collins. *Williams v. Illinois,* 567 U.S. 50, 57 (2012) (citations omitted).  State Crime Lab chief criminalist Channell's testimony about the peer review of her microscopic hair analysis did not violate Isom's right to confront witnesses either.  Peer review of Channell's analysis was not testimonial.  *See United States v. Richardson,* 537 F.3d 951, 960 (8th Cir. 2008).  Isom's arguments that the testimony rendered his convictions unreliable and impermissibly inflamed the jury are also meritless.  Any alleged error, moreover, did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht,* 507 U.S. at 637–38.  There was no constitutional error based on laying a foundation for the rape kit evidence.  Claims 10.1 and 10.2 are procedurally defaulted and also denied on the merits.

Isom also contends the trial court gave an erroneous first-degree murder instruction that violated his right to due process and to a fair trial.  This is Claim 10.4.

The trial court instructed the jury on felony capital murder based on the underlying offenses of aggravated robbery and burglary—two of the enumerated felonies in the capital murder statute, Ark. Code Ann. § 5-10-101(a)(1)(A)(vi) and (vii).  The trial court then instructed the jury on first-degree felony murder based on the underlying offense of theft of property over the value of $500.  The first-degree murder instruction had been submitted by the prosecution; Isom stated that he had no objection.

Arkansas's first-degree felony murder statute does not enumerate the underlying felonies or exclude from consideration the felonies listed in the capital felony murder statute.  Ark. Code

Ann. § 5-10-102(a)(1)(A).  A first-degree felony murder instruction is required "when capital felony murder is charged 'because the same evidence used to prove [capital felony murder] of necessity proves' first degree felony murder."  *O'Rourke v. Endell,* 153 F.3d 560, 573 (quoting *Hill v. State,* 303 Ark. 462, 798 S.W.2d 65, 69 (1990)).

Isom contends that, because the evidence did not support a finding that he knowingly took the property of another person valued over $500, the jury could not find him guilty of first-degree felony murder and instead was "forced" to find him guilty of capital murder.  *Doc. 154 at 204.*  He says due process required a jury instruction on first-degree felony murder based on the same predicate felonies as capital felony murder.

Notwithstanding any constitutional error, Isom has not shown the error "had substantial and injurious effect or influence" on the verdict or sentence.  *Brecht,* 507 U.S. at 637–38.  The jury found beyond a reasonable doubt that Isom committed felony capital murder; the verdict was supported by compelling evidence.  The death sentence imposed by the jury provides further evidence that Isom was not prejudiced by the first-degree felony murder instruction.  If jurors had felt "forced" to find Isom guilty of capital felony murder because the first-degree felony murder instruction only referred to the underlying offense of theft, "they might easily have ameliorated that result by sentencing [Isom] to life in prison instead of death."  *See O'Rourke,* 153 F.3d at 573.  Under alternative merits analysis, Claim 10.4 is denied.

o  **Ineffectiveness of Appellate Counsel.**  Isom argues his direct-appeal lawyer failed to raise several meritorious points on appeal.  The claim is procedurally defaulted, and Isom has not demonstrated any excuse for the default.  Claim 12 is denied.

- ○ **Ineffectiveness of Post-Conviction Counsel.** Isom challenges his Rule 37 lawyers' work, but "[t]here is no constitutional right to an attorney in state post-conviction proceedings." *Coleman,* 501 U.S. at 752. Claim 13 is denied.

- ○ **Cumulative Error.** Isom's final argument is that his cumulative constitutional errors entitle him to *habeas* relief. But precedent requires that each claim "stand or fall on its own." *Scott v. Jones,* 915 F.3d 1188, 1191 (8th Cir. 1990). Claim 14 is denied.

- • **Actual Innocence.** Isom argues that his actual innocence is a standalone constitutional violation warranting *habeas* relief (Claim 1) and a gateway to considering procedurally defaulted claims. He challenges the sufficiency of the evidence and repeats many of his constitutional claims. Isom's arguments fall short of demonstrating actual innocence. Claim 1 is denied; procedural default is not excused.

Isom does not rely on evidence that "was not available at trial and could not have been discovered with due diligence." *Kidd v. Norman,* 651 F.3d 947, 951–54 (8th Cir. 2011). He has not demonstrated that, in light of new evidence, "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo,* 513 U.S. 298, 327 (1995). To the extent Isom contends the jury would not have imposed the death penalty if it had heard more mitigation evidence, his argument fails. Death penalty eligibility refers to the underlying guilty verdict and death-qualifying aggravators. *Wooten,* 578 F.3d at 781–82. And Isom has not shown by "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty." *Sawyer v. Whitley,* 505 U.S. 333, 336 (1992). He has not demonstrated actual innocence to overcome procedural default.

Even if a freestanding claim of actual innocence exists, the threshold for proving the claim is higher than the gateway standard for allowing consideration of procedurally defaulted claims.

*House v. Bell*, 547 U.S. 518, 554–55 (2006).    Because Isom has not satisfied the demanding gateway standard, Claim 1 is denied as a standalone claim.

*        *        *

Isom's motion for record expansion and an evidentiary hearing, *Doc.189,* is denied.  For the reasons stated, Isom's amended *habeas* petition, *Doc. 154,* fails and will be dismissed mostly with prejudice.  Claim 3 (competency to be executed based on post-trial disability) is dismissed without prejudice.  The Court finds a certificate of appealability is not warranted.

So Ordered this 10th day of September, 2025.

_____

James M. Moody, Jr.
United States District Judge

## APPENDIX

Claim 1.  Isom is actually innocent.

Claim 2.  Isom is intellectually disabled and therefore ineligible for the death penalty.

Claim 3.  Isom's execution is unconstitutional because he was further disabled by a 2012 stroke.

Claim 4.  Isom was denied a fair trial by a biased trial judge.

Claim 5.  Isom was denied effective assistance of counsel during the guilt phase.

>       5.1.  Failure to present an alibi defense

>       5.2.  Failure to challenge eyewitness testimony

>       5.3.  Failure  to thoroughly cross-examine Lawson

>       5.4.  Failure to challenge the testimony and in-court identification of Kenneth Ouelette

>       5.5.  Failure to impeach Alfred Collins

>       5.6.  Failure to investigate, discover, and present evidence of police misconduct

>       5.7.  Failure to protect Isom's right to be tried by a fair and impartial judge

>       5.8.  Failure to hire or effectively use an independent mental health expert

>       5.9.  Failure to subject the State's forensic evidence to meaningful adversarial testing

>       5.10. Failure to object or seek a mistrial based on Isom's shackling in jury's presence

>       5.11. Failure to object to excessive security

>       5.12. Failure to object to hearsay

>       5.13. Failure to object to prejudicial statements

>       5.14. Failure to object to prosecutorial misconduct

>       5.15. Failure to argue the capital murder statute is unconstitutional

Claim 6.  Isom was denied a fair trial due to prosecutorial misconduct.

>       1.1. Failure to disclose material exculpatory evidence and correct false testimony

A-1

1.2. Engagement in misconduct

Claim 7.  Trial lawyer had a conflict of interest.

Claim 8.  Isom was denied a trial by a fair and representative jury.

8.1. Pervasive community knowledge

8.2. Lack of fair cross-section

8.3. Threats of violence and a large security presence

8.4. Undisclosed relationships

8.5. Shackling

8.6. Denial of individual sequestered *voir dire*

8.7. Denial of opportunity to rehabilitate jurors

8.8. Racial discrimination in jury selection

8.8.1. Mass dismissal of Black prospective jurors

8.8.2. Discriminatory use of hardship excusals

8.8.3. Discriminatory use of peremptory challenges

8.9. Arbitrary treatment of cause challenges

8.10. Related ineffective-assistance-of-counsel claims

8.10.1. Failure to move for venue change

8.10.2. Failure to raise a fair cross-section challenge

8.10.3. Failure to adequately argue for individual sequestered *voir dire*

8.10.4. Delegation of *voir dire* to unprepared counsel

8.10.5. Failure to challenge unqualified or biased jurors

8.10.6 Failure to object to arbitrary and capricious adjudication of cause challenges

8.10.7. Failure to object to and make sufficient record of the systematic exclusion of Black prospective jurors

8.10.8. Failure to object to *voir dire* limitations

8.10.9. Failure to request a curative instruction or striking of prospective jurors exposed to victim-impact statements during *voir dire*

8.10.10. Failure to request a curative instruction or strike of prospective jurors exposed to the victim's wish for the death penalty

Claim 9.  Isom was denied effective assistance of counsel during the penalty phase.

9.1. Failure to investigate and present evidence of intergenerational poverty, childhood adversity, and mental impairments

9.2. Failure to challenge victim impact evidence

9.3. Failure to object to bifurcation

9.4. Failure to make a reasonable closing argument

9.5. Failure to object to prosecutorial misconduct

Claim 10. Isom's due process and fair trial rights were violated by trial errors.

10.1. Admission of hearsay

10.2. Admission of evidence without proper authentication

10.3.  Quashing of Frank Spain's subpoena

10.4. Erroneous first-degree murder instructions

10.5. Admission of improper victim impact testimony

10.6. Submission of avoid-arrest aggravator

Claim 11. Isom's prosecution and trial were tainted by impermissible considerations of race.

Claim 12. Isom was denied effective assistance on appeal.

Claim 13. Isom was denied effective assistance on state collateral review.

Claim 14.  Cumulative error analysis is required on *habeas* review.